QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  R. Brian Timmons (Bar No. 155916)
  briantimmons@quinnemanuel.com
  B. Dylan Proctor (Bar No. 219354)
  dylanproctor@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443 3000
Facsimile:    (213) 443-3100

SPERTUS, JOSEPHS & MINNICK, LLP
  Kevin J. Minnick (SBN 269620)
  kminnick@spertuslaw.com
  Samuel A. Josephs (SBN 284035)
  sjosephs@spertuslaw.com
617 West 7th Street, Suite 200
Los Angeles, California 90017
Telephone:  (213) 205-6520
Facsimile:    (213) 205-6521

*Attorneys for Defendants and
Counterclaim Plaintiffs The Madera
Group, LLC, Toca Madera Holdings,
LLC, Noble 33 Management, LLC and
Defendants Tosh Berman, Michael
Tanha, Mahdiar Karamooz, Noble 33
Enterprises, LLC, and Noble 33
Holdings, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MATTHEW SYKEN

        Plaintiff,

  vs.

TOSH BERMAN, MICHAEL TANHA,
MAHDIAR KARAMOOZ, THE
MADERA GROUP, LLC, TOCA
MADERA HOLDINGS, LLC, NOBLE
33 ENTERPRISES, LLC, NOBLE 33
MANAGEMENT, LLC, NOBLE 33
HOLDINGS, LLC, and DOES 1-10
inclusive,

        Defendants.

THE MADERA GROUP, LLC, TOCA
MADERA HOLDINGS, LLC, and
NOBLE 33 MANAGEMENT, LLC,

        Counterclaim Plaintiffs,

  vs.

MATTHEW SYKEN, JON ATABEK,
and ATABEK & CO.,

        Counterclaim Defendants.

Case No.

**THE MADERA GROUP, LLC,
TOCA MADERA HOLDINGS, LLC,
AND NOBLE 33 MANAGEMENT,
LLC'S COUNTERCLAIMS
AGAINST MATTHEW SYKEN,
JON ATABEK, AND ATABEK &
CO. FOR:**

**(1) VIOLATIONS OF THE DEFEND
TRADE SECRETS ACT
(2) BREACH OF FIDUCIARY DUTY
(3) AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY
(4) CONVERSION
(5) FRAUD
(6) BREACH OF CONTRACT –
EMBEZZLEMENT
(7) BREACH OF CONTRACT –
CONFIDENTIALITY
(8) BREACH OF CONFIDENCE
(9) AIDING AND ABETTING
BREACH OF CONFIDENCE**

Trial Date:      None Set

Defendants and Counterclaim Plaintiffs The Madera Group, LLC ("TMG"), Toca Madera Holdings, LLC ("TMH"), and Noble 33 Management, LLC ("Noble 33") allege the following counterclaims, based on personal knowledge as to their own actions, and otherwise on information and belief, against Counterclaim Defendants Matthew Syken ("Syken"), Jon Atabek and Atabek & Co. (together, "Atabek"), as follows:

## NATURE OF THE ACTION

1.    Syken served as the General Counsel and Chief Legal Officer of TMG and Noble 33, respectively, for years.  In those roles, Syken agreed to act in the companies' best interests, with an obligation not to seek personal profit at the expense of his employers (and clients).  He also agreed to keep confidential the information he received as the companies' in-house counsel.  Having taken on these obligations, TMG and Noble 33 trusted Syken with their most sensitive information and business strategies.  As a fiduciary, they trusted him to act in their best interest.

2.    Syken abused that trust to an astonishing, horrific degree.  While serving as its General Counsel, Syken defrauded TMG by surreptitiously putting personal expenses on his company-issued credit card and authorizing overpayments of his salary, bonuses, and allowances.  Syken used TMG's corporate credit card to buy first-class plane tickets for his family, to fund vacation expenses in Cabo, to pay amounts owed to his divorce attorney, and to consume elective medical treatments at an anti-aging clinic.  He also had TMG wire more than $100,000 to which he was not entitled to his law office.  When the Board of TMG discovered Syken's embezzlement, which amounted to approximately $250,000 in total, it terminated him and asked him to repay what he stole.

3.    But Syken refused to accept any responsibility for his blatant theft. Instead, Syken decided to retaliate against his former employers for having terminated him for cause.  Astoundingly, Syken started conspiring with his former

Counter-Complaint

clients' litigation adversaries—who Syken knew based on his role as General Counsel—in order to feed them confidential and privileged information he learned as TMG's and Noble 33's counsel.  And then, with the assistance of his attorneys at Atabek & Co., Syken proceeded to publicize his former clients' privileged and confidential information and trade secrets, not only disclosing that information publicly but grossly mischaracterizing it in order to cause TMG and Noble 33 maximum business harm.  This outrageous conduct violated the core duties that Syken owed to TMG and Noble 33 as their trusted counsel, including his statutory obligations of confidentiality, his fiduciary duty of loyalty to his clients, and his contractual promises—not to mention the requirements of the Defend Trade Secrets Act.

4.      In short, Syken betrayed his clients as their General Counsel by embezzling from one of them and then, after he got caught, disclosing their privileged and confidential information and trade secrets to the world, including their litigation adversaries, out of spite.  TMG, its affiliate TMH, and Noble 33 now bring these Counterclaims to recover the company funds that Syken embezzled, prevent further disclosures of their confidential and privileged information and trade secrets, and hold Syken and those acting in concert with him accountable for this outrageous misconduct.

## **PARTIES**

5.      Counterclaim Plaintiff TMG is a Nevada limited liability company with its principal place of business in Texas.  TMG is known and widely respected for its cultivation of the Toca Madera and Tocaya Organica restaurant groups.

6.      Counterclaim Plaintiff Noble 33 is a Nevada limited liability company with its principal place of business in Texas.  It leads the management and expansion of a number of acclaimed fine-dining and other hospitality concepts, including Toca Madera and Casa Madera restaurants.

Counter-Complaint

7.    Counterclaim Plaintiff TMH is a Nevada limited liability company with its principal place of business in California.  It is an affiliate of TMG.

8.    Counterclaim Defendant Syken is an individual residing, on information and belief, in Dallas, Texas.  He previously served as the General Counsel of TMG and Chief Legal Officer of Noble 33, acting as the sole in-house lawyer for each entity.

9.    Counterclaim Defendant Jon Atabek is an individual residing, on information and belief, in Newport Beach, California.  He is an attorney at the law firm Atabek & Co.

10.    Counterclaim Defendant Atabek & Co. is a law firm based in Newport Beach, California.

## JURISDICTION AND VENUE

11.    Counterclaim Plaintiffs assert these counterclaims under Rule 13 of the Federal Rules of Civil Procedure.

12.    This Court has personal jurisdiction over Syken because he filed this action in California and claims to reside in Orange County, California.  The Court has personal jurisdiction over Counterclaim Defendants Jon Atabek and Atabek & Co. because they are residents of Orange County, California.

13.    This Court has original subject matter jurisdiction over Syken's claims pursuant to 28 U.S.C. § 1331. This Court also has original subject matter jurisdiction over the First Counterclaim pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1338(a).

14.    The Court has supplemental subject matter jurisdiction over the remaining counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy as both the First Counterclaim and Syken's claims against the Counterclaim Plaintiffs.

Counter-Complaint

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these counterclaims occurred within this district.

## FACTUAL BACKGROUND
### TMG Is Founded To Reimagine Hospitality

16.     In 2013, Tosh Berman and Amrou Almanaseer founded TMG. After living in Mexico for six years, Berman took note of a major gap in the Los Angeles food market - a concept that embodied the true essence of Mexican cuisine, which is healthy, simple, and fresh.  To fill it, and to re-educate the public on the cuisine, TMG launched its first Toca Madera restaurant in 2014.  Boasting a modern and upscale organic aesthetic, Toca Madera quickly became a favorite destination for dining and craft cocktails.

17.     Building on that success, in 2016, TMG launched Tocaya Organica, a fresh-casual eatery that features organic produce, hormone-free meat and sustainable seafood with gluten-free, vegetarian and vegan options.

18.     In 2021, Berman and Michael ("Mikey") Tanha co-founded Noble 33, a hospitality and lifestyle company that leads the management and continued expansion of the Toca Madera and Casa Madera brands, while also developing new concepts.  Buoyed by the success of its projects to date, Noble 33 has attracted significant investment and now owns or manages seven successful, fine-dining restaurants nationwide, with further expansion underway.

### Syken Is Hired As TMG's General Counsel And Noble 33's Chief Legal Officer

19.     On December 1, 2019, TMG entered into an employment agreement with Syken.  Pursuant to that agreement, Syken would serve as TMG's General Counsel and Chief Compliance Officer reporting directly to TMG's President, CEO, and Board of Directors.  Syken agreed to "act in the best interest of the Company at

-5-

all times" and to "abide by all reasonable written policies and decisions made by the Company."

20.    In return, Syken was compensated generously.  He received an initial base salary of $241,000, was eligible for an incentive bonus of 25% of his salary, and received a 0.75% profits interest in TMG.  Syken also received a consulting bonus, an advance of his upcoming year's bonus, relocation expenses, health insurance benefits, reimbursement of attorney bar dues, and payments towards his smartphone plan and automobile.

21.    On September 10, 2021, TMG and Noble 33 entered into a Consulting Agreement pursuant to which Syken would also provide legal services to Noble 33, acting as Noble 33's General Counsel and Chief Legal Officer.   Noble 33 separately agreed to pay Syken an additional $36,000 in 2024 and $75,000 annually in 2025.

22.    Thereafter, TMG entered into an agreement with Tender Greens, a fast casual restaurant chain.  In connection with that transaction, Syken's base compensation from TMG increased to $300,000, plus other benefits.  He was also offered additional "special bonuses" depending on the performance of the business.

23.    Syken received this handsome compensation because he was TMG's and Noble 33's most senior (and only) in-house lawyer.  In that role, Syken was entrusted with managing all of TMG's and Noble 33's legal affairs, including contract negotiations and any pending litigations.

24.    At all times, Syken's relationship with TMG and Noble 33 was that of attorney and client.  Although Syken took on the title of President of TMG years later, in late 2023, the payments that TMG and Noble 33 made to Syken were solely for his role as legal counsel.  Indeed, Syken's payments were issued to the Law Offices of Matthew Syken.

25.    As an employee of TMG, Syken was permitted to submit for reimbursement "reasonable ordinary and necessary expenses" that he incurred "in

-6-

the performance of [his] duties and responsibilities" to TMG.  To ensure that the requirements for use of Company funds were clear, TMG created a Corporate Credit Card Policy and Procedures manual to guide credit card use.  In fact – ironically – *Syken*, as TMG's General Counsel, was responsible for preparing these Policies and Procedures.  TMG's Credit Card Policy states, in no uncertain terms, that unauthorized use of the corporate credit card includes "[p]ersonal or non-business expenses of any kind."  Further, "[a]ll purchases must be business related and no personal use of card is allowed," and the "original receipt" for legitimate business expenses must be submitted to the Finance/Accounting department.

26.    As the manual that Syken prepared goes on to explain, where it is "determined through diligent review that the cardholder used the card for personal use," the employee "may be asked to reimburse the Company" and "may also be terminated for cause."

### Syken Siphons Money Through Fraudulent Business Expenses

27.    Syken did not abide by his obligation to seek reimbursement for only legitimate business expenses.  Instead, he abused the Company's trust, expensing personal items on TMG's credit card, which were paid by TMH.

28.    In the summer of 2025, TMG's Board received notice of unpaid invoices from its outside counsel.  This led the Board to direct an investigation of the company's financial records, and this uncovered an outrageous pattern of theft by Syken through personal use of the corporate credit card.  For example, on May 11, 2023, Syken charged to the Company $7,000 in elective medical services received from Asandra MD, an "Anti-Aging Clinic" offering hair restoration, testosterone replacement therapy, Botox, light therapy, and other cosmetic services.  Less than two months later, he charged another $1,800 in elective medical services received from Asandra MD.  One month after that, he charged another $3,200 of elective medical services from Asandra MD.  In all, Syken expensed $18,435 in elective medical services to TMG.

Counter-Complaint

29.     Syken also expensed trips to the Aquarium and Disneyland, clothing from Patagonia, Target runs, Netflix fees, Apple App Store purchases, ice cream treats, and video games on the Company's credit card.  He charged airline travel for his family, car service rides, gas, groceries, and more.  Syken even charged thousands of dollars in personal legal fees incurred in connection with his divorce. Syken did not just inch past the line dividing legitimate business expenses from personal ones—he disregarded that distinction altogether, charging whatever he saw fit to his employer.

30.     Of course, Syken's self-dealing use of the corporate card for personal expenses was without permission.  TMG never agreed to reimburse Syken for elective medical procedures or divorce expenses or aquarium visits or for the many other personal expenses he incurred on the company credit card—which, when put together, totaled nearly $150,000.

### Syken Fraudulently Causes TMG To Overpay Himself

31.     Syken's embezzlement did not stop at credit card expenses.  He also abused his position of trust to cause TMG to send him money to which he was not entitled—in its payroll payments, in the calculation of bonuses, with respect to the accrual of paid time off, and in other ways.

32.     In 2023, Syken double-counted his accrued paid time off, resulting in overpayments of more than $24,000.  Syken had TMG pay an unauthorized special bonus to him, and also caused TMG to overpay his phone and car allowance and holiday pay.

33.     In 2024, Syken was even more brazen.  Although he was already entitled to a salary of $313,200, he paid himself an additional $43,600 on top of that generous amount.  And in 2025, he had TMG pay himself a $20,000 discretionary bonus, falsely stating that it had been approved by the Board when that was not true.

34.     Taken together, Syken abused his position of trust to have TMG send him more than $100,000 in wire transfers to which he had no right.  Syken had

Counter-Complaint

TMG send these unauthorized payments to the Law Offices of Matthew Syken attorney bank account, which also received his authorized salary and other pay.

35.   Together with his unauthorized use of the corporate credit card for personal items, Syken embezzled approximately $250,000 from TMG.  None of these unauthorized charges and payments were known to Syken's superiors at TMG or Noble 33 or authorized by any of them.

### TMG Terminates Syken Upon Learning Of His Embezzlement

36.   Upon learning of this egregious misconduct, the TMG Board took immediate action.  On September 8, 2025, the Board of Managers called a meeting pursuant to the procedures outlined in the Operating Agreement.  At that meeting, the Board unanimously voted that, effective September 9, 2025, Syken would be removed from his capacity as an officer of the Company and terminated as an employee.  The company provided Syken with written notice of his termination.

37.   The Board further determined that Syken would be afforded seven days following termination to repay the funds he stole.

38.   On September 9, 2025, TMG notified Noble 33 that Syken had been terminated and that TMG's Board had therefore determined to terminate the Noble 33 Consulting Agreement effective 30 days later.  This termination from Noble 33 became effective on or around October 9, 2025.

### Syken Responds To His Termination For Embezzlement By Conspiring With The Companies' Litigation Adversaries and Publicly Disclosing—And Mischaracterizing—Privileged and Confidential Information

39.   As an attorney for TMG and Noble 33, Syken owed, and continues to owe, a duty of confidentiality and secrecy to both companies.  This obligation is among the most important duties an attorney can have.

40.   Recognizing as much, the California Legislature long ago enacted Bus. & Prof. Code § 6068(e), which provides that "It is the duty of an attorney to do all of the following: … (e)(1) *To maintain inviolate the confidence, and at every*

1    ***peril to himself or herself to preserve the secrets, of his or her client*.**"  This

2    statutory requirement has been carried into California Rule of Professional Conduct

3    1.6 without alteration.

4          41.    Syken's duty of secrecy prohibited him from disclosing, at any point

5    in time, ***any*** information he obtained as a result of his lawyer-client relationship with

6    TMG and Noble 33, if such disclosure could be detrimental to either of them.  This

7    statutory obligation of secrecy is far broader, and applied even more strictly, than

8    the attorney-client privilege; it encompasses ***all*** the information related to Syken's

9    representation of the companies.  Of course Syken's legal work also was, and

10   remains, subject to the attorney-client privilege.  That privilege could only be

11   waived by TMG and Noble 33, not by Syken.

12         42.    In addition to this statutory obligation of secrecy, Syken also took

13   on strict confidentiality obligations in his employment agreements.  In his December

14   2019 employment agreement with TMG, Syken agreed not to disclose TMG's

15   confidential information, including customer data, projects, business plans, pricing

16   information, and financial data, except as necessary to fulfill his job duties.  Syken

17   also agreed to a broad confidentiality provision in connection with his consulting

18   work for Noble 33.

19         43.    Syken ignored his statutory, contractual, and fiduciary obligations.

20   In a misguided effort to obtain leverage, and out of spite, Syken started conspiring

21   with TMG's and Noble 33's litigation adversaries following his termination for

22   cause, and he went on to file reams of confidential and privileged company

23   information, including trade secrets, ***in the public record***—mischaracterizing that

24   information to suggest impropriety when, as Syken well knew, there was none.

25         44.    This outrageous conduct primarily relates to two subjects:  Noble

26   33's relationship with inKind, and its 2023 and 2024 Super Bowl events.

27         45.    In 2023, Noble 33 entered into a contract with inKind, an

28   independent company that operates a marketing and finance platform for restaurants

-10-

nationwide.  Noble 33 decided to join the inKind platform in order to drive foot traffic to its restaurants, turn more people into repeat, paying customers, and increase its liquidity.  As its Chief Legal Officer, Syken knew that Noble 33 was evaluating the inKind platform as a marketing program.  In fact, he participated in the Board meeting in which the inKind platform was addressed, he was involved in drafting the inKind agreement, and was responsible for signing off on it from a legal perspective.  At no point did Syken raise any objection to the execution and ratification of that agreement.

46.    After Noble 33 joined the inKind platform, Syken received regular updates regarding its performance and the resulting financials for both Noble 33 and the participating restaurants.  At that point, seeing that Noble 33's participation in the inKind platform was lucrative and beneficial for both Noble 33 (by increasing immediate liquidity) and its restaurants (by increasing customer activation), Syken voted to *increase* the amount of inKind funding.  Syken did not raise any concerns about any of these arrangements—that is, not until after he was terminated for cause.

47.    Syken also both knew of and approved the Super Bowl contracts that Noble 33 entered into with two specific restaurants, Toca Madera Scottsdale and Toca Madera Las Vegas.  In fact, Syken *signed* the contract between Noble 33 and Toca Madera Scottsdale on behalf of TMH.  Syken therefore knew that these arrangements were highly favorable to the restaurants:  Noble 33 guaranteed the restaurants more than double the revenue they had received on the same day the previous year.  Again, Syken did not raise any concerns about any of these arrangements until after he was terminated for cause.

48.    Nevertheless, following his termination, Syken decided to cast aside his obligations as an attorney by publicly disclosing, and mischaracterizing, his clients' privileged and confidential and trade secret information regarding these

Counter-Complaint

programs—information he obtained while acting as TMG's and Noble 33's General Counsel and Chief Legal Officer.

49.    On information and belief, upon his termination Syken started conspiring almost immediately with TMG's and Noble 33's litigation adversaries, in the very cases he had previously been overseeing as their in-house counsel.  As part of a misguided campaign of retribution, he has been providing those adversaries with confidential, attorney-client privileged and work product information (either directly or through his counsel, Atabek) for use in their own lawsuits against TMG and Noble 33.  He has also provided them with false information, hoping to goad them into further misguided litigation against TMG and Noble 33.  Syken's conduct in conspiring with his former clients' litigation adversaries is among the most egregious acts of disloyalty a lawyer could undertake.

50.    Further, acting through Atabek, Syken went on to ***repeatedly*** disclose TMG's and Noble 33's privileged and confidential information and trade secrets to the public.  These astounding, unlawful disclosures and publications were no accident.  Rather, Syken's publication of his clients' closely-guarded secrets was a deliberate tactic that Syken used to exact revenge and retribution, and to try to gain leverage, after they terminated him for his embezzlement.

51.    On September 23, 2025—about two weeks after he was terminated for cause—Syken sent Noble 33 a demand for books and records which made clear that he intended to engage in litigation against his former clients.  Accordingly, Noble 33's response, dated October 3, 2025, took care to "remind Mr. Syken of his ethical obligations to Noble 33," including his "duty of confidentiality under section 6068(e) of the Business and Professions Code and Rules 1.6, 1.9, and 1.13 of the California Rule of Professional Conduct."  Noble 33 concluded its response by specifying that "Noble 33 does not authorize Mr. Syken to reveal the Company's confidential information and does not waive any privilege."

-12-

52.    Ten days later on October 13, 2025, Syken notified Noble 33 and TMG that he would seek leave to file a counterclaim in a case pending in Clark County, Nevada, *The Madera Group, LLC, v. Breakwater Madera Holdings, LLC*, Case No. A-23-875298, which was one of the litigations Syken had managed as TMG's general counsel.  Recognizing that his roles with Noble 33 and TMG would implicate privileges, Syken included the following request in his notice: "We wanted to give each of you the opportunity to review the attached putative counterclaim subject to the joint defense agreement, in the event any of you have objections that any of the conversations referenced therein are privileged and should be removed from the draft.  If we do not hear back from you by end of business on Wednesday [October 15, 2025], we will go ahead and forward the same to opposing counsel with the intent of filing our motion by the end of the week."

53.    But the next day—***before*** Syken's arbitrary self-imposed two-day deadline arrived—Syken filed his state-court complaint disclosing information he knew to be privileged and confidential.  The contents of that complaint (which has been removed to this Court) are virtually identical to those in the proposed Nevada counterclaim.  ***Yet he filed the complaint publicly, in its entirety***.

54.    In doing so, Syken knowingly disclosed, in a public forum, a wealth of confidential and privileged information and internal trade secrets learned in the course of his representation of Noble 33 and TMG.  And he grossly mischaracterized that information in purporting to describe it.  On information and belief, Syken did all this in order to convey this confidential and privileged information to the parties suing TMG and Noble 33, in violation of his duties of undivided loyalty and secrecy to his clients.

55.    The California state court took immediate action to seal the complaint after it was publicized, pursuant to Noble 33's emergency request.  But even after the sealing of the unlawfully-disclosed confidential and privileged information, Syken took the position that further disclosures of the (now sealed)

-13-

information could be made so long as they took place outside of California. Doubling down on that view, and in direct violation of TMG's and Noble 33's express requests that the information be sealed from public view, Syken publicly filed proposed counterclaims in the Nevada action disclosing *more* trade secrets and privileged information relating to Syken's former clients.

56.    And then, demonstrating that these repeated public disclosures of trade secrets and privileged information were no mistake, Syken *tripled* down. On Friday, November 21, 2025, he lodged Syken's opposition to Noble 33's motion to permanently seal the complaint in this action, along with a new declaration. Those filings contained the same confidential and privileged information that the state court had previously sealed, and more. Accordingly, on Monday, November 24, 2025, counsel for Noble 33 emailed Syken's counsel, stating: "Because Mr. Syken's declaration repeats allegations that appear in the sealed complaint, we want to make sure your office will lodge the opposition papers conditionally under seal. Please confirm that is your plan." At 12:58 p.m. that day, Syken's counsel responded: "Once we understand what you contend is currently subject to that order, we can prepare a redacted public version and lodge the remaining material conditionally under seal."

57.    Nevertheless, despite representing that they would submit the materials under seal, Syken once again—for the third time—proceeded to publicly file (and mischaracterize) the TMG and Noble 33 privileged and confidential information and trade secret strategies as distorted in Syken's opposition brief and supporting declaration. The California state court granted *another* emergency request by Noble 33 to seal these filings, but once again this took place only after Syken's spurious allegations—which he made to cause maximum harm to his former clients—were made public.

58.    These unlawful public disclosures of TMG's and Noble 33's privileged and confidential information and trade secrets have caused harm. Syken

-14-

was entitled to file his spurious lawsuit if he wished, but he and Atabek had no right to publicize the privileged and confidential information and business trade secrets to which Syken gained access while working as TMG's and Noble 33's General Counsel and Chief Legal Officer. That deliberate course of conduct, which Syken persisted in despite sealing orders from the court and numerous warnings from TMG and Noble 33, is plainly unlawful.

### Noble 33's inKind and Super Bowl Deals Benefit All Stakeholders

59.     To set the record straight: there is nothing improper about Noble 33's agreement with inKind, the 2023 and 2024 Super Bowl events that Noble 33 sponsored, or anything else that Syken identifies. There were no misrepresentations or accounting shenanigans, and Noble 33 certainly did not use the inKind platform to "siphon" money from TMG. All of Syken's claims of impropriety are false, and he knows it—because he was personally involved in each of the programs and agreements at issue.

60.     Pursuant to the inKind program, Noble 33 sells credits to inKind that can be used at restaurants managed by Noble 33. In turn, inKind provides those credits to inKind's customers. Pursuant to its licensing arrangement with TMG, Noble 33 pays TMG a license fee based on the volume of sales at restaurants where Noble 33 uses TMG's brands. These two arrangements complement one another because Noble 33 pays TMG a licensing fee based on *all* sales at restaurants— whether those sales are paid for in cash or through inKind credits. The greater the sales at restaurants where Noble 33 uses TMG's brands, the greater the license fee that Noble 33 pays to TMG—including when customers pay with inKind credits.

61.     In this way, TMG benefits from Noble 33's participation in the inKind program. The entire purpose of the inKind platform is to increase sales at participating restaurants—and currently, more than 4,000 restaurants nationwide have signed up for inKind because its mission of increasing sales is successful. Noble 33's participation in the inKind platform has increased the sales at Noble 33's

Counter-Complaint

restaurants, and that, in turn, has increased the amount of the license fee that Noble 33 pays to TMG based on such sales.

62.    For similar reasons, Noble 33's participation in the inKind platform also benefits Noble 33's individual restaurants.  The inKind platform brings in new customers who often become repeat, paying customers, making it a vast improvement over the marketing programs that were previously more prevalent at Noble 33's restaurants.  Prior to joining inKind, Noble 33 attracted attention to its restaurants by offering free meals to social media influencers and other similar figures.  Those "freebies" cost restaurants just as much as—if not more than—the marketing expenses incurred in connection with the inKind platform, but with a much lower return on investment—because unlike the customers who purchase inKind credits, these "freebie" customers usually did not become paying customers later.

63.    Nor is it true that Syken was kept in the dark about these relationships.  As the Chief Legal Officer of Noble 33, Syken was personally charged with negotiating and finalizing the agreements between Noble 33 and inKind, and he was heavily involved in drafting the Credit Purchase Agreement that governed the relationship.  As the General Counsel of TMG, Syken also had a fiduciary obligation to act in TMG's best interest.  Yet despite hundreds of emails on the subject, Syken never once suggested to anyone at either Noble 33 or TMG that Noble 33's participation in the inKind platform was supposedly problematic— until he was terminated for cause for embezzlement.  Syken never, for example, reported to Amrou Almanaseer—a member of the Board of TMG who has no interest in Noble 33—that Noble 33 was supposedly using the inKind platform to the detriment of TMG.

64.    Syken's Super Bowl event allegations are just as spurious.  In the Nevada action, Syken has suggested that events sponsored by Noble 33 for the 2023 and 2024 Super Bowls were unfair to the Toca Madera restaurants that hosted them.

Counter-Complaint

But once again, Syken knows that is false because he was directly involved in negotiating these arrangements.

65. During the Super Bowl weekends in 2023 and 2024, Noble 33 hosted private events at Toca Madera Scottsdale (2023) and Toca Madera Las Vegas (2024). For each event, Noble 33 paid the restaurants a fixed fee for each day of the Super Bowl weekend. The amount of the fixed fee that Noble 33 paid the restaurants was determined by looking at trends to predict the restaurant's expected sales during the Super Bowl in the relevant year and then **doubling** that expected revenue. That is, Noble 33 offered a guaranteed payment of twice the revenues the restaurants would hope to get if they stayed open to the public. This generous payout ensured that the restaurants would profit from the Noble 33 sponsored event much more than they would in the absence of a private event. Syken was intimately involved in all relevant contracts for these events, and here too, he never once raised any purported concerns or complaints until after he was terminated for cause for embezzlement.

66. Attorneys, by virtue of their roles and positions of trust, take on heightened duties to their clients—the very highest fiduciary obligations a person can have. Syken horrifically violated his duties by embezzling from his employer extensively and then, once he got caught, publicly disclosing his clients' privileged and confidential information and trade secrets. This pattern of misconduct is unlawful, unethical, and offensive. The Court should hold Syken to account for his blatant abuse of trust.

## FIRST CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS

### (18 U.S.C. § 1836, *et seq*. - DEFEND TRADE SECRETS ACT)

### (By TMG and Noble 33 against all Counterclaim Defendants)

67. Counterclaim Plaintiffs incorporate herein each allegation above.

68.    TMG and Noble 33 own valuable trade secrets related to products and services used in interstate and foreign commerce, including the operation and management of restaurants nationwide.

69.    TMG's and Noble 33's trade secrets include customer data, business plans, pricing information, and financial data; proprietary licensing and management agreement structures, including fees and payment schedules, profit-sharing arrangements, methodologies for calculating such amounts, and ownership and revenue metrics used in those calculations; financial performance data and cost structures; and marketing strategies and programs.

70.    These trade secrets derive independent economic value from not being generally known to competitors, restaurant operators, investors, and other persons who could obtain economic value from their disclosure or use.  The trade secrets discussed herein give TMG and Noble 33 a competitive advantage, including over other restaurant groups that compete for the same facilities, customers, and more.

71.    TMG and Noble 33 took reasonable measures to maintain the secrecy of these trade secrets, including limiting access to those subject to confidentiality agreements and with legitimate business needs and securing this information with IT security infrastructure and other restrictions.

72.    Beginning soon after his September 9, 2025 termination for embezzlement, Syken made unauthorized use and disclosure of TMG's and Noble 33's trade secrets, including as part of a campaign to pressure his former clients for financial gain and out of spite.

73.    On October 14, 2025, Syken publicly filed his complaint in this action, disclosing trade secrets including Noble 33's licensing and management fee structures with TMG, specific revenue-sharing percentages that Noble 33 pays to TMG based on restaurant sales, how those percentages are calculated, the revenue metrics used in such calculations, the nature of Noble 33's relationship with the

restaurants it manages, and the structure of Noble 33's operations. Syken made these disclosures for the purpose of harming TMG and Noble 33 and despite having no legitimate purpose for doing so. Syken filed his complaint publicly despite knowing that it included a wealth of internal TMG and Noble 33 information (which he distorted and mischaracterized to cause maximum harm), including business trade secrets, other confidential information, and privileged attorney-client communications.

74. Thereafter, on October 21, 2025, Syken publicly filed proposed counterclaims in the Nevada action disclosing similar trade secret information, even though the California court had, by that point in time, granted Noble 33's emergency request to seal the same information as set forth in Syken's California complaint. He publicly filed this information notwithstanding his clients' explicit, written objection to such disclosure. After filing Syken's Nevada counterclaims, his attorney represented to the Nevada court that he had received no objection from "anyone" prior to the filing, when in fact he had received written objections from TMG and Noble 33 just five days earlier.

75. Then, on November 24, 2025, Syken publicly filed TMG's and Noble 33's trade secrets and other privileged and confidential information for the third time. He did so on the same day that Syken's attorney stated that he would lodge such information under seal. The California state court was forced to grant, and did grant, yet another emergency motion to seal Syken's filing.

76. Atabek actively facilitated and participated in the improper uses and disclosures of TMG's and Noble 33's trade secrets discussed herein. Like Syken, Atabek received numerous warnings from TMG and Noble 33 that Syken was not permitted to publicly disclose TMG's and Noble 33's confidential or privileged information, as well as court sealing orders. Yet like Syken, Atabek proceeded to publicize TMG's and Noble 33's trade secrets, repeatedly, despite knowing this was unauthorized.

77.    These publications of TMG's and Noble 33's trade secrets were unlawful and made without consent.  Notwithstanding 18 U.S.C. § 1833's requirement that trade secrets be filed "under seal" in litigation, Syken and Atabek chose to file TMG's and Noble 33's trade secrets publicly on repeated occasions in multiple forums, despite warnings not to do so and judicial sealing orders.  On information and belief, they also disclosed the trade secrets to TMG's and Noble 33's other litigation adversaries.  These unauthorized uses and disclosures of TMG's and Noble 33's trade secrets constitute misappropriation, including under 18 U.S.C. § 1839(5)(B)(ii)(II).

78.    This misappropriation was willful and malicious.  Syken and Atabek received multiple express warnings identifying Syken's confidentiality obligations, including Noble 33's October 3, 2025 letter reminding him of his ethical duties and stating that Noble 33 "does not authorize Mr. Syken to reveal the Company's confidential information and does not waive any privilege."  The California state court also intervened to seal Syken's complaint on an emergency basis.  But despite these numerous warnings and a court order, they went on to publicly disclose trade secrets through court filings at least two more times.  Remarkably, Syken disclosed these trade secrets in the very litigation matters that he had previously managed as TMG's and Noble 33's General Counsel and Chief Legal Officer, demonstrating his intent to use confidential information to harm his former clients.  As sophisticated attorneys, Syken and Atabek were fully aware of the confidentiality obligations these actions violated, yet they chose to violate them anyway.

79.    This pattern of conduct demonstrates actual misappropriation and threatened continuing misappropriation.  Since September 9, 2025, Syken and Atabek have publicly disclosed TMG's and Noble 33's trade secrets on several occasions, willfully disregarded a sealing order in California, and on information and belief provided trade secrets to Syken's former clients' litigation adversaries—the very parties that Syken previously opposed on behalf of TMG and Noble 33.

-20-

Counter-Complaint

This escalating pattern of misconduct creates a substantial likelihood of continuing misappropriation, disclosure, and misuse. As a direct and proximate result of this misappropriation, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief under 18 U.S.C. § 1836(b)(3)(A).

80.    This misappropriation has caused actual loss to TMG and Noble 33 in an amount to be proven at trial. Because the misappropriation was willful and malicious, TMG and Noble 33 are entitled to exemplary damages not exceeding twice actual damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

### (By TMG, TMH and Noble 33 against Syken)

81.    Counterclaim Plaintiffs incorporate herein each allegation above.

82.    As their General Counsel and Chief Legal Officer, Syken owed TMG and Noble 33 fiduciary duties of the highest order, including the duties of loyalty, care, and good faith and fair dealing. Those duties required Syken to act in the best interests of his clients, prevented Syken from putting his own personal interests ahead of those of his clients, prohibited Syken from disclosing internal client information he received as counsel to third parties, and of course prohibited Syken from embezzling from his clients.

83.    Syken willfully breached these duties. By fraudulently expensing personal purchases to TMG and siphoning funds, Syken violated his fiduciary obligations, including his duty of loyalty. Syken further breached his fiduciary duties by publicizing internal information he received from his clients, including privileged and confidential information, and by mischaracterizing that information to cause maximum harm. Syken further breached his fiduciary duties by conspiring

with his clients' litigation adversaries, using and disclosing internal information he received as counsel to cause harm.

84.     Syken's breach of his fiduciary duties caused harm to TMG and Noble 33 in an amount to be proven at trial.  In addition, as a direct and proximate result of Syken's breaches, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief.  TMG and Noble 33 are entitled to an injunction preventing Syken from further disclosing or using their confidential and privileged information.  Further, Syken's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

### THIRD CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (By TMG and Noble 33 against Atabek and Atabek & Co.)

85.     Counterclaim Plaintiffs incorporate herein each allegation above.

86.     Atabek knew that Syken owed fiduciary duties to TMG and Noble 33 and that Syken's public disclosures of his former clients' privileged and confidential information and secrets were in breach of that duty.

87.     Atabek actively participated in Syken's breach of fiduciary duty by publicly filing TMG's and Noble 33's privileged and confidential information and secrets, despite repeated warnings not to do so, even after the court ordered that the information be treated as confidential and kept under seal.

88.     Atabek had ample means available to represent Syken without aiding and abetting his breaches of fiduciary duty.  They had no need or right to publicize the privileged and confidential information and secrets of TMG and Noble 33 to which Syken gained access as their General Counsel and Chief Legal Officer. They could have filed Syken's complaints under seal, as TMG and Noble 33

Counter-Complaint

demanded, but chose instead to publicize TMG's and Noble 33's privileged and confidential information and secrets in a misguided effort to gain leverage.

89.     Atabek's conduct was a substantial factor in causing both irreparable and monetary harm to TMG and Noble 33.

90.     This conduct caused harm to TMG and Noble 33 in an amount to be proven at trial.  In addition, as a direct and proximate result of these violations, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief.  TMG and Noble 33 are entitled to an injunction preventing Atabek from further disclosing or using their confidential and privileged information or other secrets.  Further, Atabek's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

## FOURTH CAUSE OF ACTION
### CONVERSION
### (By TMG and TMH against Syken)

91.     Counterclaim Plaintiffs incorporate herein each allegation above.

92.     TMG and TMH have a superior property interest in the money they collect and distribute in connection with their business operations.

93.     Syken took without authorization and retains a specific and identifiable sum of money to which he is not entitled as a result of submitting fraudulent business expenses and having TMG wire him payments larger than those to which he was entitled.

94.     TMG and TMH have suffered damages as a result of Syken's conduct, including Syken's unjustified retention of money to which he is not entitled.  Syken's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

Counter-Complaint

# FIFTH CAUSE OF ACTION

## FRAUD

### (By TMG and TMH against Syken)

95.     Counterclaim Plaintiffs incorporate herein each allegation above.

96.     In putting transactions on his corporate credit card, Syken falsely represented that charges he incurred for personal reasons were legitimate business expenses.  Syken knew that these were not legitimate business expenses but nevertheless charged these personal expenses to his corporate credit card in order to induce reliance by TMG and TMH that he had, in fact, incurred these expenses for business reasons.

97.     TMG justifiably relied on Syken's representations that the expenses that he charged on the corporate credit card were legitimate business expenses in light of Syken's role as General Counsel and a trusted fiduciary.  TMH was responsible for paying TMG's expenses and, accordingly, paid for Syken's fraudulently billed expenses.

98.     Further, Syken intentionally deceived TMG by having TMG funds to which he had no entitlement paid to Syken's personal law firm account.  As to Syken's unauthorized bonus payment for 2025, Syken fraudulently represented to TMG personnel that TMG's Board had approved Syken's bonus, knowing that was false.  TMG's personnel reasonably relied on Syken's representations in light of his role as the company's General Counsel.

99.     As a result of Syken's fraudulent conduct, TMG has paid for transactions that were not incurred for the benefit of the company and wired Syken funds to which he had no right, causing TMG damages.  Syken's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

# SIXTH CAUSE OF ACTION

## BREACH OF CONTRACT -- EMBEZZLEMENT

### (By TMG and TMH against Syken)

100.  Counterclaim Plaintiffs incorporate herein each allegation above.

101.  On December 1, 2019, Syken entered into a valid and legally enforceable written contract for employment with TMG.  That contract provided that Syken could expense "reasonable ordinary and necessary expenses" that he incurred "in the performance of [his] duties and responsibilities" to the Company.

102.  TMG has performed all obligations required of it, except as such performance may have been excused or prevented.

103.  Syken materially breached his obligations to the Company by repeatedly, over a period of years, charging to the Company personal expenses he incurred outside the performance of his duties and responsibilities to TMG.  Charges incurred by TMG were paid by TMH.

104.  As a direct and proximate result of Syken's breach and misconduct, TMG and TMH have suffered substantial damages, including for the amounts Syken fraudulently expensed to the Company and overpayments he caused the Company to make to himself and the accrued interest thereon.

### SEVENTH CAUSE OF ACTION

### BREACH OF CONTRACT – CONFIDENTIALITY

### (By TMG and Noble 33 against Syken)

105.  Counterclaim Plaintiffs incorporate herein each allegation above.

106.  On December 1, 2019, Syken entered into a valid and legally enforceable written contract for employment with TMG stating that TMG's confidential information was "being provided and disclosed to Employee solely for use in connection with his employment by theCompany [sic]" and that Syken agreed he would "not make any use of Information for his or her own benefit or the benefit of any person or entity other than the Company."

Counter-Complaint

107.   On September 10, 2021, TMG entered into a valid and enforceable written agreement with Noble 33 whereby Syken would serve as a legal consultant for Noble 33.  Pursuant to that agreement, Syken, signing on behalf of TMG, agreed he would "not, during the Term or for the two (2) years subsequent to the Term, (i) use the Confidential Information for any purpose other than the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any party other than to its employees, directors, officers, legal counsel or agents" who have a need to know the information.  Syken further agreed that any breach of the confidentiality provision would entitle Noble 33 to injunctive relief.

108.   TMG and Noble 33 have performed all obligations required of them, except as such performance may have been excused or prevented.

109.   Syken materially breached his obligations to the Company by disclosing TMG's and Noble 33's confidential information publicly and to third parties.

110.   As a direct and proximate result of Syken's breach, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief.  Additionally, as a direct and proximate result of Syken's breach, TMG and Noble 33 have suffered substantial damages, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### BREACH OF CONFIDENCE

### (By TMG and Noble 33 against Syken)

111.   Counterclaim Plaintiffs incorporate herein each allegation above.

112.   As the General Counsel of TMG and Chief Legal Officer of Noble 33, Syken had a special relationship of trust that included a duty to maintain their confidential information in confidence, a duty that continued even after his employment relationship ceased.

113.   During his employment, Syken was provided with confidential business information for the purpose of seeking and obtaining privileged legal advice.  Syken knew that the information he received was confidential and that he was not to disclose the information to any third party absent authorization.

114.   Syken breached his duty of confidence as an attorney when he disclosed privileged and confidential and secret TMG and Noble 33 information to third parties and the public.

115.   As a result of Syken's breaches, TMG and Noble 33 have been harmed in an amount to be proven at trial.  Further, as a direct and proximate result of Syken's breaches, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief.  In addition, Syken's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

## NINTH CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF CONFIDENCE

### (By TMG and Noble 33 against Atabek and Atabek & Co.)

116.   Counterclaim Plaintiffs incorporate herein each allegation above.

117.   Atabek knew that Syken owed a duty of confidence to TMG and Noble 33 and that Syken's public disclosures of his former clients' privileged and confidential information and secrets were in breach of that duty.

118.   Atabek actively participated in Syken's breach of confidence by publicly filing TMG's and Noble 33's privileged and confidential information and secrets, despite repeated warnings not to do so, even after the court ordered that the information be treated as confidential and kept under seal.

119.   Atabek had ample means available to represent Syken without aiding and abetting his breaches of confidence.  They had no need or right to publicize the privileged and confidential information and secrets of TMG and Noble

Counter-Complaint

33 to which Syken gained access as their General Counsel and Chief Legal Officer. They could have filed Syken's complaints under seal, as TMG and Noble 33 demanded, but chose instead to publicize TMG's and Noble 33's privileged and confidential information and secrets in a misguided effort to gain leverage.

120.    Atabek and Atabek & Co.'s conduct was a substantial factor in causing both irreparable and monetary harm to TMG and Noble 33.

121.    This conduct caused harm to TMG and Noble 33 in an amount to be proven at trial.  In addition, as a direct and proximate result of these violations, TMG and Noble 33 have suffered and will continue to suffer irreparable harm, entitling them to injunctive relief.  TMG and Noble 33 are entitled to an injunction preventing Atabek from further disclosing or using their confidential and privileged information or other secrets.  Further, Atabek's conduct was willful, malicious, fraudulent, and oppressive, carried out with conscious disregard of TMG's and Noble 33's rights, thereby entitling them to punitive and exemplary damages pursuant to California Civil Code § 3294.

## **PRAYER FOR RELIEF**

Wherefore, TMG, TMH and Noble 33 request the following relief:

1.  Judgment in TMG, TMH, and Noble 33's favor on the claims alleged herein;

2.  An injunction preventing Syken and Atabek, and all others acting in concert with them, from disclosing TMG and Noble 33's internal information to third parties, including its privileged or confidential information, its trade secrets, or other information that is internal to TMG or Noble 33;

3.  Disgorgement of Syken's misappropriated funds in an amount to be proven at trial;

4.  Compensatory damages in an amount to be proven at trial;

5.  Punitive and exemplary damages in an amount to be proven at trial;

Counter-Complaint

6. Prejudgment interest;

7. Attorneys' fees and expenses; and

8. All other relief the Court deems just and proper.

## JURY DEMAND

TMG, TMH, and Noble 33 hereby demand a trial by jury on all claims so triable.

DATED:  December 5, 2025      Respectfully submitted,


By  */s/ R. Brian Timmons*

**QUINN EMANUEL URQUHART & SULLIVAN. LLP**
R. Brian Timmons, Esq.
B. Dylan Proctor, Esq.


**SPERTUS, JOSEPHS & MINNICK. LLP**
Kevin J. Minnick, Esq.
Samuel A. Josephs, Esq.

*Attorneys for Defendants and Counterclaim Plaintiffs The Madera Group, LLC, Toca Madera Holdings, LLC, Noble 33 Management, LLC and Defendants Tosh Berman, Michael Tanha, Mahdiar Karamooz, Noble 33 Enterprises, LLC, and Noble 33 Holdings, LLC*

Counter-Complaint