Jon A. Atabek, Esq. (SBN 269497)
  *(jatabek@atabekandco.com)*
Shirin Ehyaei, Esq. (SBN 356975)
  *(sehyaei@atabekandco.com)*
**ATABEK & CO.**
250 Newport Center Drive, Suite 306
Newport Beach, CA 92660
Telephone:  (949) 229-0953
Facsimile:   (213) 402-3413

Attorneys for Plaintiff
MATTHEW SYKEN

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW SYKEN, an individual, | Case No.: 2:25-CV-11622 |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR:** |
| v. | |
| TOSH BERMAN, MICHAEL TANHA, MAHDIAR KARAMOOZ, AMROU ALMANASEER, THE MADERA GROUP, LLC, TOCA MADERA HOLDINGS, LLC, NOBLE 33 ENTERPRISES, LLC, and DOES 1-10 inclusive, | 1. BREACH OF CONTRACT; |
| | 2. BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING; |
| Defendants. | 3. DISABILITY DISCRIMINATION IN VIOLATION OF FEHA (GOV. CODE § 12940(A)) |
| | 4. HARASSMENT IN VIOLATION OF FEHA (GOV. CODE § 12940(J)) |
| | 5. RETALIATION IN VIOLATION OF FEHA (GOV. CODE § 12940(H)) |
| | 6. FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, AND RETALIATION (GOV. CODE § 12940(K)) |
| | 7. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY |
| | 8. RETALIATION IN VIOLATION OF LABOR CODE § 1102.5 |
| | 9. FAILURE TO PAY WAGES (LAB. CODE §§ 201, 202, 204, 1194) |
| | 10. WAITING-TIME PENALTIES (LAB. CODE § 203) |
| | 11. FAILURE TO PROVIDE EXPENSE REIMBURSEMENTS (LAB. CODE § 2802) |
| | 12. VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200. |

1

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

13. CIVIL EXTORTION
14. DECLARATORY RELIEF
15. INJUNCTIVE RELIEF.

**JURY TRIAL DEMANDED**

 

 

 

 

 

**COMES NOW**, Plaintiff MATTHEW SYKEN ("Syken" or "Plaintiff"), by and through his counsel of record, and hereby respectfully submit this First Amended Complaint[1] against Defendants TOSH BERMAN ("Berman"), MICHAEL TANHA ("Tanha"), MAHDIAR KARAMOOZ ("Karamooz"), , THE MADERA GROUP, LLC ("TMG"), TOCA MADERA HOLDINGS, LLC ("TMH"); NOBLE 33 ENTERPRISES, LLC ("Noble 33"), AMROU ALMANASEER ("ALMANASEER"), and DOES 1-10, inclusive (collectively, "Defendants"), and allege as follows:

---

[1] Part of the purpose of this amendment is to remove all claims giving rise to federal questions. To the extent any claim arguable derives under federal law or federal question, Plaintiff expressly notes that such arguable or implied claim or right is not included as part of this First Amended Complaint.



2

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

## I.  NATURE OF THE ACTION

1.  Counterclaim Defendants Berman, Tanha, and Karamooz siphoned money away from TMG and various restaurant entities managed by Noble 33, in addition to various other schemes designed to line their own pockets. They did so through millions of dollars of advances taken by Noble 33, to the detriment of TMG and the underlying operating restaurant entities. Notably, large portions of that money was taken after a court in Nevada issued a preliminary injunction prohibiting Berman and Tanha from diverting money meant for TMG to themselves.

2.  Plaintiff was, until recently, the President of TMG and contract general counsel for Noble 33. After Syken returned from medical leave caused by a recent blood cancer diagnosis, he discovered Berman, Tanha, and Karamooz's scheme. As Syken began asking questions and demanding that action be taken to correct the issues, Berman and Tanha purported to terminate Syken on behalf of TMG. They did so, even though the Court's preliminary injunction order prohibited alterations to the company's preexisting and ongoing contracts.

3.  By this action, Syken seeks to recover from Counterclaim Defendants both for himself as an individual member, and on behalf of TMG. Syken also seeks his immediate reinstatement, in line with the Court's preliminary injunction order.

4.  Syken's employment agreement with TMG includes an arbitration provision. Syken has demanded Defendants participate in the selection of an arbitrator, but Defendants have failed to engage with Syken. Accordingly, Plaintiff files this action in the Superior Court, in part, to facilitate appropriate court orders, including an anticipated Motion to Compel Arbitration.

## II.  THE PARTIES

5.  Syken is, and at all relevant times herein was, an individual residing in Orange County, California. Plaintiff was the long-time President and General Counsel of The Madera Group, LLC. Plaintiff is also a founder of Noble 33 Enterprises, LLC and provided services pursuant to a joint services/consulting agreement to said company which the board of managers independently agreed to in 2021.

6.  Berman is an individual residing in Aspen, Colorado. Berman was, at all times relevant to this action, a member of the board of managers of both TMG and Noble 33. Berman

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

is, and at all times relevant was, a financially responsible person for each of TMG/TMH and Noble 33 pursuant to Labor Code, § 558.1.

7.    Tanha is an individual residing in Miami Beach, Florida. Tanha was, at all times relevant to this action, a member of the board of managers of both TMG and Noble 33. Tanha is, and at all times relevant was, a financially responsible person for each of TMG/TMH and Noble 33 pursuant to Labor Code, § 558.1.

8.    Karamooz is an individual residing in Texas. Karamooz was, at all times relevant to this action, the contract Chief Financial Officer ("CFO") of TMG/TMH and Noble 33. Karamooz is, and at all times relevant was, a financially responsible person for each of TMG/TMH and Noble 33 pursuant to Labor Code, § 558.1.

9.    Almanaseer is an individual residing in California. At all times relevant to this action, Almanaseer exercised significant control over the operations, finances, and managerial decision-making of TMG/TMH and Noble 33, including matters directly affecting Plaintiff's wages and working conditions. Almanaseer is, and at all relevant times was, a financially responsible person for each of TMG/TMH and Noble 33 pursuant to Labor Code § 558.1.TMG is a Nevada limited liability company with its principal place of business in Plano, Texas.

10.   TMH is a Nevada limited liability company with its principal place of business in Plano, Texas.

11.   Noble 33 is, and at all relevant times herein was, a Delaware limited liability company with its principal place of business in Plano, Texas. Its subsidiaries were each formed in Nevada, but share the same principal place of business.

12.   Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of said Defendants when the same have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the acts complained of herein. Unless otherwise stated, all references to named Defendants shall include DOE Defendants as well. Plaintiff is informed and believes and thereon alleges that at all times material herein each fictitiously named DOE Defendant was either the true

Defendant or the agent, servant, employee, partner, joint venturer, or co-conspirator of each of the other Defendants, and in doing the things alleged herein, was acting within the course and scope of such relationship and with the permission, consent, and ratification of the other Defendants. Named defendants and DOES 1 through 10 are referred to collectively as "Defendants."

### III.    JURISDICTION AND VENUE

13.    Jurisdiction is proper in this Court because this action arises under California's Fair Employment and Housing Act (Gov. Code § 12900 et seq.), the California Labor Code, and common law. Defendants conduct substantial business operations in California, employed Plaintiff in California, the unlawful employment practices occurred in California, and the amount in controversy exceeds the jurisdictional minimum of this Court.

16. Venue is proper in this Court under Code of Civil Procedure section 395 because Plaintiff resides in the County of Los Angeles, California, and the wrongful acts and omissions alleged herein—including the discriminatory and retaliatory conduct, Plaintiff's suspension and constructive termination, and the withholding of wages and benefits—occurred in the County of Los Angeles, California. Defendants TMG, TMH, and Noble 33 conducted business in Los Angeles County, and individual Defendants Berman and Tanha reside and transact business in Los Angeles County.

17. Plaintiff timely exhausted administrative remedies with the California Civil Rights Department (CRD). On September 25, 2025, CRD issued a Right-to-Sue Notice (CRD Matter No. 202509-31415225), which is attached hereto as **Exhibit 1** and incorporated herein by reference. See Gov. Code § 12965(b).

### IV.    FACTUAL BACKGROUND

**A. TMG, Breakwater, and Noble 33: Equity, Lending, Licensing, Management, and Comp.**

18. TMG owned and currently owns the intellectual property rights of the national restaurant brand Toca Madera and its affiliated brands. ***Noble 33 does not own it***.

19. Syken was the General Counsel/Chief Compliance Officer of TMG for the vast majority of its existence and has as Executive Officer/President for nearly half-a-decade.



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

20. In 2018, TMG sought to raise funds.

21. Defendant/Counterclaimant Breakwater Madera Holdings, LLC ("BMH"), lent money to and invested money in TMG, taking on both debt and equity positions. BMH assumed approximately 45% of the membership units of TMG as of today. As a result, Berman and Tanha held only approximately 25% of the membership units. The remaining units were held by various former employees, including Syken.

22. In 2021, TMG and BMH negotiated an agreement whereby: (1) BMH would take the Tocaya Organica brand to merge it with the Tender Greens brand; (2) TMG would buy back BMH's shares for $1,000,000 after first paying off the sizeable debt owed to BMH; and (3) Tanha and Berman would be permitted to non-exclusively operate the Toca Madera and Casa Madera brands through a new company (then called "NewCo") (the "Buyout Agreement").

23. In order to induce the other members of TMG to agree to the Buyout Agreement, Berman and Tanha represented to the other members of TMG that if they operated the Toca Madera brand, they would cause revenues to flow up to members of TMG through management and licensing agreements based on a share of revenues earned in stores.

24. Relying on those representations, the other members of TMG consented to the agreement, including spinning off operations to a new operating company.

25. Berman and Tanha (along with Karamooz and Syken) formed Noble 33 in July 2021 to assume the role of operator as set forth in the Buyout Agreement. Berman and Tanha alone represent approximately 80% of the membership units of Noble 33.

26. Based on those representations, TMG agreed to license the Toca Madera brand to various entities operating local restaurants across the United States, through Noble 33. Those restaurants each have unique ownership structures and investors.

27. Noble 33 operates those single purpose entities pursuant to both a Licensing Agreement and Management Agreement between the parties.[2] In exchange for the right to operate those entities, use TMG's intellectual property, and collect a share of revenues from the operations

---

[2] One or more agreements refer internally to entering into contracts with NewCo. Noble 33 is the successor to NewCo and the operating party to the contract in those agreements.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**



of those restaurants, Noble 33 is required to pay large percentages of operating revenues from the restaurants back to TMG. The amount of the licensing fees depends on the revenues earned by each restaurant. The Licensing Agreement and Management Agreement are attached hereto as **Exhibit 2** and **Exhibit 3**, respectively.

28. Syken also performed services for Noble 33 pursuant to a Consulting Agreement, sometimes referred to by the parties as the "Joint Services Agreement."

**B. The Breakwater Dispute.**

29. TMG did not initially pay the sums owed under the terms of the Buyout Agreement.

30. Initially, TMG was chronically undercapitalized and lacked the funds to repay Breakwater and went through periods of having to borrow money from various sources in order to float its operations.

31. In the spring of 2022, a dispute arose between TMG and BMH regarding whether the Buyout Agreement was even enforceable in the first instance.

32. After some negotiations, in early 2023, the negotiations eventually broke down, with no resolution.

**C. Noble 33's Extensive Use of InKind.**

33. The original business plan for TMG was slow and steady growth through means of financing and marketing that were well-established in the industry.

34. In early 2023, Tanha approached TMG with a proposal to enter into a business relationship with a company called InKind.

35. As Tanha explained it, InKind was a form of marketing that was functionally equivalent to a gift card program.[3] In essence, Noble 33 would receive approximately fifty cents

---

[3] Syken served dual roles as President of TMG, and at times, General Counsel for both TMG and Noble 33. Syken does not include herein any communications that were part of any privileged communications, but rather only those communications arising solely from Syken's role as President and/or member of TMG/Noble 33. Any communications relating to legal advice given regarding the potential legality of any of the foregoing contracts or practices, whether between Syken and TMG/Noble 33, or including outside counsel, to the extent such communications exist, are not being included herein. Syken reserves the right to contend that such communications, to the extent they exist, may not be privileged in light of the potential application of the crime-fraud exception to the attorney-client privilege.



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

for each dollar's worth of store credits, redeemable at any of the Toca Madera properties operated by Noble 33. To the extent any of the credit purchased by InKind was not redeemed by InKind customers, Noble 33 would be responsible for repayment of the sums received by Noble 33 representing the unredeemed credits (the "InKind Agreement"). However, to the extent an InKind customer redeemed credits at one of the TMG-affiliated restaurants, that restaurant would be obligated to deliver goods and services of equivalent value without receiving any money at the store level from that customer. A true and correct copy of the first InKind Agreement is attached hereto as **Exhibit 3**.

36. Initially, the InKind Agreement did not raise any red flags with Syken; indeed, TMG had extensive experience implementing gift card programs, and Tanha characterized the program as such a gift card marketing program. Syken assumed that, in line with past gift card programs, the individual stores (and thus TMG, through its agreements with Noble 33) would receive appropriate portions of the money received by Noble 33 from InKind. At that time, Syken had no reason to think that Noble 33, and by extension, Berman and Tanha, would personally pocket millions of dollars at the expense of TMG and the underlying restaurants.

37. Unfortunately, around the same time, Syken became very ill. Syken suffers from a form of blood cancer and was hospitalized for several weeks after almost dying. Syken did not return to work until later in 2023.

38. When Syken returned to work as President of TMG, he learned from Tanha and Karamooz that InKind credits were being redeemed at TMG's stores with devastating frequency. While InKind helped to drive business to Toca Madera restaurants, it also left the restaurants financially vulnerable, because the restaurants would have to give out goods and services without receiving any cash in return. During mid-to-late 2023, InKind credits were being redeemed with such frequency at the restaurants, that the restaurants were not taking in enough cash to fund their own operations.

39. During this time, Karamooz expressed his frustrations with Tanha to Syken. Karamooz express that he had an argument with Tanha, stating that he had warned Tanha this could happen, and that it could result in the collapse of the entire company.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

40. Thereafter, Tanha and Karamooz were in near-constant communication with InKind, seeking to place limits on the number of InKind credits that could be redeemed at TMG's restaurants during any given period of time. Syken was not looped into those conversations.

41. Eventually, InKind agreed to place such a cap.

**D. The Breakwater Litigation, Preliminary Injunction, and Noble 33's Decision to Use InKind to Siphon Money from TMG.**

42. Just before filing of the instant lawsuit, TMG purported to pay the sums owed under the Buyout Agreement.[4]

43. On August 3, 2023, TMG filed the instant lawsuit.

44. On November 22, 2023, the Court issued a Preliminary Injunction that, among other orders, prohibited TMG from "making any distributions to members, other than to pay taxes; . . . selling or encumbering any assets; entering into any material contracts; engaging in any transactions or making any payments to any of the company's current or former managers or unitholders or their affiliates other than in the ordinary course of business pursuant to previously agreed to and approved in preexisting and ongoing contracts."

45. Since the issuance of that order, Noble 33 entered into several additional agreements with InKind relating to the additional sale of store credits through InKind. Syken was not brought in to review those newer contracts.

46. As a result, Noble 33 took in millions of dollars of revenues for pre-sold meals from InKind.

47. Starting in 2024, Tanha and Berman began making large distributions to themselves through Noble 33 using the money received from InKind. Indeed, Syken estimates those distributions exceed $4,000,000 each to Tanha and Berman.

48. In the summer of 2024, Noble 33, through Karamooz, was issuing opaque spreadsheets in place of detailed financials relating to the performance of the restaurants. These spreadsheets did not disclose or describe the money being taken from InKind, the resulting liability at the restaurant level, or its effect on the finances of TMG.

---

[4] Breakwater disputes whether the entire sum was paid.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

49. Syken, as president of TMG, asked for more detailed financials and disclosures to be prepared. Tanha and Karamooz did not do so. Indeed, Tanha misrepresented the nature and effect of the InKind program to Syken. In addition, Tanha and Berman concealed the nature of the InKind payments to TMG's independent board member, Amrou Almanseer.

50. Despite being an independent board member of TMG, and having full access and authority to demand accurate financial reporting, Almanaseer failed to investigate or stop the improper diversion of funds, even after becoming aware of discrepancies between the information he was provided and the company's actual financial condition. His inaction enabled the continued siphoning of money away from TMG and contributed directly to the cash shortages impacting employee wages, benefits, and operational stability.

**E.  Syken's Attempts to Seek Transparency.**

51. Prior to January 2025, Syken would receive financial statements for Noble 33 and TMG, monthly and quarterly, respectively. While not detailed and almost impossible to understand without the assistance of Karamooz, he would at least receive something.

52. Starting in January 2025, the TMG and Noble 33 stopped providing financial statements to Syken altogether.

53. That practice continued until June of 2025, when Syken complained to employees within the company about being left in the dark, in email, stating that the failure to provide financials was highly suspicious.

54. Rather than direct staff to provide Syken with the financials, Tanha criticized Syken for directing the communications to employees of the company, worried Syken may "spook" them unnecessarily.

55. After June 2025, TMG/Noble 33 did resume sending financial statements to Syken.

56. Then, later in the summer of 2025, TMG failed to timely pay Syken's salary and health insurance premiums. While this had happened before in the past, TMG had also racked up arrears on their legal bills of in excess of $2,000,000.

57. Syken was now very concerned about the financial condition of the company.

58. Syken set about accessing the company's bank records to see what was happening



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

to the company's cash. Syken immediately noticed a discrepancy; the amount of money the company was actually receiving from Noble 33 did not match what was supposedly paid according to the financial statements he received. Those discrepancies alone amounted to more than $100,000 missing per quarter.

59. Syken raised these concerns with each of Tanha, Berman, and Karamooz in July and August of 2025. Syken also noted that there appeared to be millions of dollars missing at TMG and questioned why the company seemed to never have any money, even though the restaurants appeared to be constantly filled with customers, and Noble 33 was seemingly making money hand-over-fist. He questioned a laundry list of problematic transactions and practices that Tanha and Berman had been engaging in through Noble 33 and their control of the board of TMG.

60. The consistent answer from Berman, Tanha, and/or Karamooz at that point in time was mostly deflection. Berman and Tanha questioned whether they could still "trust" Syken, and whether this was his "cancer talking," suggesting Syken's health had compromised him somehow. Karamooz, on the other hand, confirmed that Noble 33 was not planning to reimburse TMG or the restaurants—that Tanha and Berman had decided to keep the money.

**F. TMG's Discriminatory and Pretextual, Putative Termination of Syken and Issuance of an Improper Tax Form K-1 to Syken.**

61. On September 9, 2025, Noble 33 oversaw the VIP opening of the 1587 Prime steakhouse restaurant in. Kansas City—a star-studded event, attended by celebrities such as Taylor Swift, Travis Kelce, and Patrick Mahomes. Each of Syken, Tanha, Berman, and Karamooz were also in attendance.

62. At the opening, Tanha and Berman delivered a letter to Syken purporting to inform him of his termination as President and General Counsel of TMG.[5] The letter accused Syken of improperly taking approximately $257,000 out of TMG through various means, including through use of the company's credit card. ***Noble 33 had already taken full control of TMG's bank***

---

[5] Syken has not been formally terminated from Toca Madera Holdings, LLC, a subsidiary of TMG and the entity which paid his paycheck – but has not been paid ever since September 9, 2025; nor was he provided any paperwork that one would receive in an actual termination.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

*accounts and IT/email servers and locked Syken out as the meeting began*.

63. Syken denied the allegation and asked Tanha and Berman for details. Tanha and Berman initially refused, but then indicated certain things like allegedly unauthorized bonuses, payments to Amazon, travel expenses, and the like. Syken pointed out that several of those expenses were actually incurred for the Noble 33 business and where part of the reimbursements Noble 33 was seemingly refusing to provide in violation of the Joint Services Agreement. Berman conceded that the amount Syken took was likely not accurate. When Syken pointed out that the reimbursements would have to be paid back to TMG by Noble 33, Berman responded, "We'll have to figure that out." Syken asked if they knew what they were doing or had at least spoken with a lawyer, which they claimed they had, but did not know the lawyer's name.

64. Syken stated his belief that the termination was specifically in response to, and in retaliation for his demands that Noble 33 begin paying more money to TMG. Neither Tanha nor Berman responded to that allegation. As Berman was about to respond, Tanha stopped him, saying, "Stop talking. Stop Talking."

65. Berman and Tanha also told Syken that he was being "suspended," but not terminated from Noble 33. They conceded they had no evidence Syken had done anything wrong at Noble 33, but that he would be suspended while he was "under investigation" because they did not "know what else to do there with him."[6]

66. Notably, despite repeated requests, TMG/Tanha/Berman have refused to provide the alleged backup data for the putative "audit" relating to the allegations against Syken.

67. Adding insult to injury, TMG then issued a tax form K-1 to Syken purporting to add approximately $50,000 in uncategorized income to Syken seemingly derived[7] from the false

---

[6] There is a certain irony in the allegations leveled by Tanha/Berman against Syken. In 2020/2021, Berman and Tanha were themselves accused of misuse of company funds and faced termination attempts by the Board of TMG (twice as to Tanha). Following Plaintiff's intervening whistleblower complaint against other Board members, Berman and Tanha temporarily retained their positions; TMG severed ties with them in mid-2021. This episode appears to have inspired the current, false misappropriation allegations against Plaintiff.

[7] Syken is unsure whether the unaccounted for sum is, in fact, attributable to the disputed approximately $257,000 claimed by TMG, because, again, TMG refuses to provide any kind of accounting or backup documentation for the sums it is claiming, despite repeated demands made



12

allegations against Syken that he improperly took money from the company, thereby exposing Syken to tax liability for money and benefits that he never received.

## FIRST CAUSE OF ACTION

### (Breach of Contract, by Syken against TMG, TMH, and Noble 33)

68. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

69. The employment agreements between Syken and TMG/TMH, and the Consulting Agreement/Joint Services Agreement between Syken and Noble 33 on the other hand, each constituted valid and enforceable agreements (even if the Consulting Agreement/Joint Services Agreement with Noble 33 misclassified Syken as an independent contractor) (collectively, the "Contracts"). Syken was also an intended third party beneficiary of obligations owed by Noble 33 to TMG relating to the reimbursement of business related expenses.

70. Syken performed all obligations owed by him under the terms of the contracts, except to the extent any such obligations were not yet due or excused.

71. Pursuant to the Contracts, Defendants TMG/TMH and Noble 33 were obligated to, among other things, employ Plaintiff as President/General Counsel, pay him salary, and distributions, reimburse business expenses (both to Syken and TMG), and maintain his rights and protections under the agreements and applicable law.

72. As noted above, Defendants breached the Contracts by, among other things, failing to reimburse expenses owed to TMG by Noble 33, wrongfully terminating Syken for discriminatory and retaliatory reasons and failing and refusing to pay sums owed under the terms of those Contracts, suspending Syken from his work at Noble 33, admittedly without cause, and cutting off his access to systems, employees, and records, thereby interfering with his ability to fulfill his role. Defendants also breached the terms of the Contracts on numerous occasions in the past by "bouncing" payments to Syken and thereby failing to timely pay Syken's salary. Indeed, after the fact, Defendants would authorize Syken to use the company credit card to make up the

by Syken. Notably, Syken has made these demands both in his capacity as a former employee being accused of misconduct, and in his capacity as a member of the LLC, to no avail.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**



1  ==difference and then reduce subsequent pay owed to Syken to account for it.== But the net result was

2  always untimely pay when it happened.

3        73. Syken was directly and proximately harmed by the foregoing breaches in an amount

4  according to proof at trial.

**<u>SECOND CAUSE OF ACTION</u>**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing by Plaintiff against TMG and TMH)**

8        74. Plaintiff hereby alleges and incorporates by reference each and every allegation set

9  forth above, as if fully set forth herein.

10       75. Under California law, every employment and service contract includes an implied

11  covenant of good faith and fair dealing, which obligates the parties to act fairly, honestly, and in

12  good faith so as not to deprive the other of the benefits of the agreement. Those duties are implied

13  into the Contracts at issue in this action.

14       76. Defendants breached this implied covenant by engaging in conduct that unfairly

15  frustrated Plaintiff's contractual rights, including: (a) fabricating a pretextual "audit" and

16  demanding $257,000 in alleged expenses; (b) issuing an unauthorized and invalid "Notice of

17  Termination" in violation of both the governing Operating Agreement and a Nevada court order;

18  (c) freezing Plaintiff out of company systems and communications; (d) failing to pay salary, and

19  reimbursements due;; and (e) suspending Plaintiff from his work at Noble 33.

20       77. Defendants' actions rendered Plaintiff's continued performance under the contracts

21  impossible and deprived him of the compensation, authority, and protections promised under the

22  Employment Agreement and related agreements.

23       78. As a direct and proximate result of Defendants' breaches of the implied covenant,

24  Plaintiff has suffered damages, including loss of salary, equity value, and future earnings, in an

25  amount subject to proof at trial.

26

27  / / /

28  / / /

14

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

## **THIRD CAUSE OF ACTION**

**(Disability Discrimination (Gov. Code § 12940(a)) by Plaintiff against Berman, Tanha, Almanaseer, TMG, TMH, Noble 33)**

79. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

80. Plaintiff suffers from serious medical conditions, including blood cancer and an autoimmune disease, which qualify as disabilities under the Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900 et seq.

81. At all relevant times, Defendants TMG, TMH, and Noble 33 were "employers" within the meaning of FEHA.

82. Plaintiff was an "employee" of each of TMG, TMG, and Noble 33 within the meaning of FEHA, protected from discrimination under FEHA.

83. To the extent the Joint Services Agreement posits Syken was anything other than an employee, that agreement has willfully misclassified Syken. Indeed, Syken's role within the company as a founder and key executive were well established.

84. Defendants knew or should have known of Plaintiff's disabilities and serious medical conditions. Plaintiff disclosed his diagnosis to Berman and Tanha in Fall 2024, and Defendants acknowledged his treatment and the need for related accommodations.

85. Plaintiff was at all times qualified for his position as President/Managing Member of TMG and TMH and as a service provider under the Joint Services Agreement with Noble 33. Plaintiff performed his job satisfactorily at all times.

86. Despite his qualifications and successful performance, Defendants subjected Plaintiff to adverse employment actions because of his disability and/or medical condition, including but not limited to:

    a. Disparaging his concerns about financial mismanagement as merely "personal" or a result of his illness;

    b. Questioning his composure and trustworthiness due to his cancer diagnosis;

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

c. Isolating him from reporting structures, including withholding financial information for over six months;

d. Fabricating a $257,000 "audit" dispute as a pretext for his removal;

e. Issuing an unauthorized "Notice of Termination" in September 2025;

f. Falsely attributing approximately $50,000 in income to Plaintiff on a form K-1;

g. Falsely accusing Plaintiff of misappropriating travel funds for Plaintiff's wife and caregiver, which use of funds were authorized by TMG;

h. Cutting off his email and access to company records; and

i. Withholding salary

87. The above adverse actions were motivated substantially by Plaintiff's medical condition and disabilities.

88. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered substantial harm, in an amount to be proven at trial.

89. Defendants' discriminatory acts were carried out willfully, maliciously, fraudulently, and oppressively, in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive and exemplary damages pursuant to Gov. Code § 12965(b) and Cal. Civ. Code § 3294.

## FOURTH CAUSE OF ACTION

**(Harassment (Gov. Code § 12940(j)) by Plaintiff vs. Berman, Tanha, TMG, TMH, Noble 33)**

90. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

91. Plaintiff is an individual with disabilities, including blood cancer and an autoimmune disease, which qualify as protected conditions under FEHA. Defendants Berman and Tanha were aware of Plaintiff's conditions, as he disclosed his cancer diagnosis to them in or about Fall 2024.

92. Because of Plaintiff's disabilities and his need for medical treatment, Berman and Tanha subjected him to severe and pervasive harassment that unreasonably interfered with his work environment and created an intimidating, hostile, and offensive atmosphere.



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

93. Such harassment included, but was not limited to:

    a. Belittling Plaintiff's concerns about financial mismanagement by dismissing them as merely "personal" or a byproduct of his illness;

    b. Questioning whether Plaintiff had "lost his composure" due to his cancer diagnosis and whether they could "trust" him to lead the Companies;

    c. Refusing to speak to Plaintiff for extended periods after he raised objections to Defendants' financial misconduct, thereby isolating him from the executive team;

    d. Falsely attributing approximately $50,000 in income to Plaintiff on a form K-1;

    e. Falsely accusing Plaintiff of misappropriating travel funds for Plaintiff's wife and caregiver, which use of funds were authorized by TMG;

    f. Publicly marginalizing Plaintiff in front of other executives by undermining his authority, withholding financial information for more than six months, and excluding him from reporting chains;

    g. Cutting off his email and access to systems while falsely telling employees and third parties that he was terminated; and

    h. Leveraging Plaintiff's vulnerable medical condition by threatening his livelihood and health benefits at a time when he required life-sustaining treatment.

94. The harassment was committed by Berman and Tanha, both of whom were high-level managers, owners, and controlling members of TMG, TMH, and Noble 33. Their conduct is therefore imputed to the entity Defendants under the doctrine of *respondeat superior*.

95. Defendants failed to take all reasonable steps to prevent or remedy this harassment, despite having notice of Plaintiff's medical condition and repeated objections to Defendants' conduct.

96. As a direct and proximate result of the harassment, Plaintiff suffered damages according to proof at trial.



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

97. The above-described actions were undertaken with malice, oppression, and fraud, and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive and exemplary damages pursuant to Gov. Code § 12965(b) and Cal. Civ. Code § 3294.

## FIFTH CAUSE OF ACTION

**(Retaliation (Gov. Code § 12940(h)) by Plaintiff vs Tanha, Berman, Almanaseer, TMG, TMH, Noble 33)**

98. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

99. The FEHA makes it unlawful for an employer to retaliate against an employee for opposing any practices forbidden under Cal. Gov't. Code §§ 12900–12966 or because the employee has filed a complaint, testified, or assisted in any proceeding under FEHA. (Cal. Gov't Code § 12940(h).) At all times relevant to this Complaint, § 12940(h) was in effect and applied to Defendants, each of which employs more than five persons. (Cal. Gov't Code § 12926(d).)

100. Plaintiff engaged in legally protected activity on multiple occasions, including but not limited to: (a) objecting to Defendants' financial misconduct and fraudulent practices; (b) opposing misuse of company resources and violations of licensing laws; (c) demanding reimbursement of expenses owed to TMG/TMH under the Joint Services and Licensing/Management Agreements; and (d) complaining of discrimination, harassment, and retaliation after disclosing his cancer diagnosis.

101. Plaintiff is informed and believes, and based thereon alleges, that as a consequence of engaging in such legally protected activity, Defendants retaliated against him by, among other things: (a) subjecting him to escalating hostility and marginalization; (b) excluding him from financial reporting and company operations; (c) falsely accusing him of misappropriation of funds; (d) threatening his law license and professional reputation; (e) withholding wages; (f) falsely attributing approximately $50,000 to Plaintiff's K-1; and (g) pretextually terminating his employment in violation of a Nevada court order.

102. Plaintiff's protected activity was a substantial motivating reason for Defendants' adverse employment actions.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**



103. Defendants' retaliatory conduct was a substantial factor in causing Plaintiff harm. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount according to proof at trial.

104. Plaintiff also continues to incur attorneys' fees and legal expenses in an amount according to proof at trial, recoverable pursuant to Gov't Code § 12965(b).

105. The above-described retaliatory actions were perpetrated and/or ratified by managing agents, officers, or directors of Defendants. These acts were done maliciously, fraudulently, and oppressively, and in reckless disregard of Plaintiff's rights. Such conduct was deliberate, intentional, despicable in character, and warrants the imposition of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294, in an amount sufficient to punish and deter Defendants' future misconduct.

## SIXTH CAUSE OF ACTION

**(Failure to Prevent Discrimination, Harassment, and Retaliation (Gov. Code § 12940(k)) by Plaintiff Against Berman, Tanha, Almanaseer, TMG, TMH, and Noble 33)**

106. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

107. Under the Fair Employment and Housing Act ("FEHA"), Defendants TMG, TMH, and Noble 33 were required to take all reasonable steps to prevent discrimination, harassment, and retaliation from occurring, as set forth in Gov. Code §§ 12940 et seq.

108. As explained herein, Plaintiff was subjected to discrimination, harassment, and retaliation in the course of his employment, including but not limited to: (a) being marginalized and disparaged following his cancer diagnosis; (b) being falsely accused of financial misconduct; (c) being denied access to financial information and company systems; (d) being denied wages;and (e) being pretextually terminated in violation of a Nevada court order.

109. Despite knowing of Plaintiff's disability and his protected complaints regarding financial misconduct, Defendants failed to take reasonable steps to prevent unlawful discrimination, harassment, and retaliation, including failing to investigate his complaints, failing to stop retaliatory acts by Berman and Tanha, and failing to correct or remediate the unlawful

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

1  conduct.

2      110. As a direct and proximate result of Defendants' failure to prevent discrimination,

3  harassment, and retaliation, Plaintiff has suffered and continues to suffer damages in an amount

4  according to proof at the time of trial.

5      111. Plaintiff has also incurred, and will continue to incur, attorneys' fees and litigation

6  expenses in an amount according to proof at trial, which are recoverable pursuant to Gov. Code §

7  12965(b).

8      112. The above-described actions and failures to act were perpetrated, ratified, or

9  condoned by managing agents, officers, or directors of Defendants. These acts were undertaken

10  maliciously, fraudulently, oppressively, and in reckless disregard of Plaintiff's rights, including

11  the assertion of false, pretextual grounds for his termination and the refusal to pay him wages

12  owed. Such acts warrant the imposition of punitive and exemplary damages pursuant to Cal. Civ.

13  Code § 3294, in an amount sufficient to punish and deter Defendants from engaging in such

14  conduct in the future.

15  **SEVENTH CAUSE OF ACTION**

16  **(Wrongful Termination by Plaintiff Against Berman, Tanha, Almanaseer, TMG, TMH, and**

17  **Noble 33)**

18      113. Plaintiff hereby alleges and incorporates by reference each and every allegation set

19  forth above, as if fully set forth herein.

20      114. Plaintiff was employed by TMG and TMH as President pursuant to his

21  Employment Agreement and also provided services to Noble 33 pursuant to the Joint Services

22  Agreement. At all relevant times, Plaintiff performed his job duties competently, faithfully, and in

23  furtherance of the Companies' interests.

24      115. Plaintiff engaged in protected activity by objecting to and reporting unlawful,

25  fraudulent, and harmful conduct by Berman and Tanha, including their taking of company funds

26  for personal use, commingling of assets between entities, falsification of financial records, misuse

27  of licensing revenues, and other breaches of fiduciary and contractual duties.

28      116. Plaintiff also engaged in protected activity by disclosing and objecting to practices

20

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

that violated brand standards, exposed TMG/TMH to investor fraud claims and regulatory scrutiny, and contravened the express order of the Clark County District Court prohibiting modification of material contracts.

117. Additionally, following his cancer diagnosis in Fall 2024, Plaintiff requested continued protections, benefits, and fair treatment in light of his medical condition, activity that is protected under FEHA and California public policy.

118. Defendants, acting through Berman and Tanha, retaliated against Plaintiff for these protected activities by fabricating an expense "audit," manufacturing a pretext for his termination, cutting off his access to company systems, withholding wages, , and publicly communicating that he had been terminated.

119. Plaintiff's termination and freeze-out were substantially motivated by his protected complaints and medical condition.

120. As a direct and proximate result of Defendants' wrongful termination, Plaintiff has suffered substantial damages according to proof at trial.

121. Defendants' conduct was fraudulent, oppressive, malicious, and carried out with willful and conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive and exemplary damages pursuant to Cal. Civ. Code § 3294.

### EIGHTH CAUSE OF ACTION

**(Whistleblower Retaliation (Labor Code § 1102.5), by Plaintiff Against TMG, TMH, and Noble 33)**

122. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

123. Labor Code § 1102.5 prohibits an employer or person acting on its behalf from retaliating against an employee for disclosing information to a government or law enforcement agency, or to a person with authority over the employee, when the employee reasonably believes the information discloses a legal violation.

124. Plaintiff made internal disclosures and objections to Berman and Tanha, including demanding that they seek approval from TMG's independent board member, Aamrou Almanaseer,

21
**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

regarding conduct he reasonably believed to be unlawful, including misuse of funds, commingling, nonpayment of wages, fraudulent financial practices involving inKind, licensing issues, and disability-based discrimination/retaliation.

125. Plaintiff had reasonable cause to believe the disclosed information evidenced violations of state and federal statutes, rules, or regulations.

126. Defendants retaliated against Plaintiff for these protected disclosures by escalating hostility, restricting access to information, falsely accusing Plaintiff of impropriety, withholding wages, threatening his reputation, and terminating him.

127. Plaintiff's protected activity was a substantial motivating reason for Defendants' adverse actions.

128. As a direct and proximate result, Plaintiff suffered lost wages, equity value, career opportunities, and other economic damages according to proof at trial.

129. Plaintiff also suffered general damages, including emotional distress and reputational harm, according to proof.

130. Plaintiff is entitled to attorneys' fees and costs under Labor Code § 1102.5(j).

131. Defendants' acts were malicious, fraudulent, and oppressive, warranting punitive damages under Civil Code § 3294.

**NINTH CAUSE OF ACTION**

**(Failure to Pay Wages (Lab. Code §§ 201, 202, 204, 1194), by Plaintiff Against TMG and TMH; and Against Berman, Tanha, and Karamooz, and Almanaseer Under Lab. Code § 558.1 92)**

132. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

133. Labor Code §§ 201, 202, and 204 required Defendants to timely pay all wages due; § 203 imposes waiting-time penalties for willful failure to pay all wages due at separation; § 1194 authorizes recovery of unpaid wages, interest, and attorneys' fees.

134. Plaintiff was an employee of TMG and TMH covered by these provisions.

135. Defendants knowingly and willfully failed to pay all earned wages, including



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

salary, accrued PTO,  and reimbursable amounts due under the parties' agreements and California law.

136. Following Plaintiff's pretextual termination, Defendants failed to tender all wages due and failed to continue salary as required. This is particularly true to the extent Plaintiff was only putatively terminated from TMG and never terminated from TMH, but was in fact receiving his salary through TMH at the time of his termination.

137. As a proximate result, Plaintiff suffered damages including unpaid wages, penalties, interest, attorneys' fees, and costs of suit, according to proof at trial.

138. Defendants' violations were willful.

139. Plaintiff is entitled to unpaid compensation, penalties, interest, and relief under Labor Code §§ 218.5, 225.5, 226, 558, and 1194.

140. The foregoing acts were perpetrated and/or ratified by managing agents, officers, or directors of Defendants.

141. Berman, Tanha, and Karamooz exercised control over reimbursement decisions and are personally liable under Labor Code § 558.1.

142. California Labor Code §§ 201 and 202 require employers to pay all compensation due and owing to an employee at or around the time the employment is terminated. California Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge or resignation, the employer is liable for penalties in the form of continued compensation up to thirty (30) workdays.

## TENTH CAUSE OF ACTION

**(Waiting-Time Penalties (Lab. Code § 203), by Plaintiff Against TMG and TMH; and Against Berman, Tanha, and Karamooz, and Almanaseer Under Lab. Code § 558.1)**

143. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

144. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

145. Labor Code §§ 201 and 202 required payment of all earned and unpaid wages



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

immediately upon discharge or within 72 hours of resignation; § 203 imposes waiting-time penalties for willful nonpayment.

146. Plaintiff's employment was unlawfully and pretextually terminated on or about September 9, 2025, at which time unpaid wages remained due.

147. Despite demand, Defendants willfully failed to pay all final wages due, including salary, and accrued PTO.

148. Defendants' failure was knowing and deliberate.

149. Plaintiff is entitled to waiting-time penalties under § 203, in addition to wage loss, interest, and attorneys' fees.

150. The foregoing acts and omissions were perpetrated and/or ratified by Berman and Tanha as managing agents of TMG and TMH.

151. Berman, Tanha, and Karamooz exercised control over reimbursement decisions and are personally liable under Labor Code § 558.1.

## **ELEVENTH CAUSE OF ACTION**

**(Failure to Reimburse Expenses (Lab. Code § 2802), by Plaintiff Against TMG and TMH; and Against Berman, Tanha, and Karamooz, and Almanaseer Under Lab. Code § 558.1)**

152. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

153. Labor Code § 2802 requires employers to indemnify employees for all necessary expenditures or losses incurred as a direct consequence of their duties or in obedience to the employer's directions.

154. During employment, Plaintiff incurred necessary business expenses for TMG and TMH, including travel/lodging for operations and compliance, competitor research at Defendants' direction, and joint-services activities benefiting both TMG and Noble 33.

155. Despite demand, Defendants failed and refused to reimburse these necessary and reasonable expenses.

156. As a direct and proximate result, Plaintiff suffered damages including unreimbursed expenses, interest, and consequential losses, according to proof.

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

157. Berman, Tanha, and Karamooz exercised control over reimbursement decisions and are personally liable under Labor Code § 558.1.

158. Defendants acted knowingly and in conscious disregard of Plaintiff's rights; Plaintiff is entitled to compensatory damages, interest, attorneys' fees, costs, and punitive damages pursuant to Civil Code § 3294.

## TWELFTH CAUSE OF ACTION

**(Unfair Competition (Bus. & Prof. Code § 17200 et seq.), by Plaintiff Against TMG, TMH, and Noble 33)**

159. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

160. The Unfair Competition Law prohibits unlawful, unfair, or fraudulent business acts.

161. Defendants engaged in unlawful, unfair, and fraudulent practices, including: (a) violating FEHA by discriminating and retaliating against Plaintiff; (b) violating Labor Code §§ 201, 202, 203, 204, 2802, and 1102.5; (c) misusing company assets while withholding money owed to Plaintiff, including $90,000 in investment funds; and (d) pretextually freezing Plaintiff out to deprive him of earned compensation and diminish his ownership value.

162. Each act constitutes a separate UCL violation and reflects a consistent course of unlawful and unfair conduct.

163. As a direct and proximate result, Plaintiff lost money or property within the meaning of § 17204, including unpaid wages, reimbursements, and investment funds.

164. Plaintiff seeks restitution and disgorgement of all money wrongfully obtained or withheld, with interest. Plaintiff also seeks injunctive relief under § 17203 enjoining further unlawful, unfair, and fraudulent practices.

## THIRTEENTH CAUSE OF ACTION

**(Civil Extortion, by Plaintiff Against Berman and TMG)**

165. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

166. Uunder California law, extortion occurs when a defendant makes a wrongful threat



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

to obtain money or property to which the defendant has no lawful claim.

167. Berman and TMG wrongfully attempted to coerce Plaintiff into paying approximately $257,000 in purported "improper" charges by threatening, among other things, harm to Plaintiff's law license and issuing demands based on a fabricated audit figure Berman later admitted was materially inaccurate.

168. These threats were made to pressure Plaintiff to surrender funds Defendants knew were reimbursable business expenses or obligations of Noble 33, not Plaintiff personally, and to pressure an unfair and undervalued buyout of Plaintiff's membership units in TMG and Noble 33.

169. Plaintiff reasonably understood these threats as extortionate, made under color of authority and influence.

170. As a direct and proximate result, Plaintiff suffered financial losses, emotional distress, reputational harm, and legal expenses, in amounts according to proof.

171. Defendants acted maliciously, fraudulently, and oppressively, warranting punitive damages under Civil Code § 3294.

## <u>FOURTEENTH CAUSE OF ACTION</u>

### (Declaratory Relief (Code Civ. Proc. § 1060) By Plaintiff Against All Defendants as Appropriate)

172. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

173. An actual controversy exists concerning, without limitation: (a) the validity and effect of Plaintiff's purported termination; (b) Plaintiff's rights and obligations regarding repayment of expenses claimed by TMG; and (c) his rights to wages, and reimbursements,

174. A judicial declaration is necessary and proper to resolve these disputes and to guide the parties' future conduct.

175. Plaintiff seeks declarations consistent with the foregoing allegations and applicable law.

/ / /



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

## FIFTEENTH CAUSE OF ACTION

### (Injunctive Relief, by Plaintiff Against all Defendants as Appropriate)

176. Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

177. Legal remedies are inadequate, and Plaintiff will suffer irreparable harm absent injunctive relief.

178. Plaintiff seeks preliminary and permanent injunctions: (a) enjoining retaliation and defamation; (b) compelling payment of wages, and reimbursements; and (c) prohibiting modification of material contracts in violation of the Breakwater preliminary injunction order.

179. The balance of hardships and public interest favor injunctive relief to prevent ongoing statutory violations and preserve the status quo.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**On the First Cause of Action (Breach of Contract)**

1. For general and special damages, including unpaid compensation, , and equity value, according to proof at trial;

2. For consequential damages resulting from Defendants' breach;

3. For prejudgment interest pursuant to Civil Code § 3287; and

4. For costs of suit.

5. For general and special damages according to proof at trial;

**On the Second Cause of Action (Breach of the Implied Duty of Good Faith and Fair Dealing)**

1. For general and special damages according to proof at trial;

2. For consequential damages for loss of income, and opportunities;

3. For prejudgment interest as allowed by law; and

4. For costs of suit.

/ / /



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

**On the Third Cause of Action (Disability Discrimination in Violation of Feha (Gov. Code § 12940(A))**

1. For economic damages including lost wages, and salary according to proof;

2. For non-economic damages including emotional distress, humiliation, and mental anguish according to proof;

3. For punitive damages pursuant to Civil Code § 3294; and

4. For attorneys' fees and costs pursuant to Government Code § 12965(b).

**On the Fourth Cause of Action (Harassment in Violation of Feha (Gov. Code § 12940(J))**

1. For general and special damages including emotional distress and loss of professional reputation according to proof;

2. For punitive damages pursuant to Civil Code § 3294; and

3. For attorneys' fees and costs pursuant to Government Code § 12965(b).

**On the Fifth Cause of Action (Retaliation in Violation of FEHA (Gov. Code § 12940(h)))**

1. For economic damages including lost wages, and bonuses according to proof;

2. For emotional distress and reputational harm according to proof;

3. For punitive damages pursuant to Civil Code § 3294; and

4. For attorneys' fees and costs under Government Code § 12965(b).

**On the Sixth Cause of Action (Failure to Prevent Discrimination, Harassment, and Retaliation (Gov. Code § 12940(k)))**

1. For compensatory damages including lost earnings and emotional distress according to proof;

2. For injunctive relief requiring Defendants to adopt and enforce lawful anti-discrimination and anti-retaliation policies; and

3. For attorneys' fees and costs pursuant to Government Code § 12965(b).

**On the Seventh Cause of Action (Wrongful Termination in Violation of Public Policy)**

1. For damages for lost wages, and salary including front pay and back pay, according to proof;

2. For general and emotional distress damages according to proof;

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

3.  For punitive damages according to proof;

4.  For prejudgment interest as permitted by law.

**On the Eighth Cause of Action (Retaliation in Violation of Labor Code § 1102.5)**

1.  For lost wages and future earnings according to proof;

2.  For emotional distress damages according to proof;

3.  For punitive damages pursuant to Civil Code § 3294; and

4.  For reasonable attorneys' fees and costs pursuant to Labor Code § 1102.5(j).

**On the Ninth Cause of Action (Failure to Pay Wages (Lab. Code §§ 201, 202, 204, 1194))**

1.  For all unpaid wages, salary, and other compensation according to proof;

2.  For statutory penalties, interest, and liquidated damages as provided by law; and

3.  For reasonable attorneys' fees and costs pursuant to Labor Code § 1194.

**On the Tenth Cause of Action (Waiting-Time Penalties (Lab. Code § 203))**

1.  For statutory waiting-time penalties in an amount according to proof;

2.  For attorney's fees and costs pursuant to statute.

**On the Eleventh Cause of Action (Failure to Provide Expense Reimbursements (Lab. Code § 2802))**

1.  For reimbursement of all necessary business expenses in an amount according to proof;

2.  For interest thereon as provided by law; and

3.  For attorneys' fees and costs pursuant to Labor Code § 2802(c).

**On the Twelfth Cause of Action (Violation of Business & Professions Code § 17200 et seq.)**

1.  For restitution and disgorgement of wages and funds wrongfully withheld;

2.  For injunctive relief enjoining Defendants from continuing unlawful and unfair business practices; and

3.  For attorneys' fees and costs as permitted by law.

**On the Thirteenth Cause of Action (Civil Extortion)**

1.  For general and special damages, including economic and emotional distress damages, according to proof; and

2.  For punitive damages pursuant to Civil Code § 3294.



29

**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

**On the Fourteenth Cause of Action (Declaratory Relief)**

    1.   For a judicial declaration of Plaintiff's rights regarding his employment status, compensation, and contractual entitlements; and

    2.   For such other and further declaratory relief as the Court deems just and proper.

**On the Fifteenth Cause of Action (Injunctive Relief)**

    1.   For preliminary and permanent injunctions requiring Defendants to:

        a. Cease and desist from discrimination, retaliation, and defamation;

        c. Pay all wages and reimbursements owed; and

        d. Comply with applicable California and federal labor and employment laws.For general damages for harm to reputation and standing in the community;

    1.   For Plaintiff's reasonable attorneys' fees and costs as permitted by law, to the extent such fees are available;

    2.   For prejudgment and post-judgment interest as permitted by law;

    3.   For any further relief the Court deems just and proper.

                            Respectfully Submitted,

                            **ATABEK & CO.**

Dated: December 15, 2025              By:  */s/ Jon A. Atabek*

                            Jon A. Atabek, Esq.
                            Shirin Ehyaei, Esq.

                            Attorneys for Plaintiff
                            MATTHEW SYKEN



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims triable to a jury.


**ATABEK & CO.**

Dated: December 15, 2025                    By:   _/s/ Jon A. Atabek_

Jon A. Atabek, Esq. (to apply *pro hac vice*)
Shirin Ehyaei, Esq. (to apply *pro hac vice*)

Attorneys for Plaintiff
MATTHEW SYKEN



**CLAIM FOR DAMAGES AND INJUNCTIVE RELIEF**

# EXHIBIT 1

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency          GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 25, 2025

Shirin Ehyaei
250 newport center dr.
newport beach, CA 91367

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202509-31415225
Right to Sue: Syken / Berman et al.

Dear Shirin Ehyaei:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 25, 2025

RE:  **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202509-31415225
Right to Sue: Syken / Berman et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 25, 2025

Matthew Syken
21151 daylight lane
huntington beach, CA 92646

RE:     **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202509-31415225
Right to Sue: Syken / Berman et al.

Dear Matthew Syken:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective September 25, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

# COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
## Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Matthew Syken                                          CRD No. 202509-31415225

                              Complainant,

vs.

Tosh Berman
7160 Dallas Pkwy Suite 340
Plano, TX 75024

Michael Tanha
7160 Dallas Pkwy
Plano, TX 75024

The Madera Group, LLC/ Toca Madera Holdings, LLC
865 S Figueroa St # 3100
Los Angeles, CA 90017

Noble 33 Enterprises, LLC
2431 Main Street, Suite C
Santa Monica, CA 90405

Amrou Almanseer
2029 Century Park E., Ste.
Los Angeles, CA 90067

                              Respondents
_____

**1.** Respondent **Tosh Berman** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2.**Complainant is naming **Michael Tanha** individual as Co-Respondent(s).
Complainant is naming **The Madera Group, LLC/ Toca Madera Holdings, LLC** business as Co-Respondent(s).
Complainant is naming **Noble 33 Enterprises, LLC** business as Co-Respondent(s).
Complainant is naming **Amrou Almanseer** individual as Co-Respondent(s).

*Complaint – CRD No. 202509-31415225*

Date Filed: September 25, 2025

CRD-ENF 80 RS (Revised 2025/02)

**3**. Complainant **Matthew Syken**, resides in the City of **huntington beach,** State of **CA.**

**4**. Complainant alleges that on or about **September 9, 2025**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's medical condition (cancer or genetic characteristic), age (40 and over), disability (physical, intellectual/developmental, mental health/psychiatric).

**Complainant was discriminated against** because of complainant's medical condition (cancer or genetic characteristic), age (40 and over), disability (physical, intellectual/developmental, mental health/psychiatric), family care and medical leave (cfra) related to serious health condition of employee or family member, child bonding, or military exigencies and as a result of the discrimination was terminated, denied any employment benefit or privilege, other, denied accommodation for a disability.

**Complainant experienced retaliation** because complainant requested or used a disability-related accommodation and as a result was terminated, other, denied accommodation for a disability.

**Additional Complaint Details:** I was discriminated against, harassed, and retaliated against after disclosing my cancer diagnosis in Fall 2024 and raising repeated objections to serious financial and legal misconduct at TMG, TMH, and Noble 33. Following disclosure of my diagnosis, Berman and Tanha dismissed my concerns as "personal," questioned whether I had lost composure due to cancer, and said they could not "trust" me. These demeaning remarks and undermining of my authority created a hostile work environment. When I continued to object to their failure to reimburse expenses, misuse of corporate funds, and other malfeasance, I was threatened with termination, stripped of responsibilities, and ultimately terminated in September 2025 in violation of a court order. These actions were motivated by discrimination and harassment based on my disability/medical condition and by retaliation for my protected complaints.

-2-
*Complaint – CRD No. 202509-31415225*

Date Filed: September 25, 2025

CRD-ENF 80 RS (Revised 2025/02)

VERIFICATION

I, **Shirin Ehyaei**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On September 25, 2025, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Newport Beach CA**

-3-
*Complaint – CRD No. 202509-31415225*

Date Filed: September 25, 2025

CRD-ENF 80 RS (Revised 2025/02)

# EXHIBIT 2

# TOCA MADERA/CASA MADERA BRANDS

# LICENSE AGREEMENT

## BETWEEN

## THE MADERA GROUP, LLC, AS LICENSOR

## AND

## [NEWCO, LLC], AS LICENSEE

### JULY __, 2021

THIS LICENSE AGREEMENT (this **"Agreement"**) dated as of July __ 2021, (the **"Effective Date"**), is made by and between THE MADERA GROUP, LLC (**"Licensor"**), and NewCo LLC, a Nevada limited liability company (**"Licensee"**).  Licensor and Licensee are hereinafter collectively referred to as the **"Parties"** and individually as a **"Party"**.

### R E C I T A L S :

**WHEREAS**, as between Licensor and Licensee, Licensor is the owner of all right, title and interest in and to the trademarks and copyrights used by the Toca Madera and Casa Madera restaurant brands, including, without limitation, those listed in Exhibit A, including any improvements, enhancements, modifications, alterations, or other developments associated therewith (the **"Brand"**), as the same may be changed and updated from time-to-time by Licensor in Licensor's sole and absolute discretion, along with any trade dress and source indicating components of the Licensed Locations (e.g., as specified in the Brand Standards) or the packaging or design of Branded Products, including the store designs and image developed, owned or used by Licensor in conjunction with the Brand. (collectively, the **"Toca/Casa Intellectual Property"**); and

**WHEREAS**, Licensee desires to use the Toca/Casa Intellectual Property in connection with the operation of such restaurant(s) or other food and beverage concepts described on Exhibit B (each, a **"Licensed Location"**, and if more than one, collectively, the **"Licensed Locations"**), after the Effective Date (as defined below), and, therefore, Licensor and Licensee desire that the rights and obligations of the Parties under this Agreement become effective, with respect to each Licensed Location, as of the date that (a) a management agreement with respect to such Licensed Location has been executed by Licensee or its Affiliate as the manager thereunder (as applicable with respect to each such Licensed Location, also an "Effective Date"), pursuant to which management agreement the Licensed Location is to be operated under the Brand using the Toca/Casa Intellectual Property (each, a **"Management Agreement"**, and each such Licensed Location a **"Managed Location"**), (b) NewCo or its Affiliate otherwise acquires the rights as an owner, lessee, sublessee, or assignee of Licensor or its Affiliate in and to any "pipeline deals" described on Exhibit B for any full-service restaurant, bar, or lounge concept using the Toca/Casa Intellectual Property which, as of the Effective Date of this Agreement may not be currently operating but which are either contemplated or in development, with the Licensed Location ultimately to be operated under the Brand using the Toca/Casa Intellectual Property (each, a **"Pipeline Deal"**), or (c) a license agreement or consulting agreement, or its equivalent, has been executed by Licensor or its Affiliate or by Licensee or its Affiliate, or has been assigned by Licensor to Licensee, for Licensed Locations at hotels, whether domestically or internationally, and to be operated under the Brand using the Toca/Casa Intellectual Property (each, a **"Hotel Group Deal"**), and of the foregoing as set forth and described in Exhibit B.  The Parties may amend/update Exhibit B without amending this entire Agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1.

## License

(a) <u>Grant of License</u>. Upon and subject to the terms and conditions contained herein, effective as of Effective Date, with respect to the Licensed Location (or each Licensed Location, if more than one) specified on <u>Exhibit B</u>, Licensor grants to Licensee an exclusive (for any or all Licensed Locations, Managed Locations, Pipeline Deals, and Hotel Group Deals, and for a ___ mile radius centered around the physical location of each of the foregoing) and non-transferable (except as provided herein) license to use, directly or through one or more Third-Party Managers (as hereinafter defined), the Toca/Casa Intellectual Property for and in connection with the marketing, operation, and management of each Licensed Location, Managed Location, Pipeline Deal, and Hotel Group Deal (the "**License**"). Licensor acknowledges and agrees that the rights granted to Licensee under this Agreement shall equally apply to any future Toca Madera or Casa Madera location anywhere in the world without the need for Licensee to execute a new license agreement. For Managed Locations, the Parties acknowledge and agree that the License granted under this Section 1.1 shall only apply to Licensee's activities as Manager under the Management Agreement, and that such Managed Locations have a right to use the Brands based on their affiliation with Licensor separate and apart from the License granted hereunder, and that such right does not conflict with Licensee's exclusivity under this Section 1.1.

Licensee shall: (a) use the Toca/Casa Intellectual Property only in accordance with this Agreement; (b) not assert or acquire any ownership or other rights in the Toca/Casa Intellectual Property other than the License expressly granted in this Agreement; (c) not take any action or assist any other person or entity in taking any action to contest Licensor's proprietary interest in the Toca/Casa Intellectual Property; and (d) refrain from undertaking any acts or omissions that infringe upon or tarnish the Toca/Casa Intellectual Property. Any breach by Licensee of this paragraph shall be deemed a material breach of this Agreement.

(b) <u>Reserved Rights</u>. Nothing in this Agreement shall be construed as conferring upon Licensee by implication, estoppel or otherwise, any rights or license, including, without limitation, any right or license under intellectual property rights, except for the rights and licenses expressly and unequivocally granted hereunder. All rights in the Toca/Casa Intellectual Property other than those specifically granted in this Agreement are reserved by Licensor for its own use and benefit.

(c) <u>Branded Products</u>. For the avoidance of doubt, this Agreement does grant to Licensee, the right to use, distribute, and sell, within each Licensed Location, products containing or bearing the Brand and any Toca/Casa Intellectual Property (collectively, "**Branded Products**"). Any Branded Products purchased by Licensee for sale at a Licensed Location shall be without any fee, markup or commission payable to Licensor.

(d) <u>Trademark Notice</u>. Licensee shall place on all marketing materials appropriate trademark notices for the Brand and a notice indicating that the Brand is owned by Licensor and is used under license.

(e) <u>No Rights Granted to Others</u>. No third party shall have the right or claim to use the Toca/Casa Intellectual Property as a result of this Agreement.

(f) <u>Pricing and Distribution Strategies</u>. Except as otherwise agreed in writing by the Parties, including in regard to Section 5 and 12 below in regard to marketing and promotional matters, Licensor shall have no authority to dictate pricing or distribution strategies for any aspect of a Licensed Location's operation.

(g) <u>Cooperation</u>. Subject to the restrictions set forth in this Agreement, Licensor will cooperate with Licensee and its Third-Party Managers with respect to the Licensed Location's marketing and sales efforts.

(h) <u>Entities</u>. The Parties intend that Licensee own and control any and all single purpose entities created for the Pipeline Deals, Hotel Group Deals, or for any other Licensed Location set forth in <u>Exhibit B</u>, including without limitation ownership and control of any and all tangible and intangible assets, including bank and securities accounts.

**Fees, Liabilities, Other Payments and Reporting**

(a) <u>License Fee</u>. Any and **"License Fees"** for Licensed Locations shall be set forth in <u>Exhibit B</u>.

(i) As used therein, **"Gross Revenue"** shall mean: the aggregate gross proceeds of all of Licensee's operations at the Licensed Locations, including, without limitation, all revenues associated with the sale of all food, beverages, products, merchandise, goods and services (including the sale of gift or merchandise certificates) sold in connection with the Licensed Location, <u>excluding</u> the following: (i) sales taxes, luxury taxes, excise taxes, license fees, or similar taxes now or hereafter imposed upon the sale of products, merchandise or goods; (ii) gratuities paid to staff to the extent the same are expressly designated as such and separately added to the total price charged, whether the same are collected by the manager as a stated percentage of any dollar amount or which are voluntarily paid by customers, and which are paid by manager to staff directly; (iii) any exchange of goods or merchandise between other projects owned or managed by manager or its Affiliates, where such exchange of goods or merchandise is made solely for the convenience of manager and not for the purpose of consummating a sale which has theretofore been made at, in or from the Licensed Location or for the purpose of depriving the owner of the benefit of a sale which otherwise would be made at, in or from the Licensed Location (and if such transfer is made between a Licensed Location with a lower royalty rate and one with a higher royalty rate, Licensor shall be entitled to the higher royalty rate); (iv) the redemption of gift or merchandise certificates; (xi) rebates, discounts or credits of a similar nature and/or, any amount for any goods or services provided on a complimentary basis, in each case given consistently with TMG's policies, procedures, and historical conduct in the three years preceding the Effective Date; (v) proceeds from any financing; and/or (vi) any working capital provided by Owner or interest earned on funds held in any account. In the case that any Third Party Manager or any other affiliate or subcontractor is engaged by Licensee to provide any Services at any Licensed Location, Gross Revenue shall be calculated based on the amounts received by such Third Party Manager or subcontractor from an unaffiliated end customer where such amounts are higher than the amounts received by Licensee from such Third Party Manager or subcontractor.

(ii) Licensee shall pay Licensor the License Fee quarterly in arrears within twenty days (20) days following the last day of each calendar quarter until the expiration of the Term.

(b) <u>No Other Fee.</u> For sake of clarity, no fees or consideration other than the License Fee described in <u>Exhibit B</u> shall be due and payable from Licensee to Licensor in connection with the operation of a Licensed Location under the Brand or the use of the Toca/Casa Intellectual Property.

(c) <u>Quarterly Reports</u>. Licensee shall deliver to Licensor the following during the Term: within forty-five (45) days after the end of each calendar quarter, statements signed and certified as true by Licensee setting out in respect of the immediately preceding calendar quarter (i) the Gross Revenue (itemized by revenue producing activity) and (ii) the itemized amounts due to Licensor.

(d) <u>Place and Means of Payment</u>.  All fees and other amounts due to Licensor or its affiliates under this Agreement shall be paid to Licensor in U.S. Dollars, in immediately available funds, at the location(s) specified in writing by Licensor from time to time.

3.

**Proprietary Information**

(a) <u>Non-Disclosure of Proprietary Information</u>.

(i) Licensee shall not disclose any non-public information and materials relating to the Brand, other than as required by any current, prospective or future lender, current, prospective or future investor, any current, prospective or future licensor of any Licensed Location components, any current, prospective or future landlord of a Licensed Location (with respect to gross revenue, if needed to calculate rent or other figures due and

payable)(or any current, prospective or future lender of any Licensed Location components, or as permitted under any other agreements between Licensee and Licensor and/or affiliates of Licensor in connection with the sale of the Licensed Location or the appointment of any Third-Party Managers (as hereinafter defined), provided that any such disclosure is made under a written non-disclosure agreement consistent with this Section 3. The restrictions in this Section 3.1(a) shall not apply to information which is or becomes generally known in the hospitality industry or to the general public (other than through disclosure in breach of this Agreement or otherwise in breach of any duty to Licensor), or has been developed independently by Licensee without using the Licensor Proprietary Information or the Toca/Casa Intellectual Property, or to the extent such disclosure is required under applicable laws or regulations, including those of the Securities Exchange Commission. If Licensee or any of its affiliates receives a request to disclose any Licensor Proprietary Information by subpoena, oral question, interrogatory, request for information or documents, civil investigative demand, order, or similar process from the U.S. Securities and Exchange Commission, the California Attorney General, or any other applicable Governmental Authority or from Licensee's direct or indirect investors, owners or partners, Licensee shall: (A) promptly notify Licensor (B) consult with Licensor on the advisability of taking steps to resist or narrow such request; and (C) if disclosure is required or reasonably deemed advisable by Licensee, cooperate with Licensor in any reasonable attempt Licensor may make to obtain an order or other assurance that confidential treatment will be accorded to the matters disclosed. Except as may be permitted by other agreements between Licensor and Licensee and/or affiliates of Licensee or required by legal counsel, upon the termination or expiration of this Agreement for any reason whatsoever, Licensee shall promptly, to the extent reasonably practicable, return to Licensor all Licensor Proprietary Information in tangible form that Licensee received from or on behalf of Licensor or Licensor and/or affiliates of Licensor and shall not retain any copies or extracts therefrom. This Section 3.1(a) shall survive the termination of this Agreement.

(A) **Licensor Trade Secrets.** Licensee acknowledges and agrees that Licensor's proprietary recipes as well as Licensor's supplier lists and pricing comprise the valuable trade secrets of Licensor. Licensee shall ensure that all of its personnel who receive access to Licensor trade secrets are bound by written nondisclosure agreements requiring such personnel not to disclose such trade secrets to any third parties for so long as such trade secrets are protected under applicable law. Any breach by Licensee's personnel of such non-disclosure obligations shall be deemed a material breach of this Agreement by Licensee. For the avoidance of doubt, Licensee's recipes developed and/or used at Licensed Locations shall be deemed Licensor Proprietary Information and not Licensee Proprietary Information, and in furtherance of the foregoing, Licensee shall and hereby does assign all right, title, and interest in and to such recipes that may vest or accrue in Licensee through performance of Licensee's obligations under this Agreement or the Management Agreement to Licensor.

(ii) Licensor shall not disclose any non-public information and materials relating to Licensee or the business affairs of Licensee provided under this Agreement, including without limitation: (i) operational manuals relating specifically and uniquely to the proprietary instructions, requirements, guidance or policy statements of the Licensed Location that do not constitute Licensor Proprietary Information; (ii) material relating to the operation and design standards that do not constitute Licensor Proprietary Information; and (iii) all trade secrets and copyrightable or patentable subject matter developed, acquired or licensed by Licensee in the operation of any Licensed Location or other similar operation or similar facility licensed, leased, operated or franchised by Licensee or any of its affiliates in which Licensor is not involved ("**Licensee Proprietary Information**") other than as required by any current or future lender or as expressly permitted under any other agreements between Licensor and Licensee and/or affiliates of Licensee. The restrictions in this Section 3.1(b) shall not apply to information which

is or becomes generally known or available to the general public (other than through disclosure in breach of this Agreement), or has been developed independently by Licensor or to the extent such disclosure is required under applicable laws or regulations, including those of the Securities Exchange Commission. Licensor, at all times during the Term of this Agreement and thereafter, shall protect the confidentiality of the Licensee Proprietary Information and shall not communicate or make the Licensee Proprietary Information available to, or use it for the benefit of, any unauthorized persons or entities. If Licensor or any of its affiliates receives a request to disclose any Licensee Proprietary Information by subpoena, oral question, interrogatory, request for information or documents, civil investigative demand, order, or similar process from the U.S. Securities and Exchange Commission, the California Attorney General, or any other applicable Governmental Authority or from Licensor's direct or indirect investors, owners or partners, Licensor shall: (A) promptly notify Licensee; (B) consult with Licensee on the advisability of taking steps to resist or narrow such request; and (C) if disclosure is required or reasonably deemed advisable by Licensor, cooperate with Licensee in any reasonable attempt Licensee may make to obtain an order or other assurance that confidential treatment will be accorded to the matters disclosed. Except as may be permitted by other agreements between Licensor and Licensee and/or affiliates of Licensee or required by legal counsel, upon the termination or expiration of this Agreement for any reason whatsoever, Licensor shall promptly, to the extent reasonably practicable, return to Licensee all Licensee Proprietary Information in tangible form that Licensor received from or on behalf of Licensee or Licensee and/or affiliates of Licensee and shall not retain any copies or extracts therefrom. This Section 3.1(b) shall survive the termination of this Agreement.

(iii) Notwithstanding the foregoing, Licensee shall have the right to use the Toca/Casa Intellectual Property for the purpose of raising capital for any and all Pipeline Deals and other Licensed Locations, including but not limited to those listed in Exhibit B hereto provided that such disclosure is subject to written non-disclosure agreements consistent with this Section 3.

4.
**Brand Standards; Use of Intellectual Property**

(a) Brand Standards. Licensee acknowledges and agrees that misuse of the Toca/Casa Intellectual Property by Licensee can have a substantial adverse effect on the reputation of, and goodwill associated with the Toca/Casa Intellectual Property. Licensee acknowledges that compliance with the Brand Standards (as defined below) is necessary to protect and enhance the value of the Toca/Casa Intellectual Property and the associated goodwill. Therefore, unless permitted otherwise, Licensee agrees that use of the Toca/Casa Intellectual Property under this Agreement shall at all times be: (a) in accordance with the terms of this Agreement; and (b) with respect to the operation of the Licensed Location, at a level of service which is at least generally consistent with, and does not materially deviate from, those standards evidenced, represented and exemplified by the operation of the Licensed Location (as a whole and not with respect to isolated events or instances) immediately prior to the Effective Date, and with, any written manuals, guidelines or standards related to the Toca/Casa Intellectual Property provided by Licensor from time to time (collectively, the "**Brand Standards**").

(b) Changes to the Toca/Casa Intellectual Property. From time to time and at Licensor's reasonable discretion and cost, Licensor may modify all or any part of the Toca/Casa Intellectual Property, so long as such modifications are consistent with the Brand Standards, which shall also apply to Licensor owned and operated locations. Licensee further acknowledges that Licensor requires the flexibility to modify all or any part of the Toca/Casa Intellectual Property and the Brand Standards to respond to market trends, customer demands, economic conditions, technological advances, and other factors affecting the Licensed Location and Licensed Location goods and services under the Brand, as they may change from time to time. Licensor may designate one or more new, modified or replacement Toca/Casa Intellectual Property, without Licensee's consent; provided, that Licensee shall not be required to utilize new Toca/Casa Intellectual Property except as required under the Brand Standards, but any modified or replacement Toca/Casa Intellectual Property shall be implemented promptly by Licensee.

Licensee shall use commercially reasonable efforts to do so as reasonably possible to Toca/Casa Intellectual Property or Brand Standard (e.g., logo changes shall be immediately implemented in any websites and social media platforms, but any pre-printed marketing materials and menus may be used up and the branding thereon replaced when reordered). Notwithstanding the foregoing, in the event of any change to the Toca/Casa Intellectual Property that requires repairs, alterations, improvements, renewals, replacements or additions of or to the structure or exterior façade of the Licensed Location, or to the mechanical, electrical, plumbing, HVAC, vertical transport and similar components of the Licensed Location that are capitalized under GAAP and depreciated as real property and/or replacement of furniture, fixtures, equipment, interior and exterior signs, as well as other improvements and personal property to comply with such change, whether expensed or capitalized, (a **"Physical Standard Change"**), Licensor shall give Licensee a minimum of six (6) months written notice of such Physical Standard Change, and any updates to Toca/Casa Intellectual Property or Brand Standard changes that require a Physical Standard Change may be implemented over the course of twelve (12) months at Licensee's cost and expense, so long as the costs required to effect such Physical Standard Change do not exceed $20,000.00 annually per venue and, in any case, are not greater than the cost of ordinary repair or replacement of a like item (and if such costs are greater than the foregoing threshold, Licensor shall bear the excess cost of such Physical Standard Change). If Licensor requires any Physical Standard Change to the same physical feature more than once every thirty (30) months, Licensor shall bear the costs of such additional requests or waive compliance with such subsequent changes until after twenty-four (24) months has elapsed since the previous Physical Standard Change was implemented by Licensee.

(c) <u>Licensor's Promotional Access</u>. Licensor or its representatives, during normal business hours and upon the prior approval of Licensee, which approval is not to be unreasonably withheld, conditioned or delayed, may enter the public areas of the Licensed Location (and in the case of secured areas such as guest rooms, accompanied by a representative of Licensee) to examine same for compliance with the Brand Standards and take photographs and videotapes of the exterior and interior of the Licensed Location, provided that Licensor shall be solely responsible for clearing intellectual property rights of third parties that may be depicted within such photographs and videotapes. Licensor may use such photographs and videotapes for such purposes as advertising, training, marketing and public relations, without any compensation to Licensee; provided, that Licensee shall have the right to review and comment on any such photographs and video to ensure that such photographs and video do not obviously infringe on the intellectual property rights of any other party, and could not reasonably be interpreted in a negative light, provided that final approval shall be in Licensor's sole discretion. Licensor shall be solely responsible with respect to, and shall indemnify, defend and hold Licensee, its affiliates, and their respective members, managers, directors, officers, employees, agents and representatives, including, without limitation, Third-Party Managers, harmless from and against, any liability that results from Licensor's entry onto the Licensed Location or creation or use of any intellectual property rights and/or marketing materials relating to the Licensed Location.

(d) <u>Licensor's Inspection Rights</u>. In order to ensure compliance with the Brand Standards, Licensee shall (a) permit Licensor (and/or its designee), accompanied by a representative of Licensee, to enter the Licensed Location, at any reasonable time during normal business hours, to conduct inspections; (b) cooperate with such inspections by rendering such assistance as Licensor (and/or its designee) may reasonably request; and (c) upon written notice from Licensor, promptly take such steps as may be necessary to correct any material variation from the Brand Standards identified in reasonable written detail and in writing during any inspection or provide a written notice of Licensee's objection to any alleged deficiency; provided that any material variations from the Brand Standards that were permitted to exist prior to the Effective Date with respect to operations under the Brand shall continue to be permitted, and shall not be required to be corrected under this Agreement.

(e) [Intentionally omitted.]

(f) <u>Refreshment of Toca/Casa Intellectual Property</u>. Licensee agrees that on a periodic basis during the Term of this Agreement, Licensor and Licensee, at Licensor's reasonable request, shall meet, in person or telephonically, for the purpose of reviewing the creative elements embodied in the Licensed Location as well as the physical design of the Licensed Location premises, with the view to evaluating

ideas and concepts to reflect the Licensed Location.

(g) <u>Licensee Acknowledgement</u>.  Because uniformity may not always be possible or desirable, Licensee acknowledges and agrees that Licensor, at its reasonable discretion, may vary the Brand Standards for the Licensed Location and for other properties that utilize the Toca/Casa Intellectual Property to the extent reasonably required by the physical conditions of a location or to comply with Laws.  Any material deviations from the Brand Standards shall be approved by Licensor in writing.

## 5.
## Marketing Matters

(a) <u>Website Ownership</u>.  Licensee, at Licensee's sole option and discretion, may elect to maintain a website for the Licensed Location, provided, however, that any domain names used by Licensee that incorporate the Toca/Casa Intellectual Property shall be owned and registered by Licensor. Data collected from visitors of the Licensed Location website or visitors who were directed to Licensor's website from the Licensed Location website or who visit Licensor's website for the purpose of obtaining information on the Licensed Location shall be the joint property of Licensor and Licensee, provided, however, that Licensee shall be solely responsible for ensuring that all necessary notices are provided and consents obtained under applicable law in regard to such information.

(b) <u>Licensor Social Media and Other Websites</u>.  Licensor currently owns and operates social media accounts, third-party listing websites, and other internet properties dedicated to the Brand and/or the Toca/Casa Intellectual Property as identified on <u>Exhibit E</u> (collectively, the "**Licensor Internet Properties**"). Licensor shall maintain all Licensor Internet Properties consistently with historical practice and the Brand Standards. Licensee shall, in accordance with the Brand Standards, maintain first-class internet and social media marketing presence with respect to property-level social media and internet accounts related to the Licensed Locations.

## 6.
## Licensed Location Manager and Third-Party Operators; Licensed Location Staff

(a) <u>Licensed Location Manager</u>. Licensee shall have the right to self-manage or retain third-party managers or lessees to provide management services for any or all venues incorporating the Toca/Casa Intellectual Property ("**Third-Party Managers**") subject to Licensor's prior written approval not to be unreasonably withheld.  Notwithstanding the foregoing, and for the avoidance of doubt, Licensor expressly pre-approves, and shall have no approval rights with respect to, any management company controlled by Tosh Berman or Mikey Tanha, or NewCo LLC so long as Tosh Berman or Mikey Tanha, collectively or individually, are controlling owners of NewCo LLC.

(b) <u>Third-Party Operators</u>.  Except as otherwise agreed between Licensor, Licensee, any Third-Party Manager and their respective affiliates, any facility or concession areas (as the same may be modified by Licensee from time to time) in the Licensed Location may be operated by a third-party lessee or operator under a lease or management or concession agreement; provided that Licensee is in no way relieved or otherwise released from any of its obligations under this Agreement. Licensee shall be jointly and severally liable for all obligations of any Third-Party Managers and any other subcontractors of Licensee, and shall be primarily liable for ensuring that license fees are paid by all Third-Party Managers.

(c) <u>Licensed Location Staff</u>.  Licensee (or Licensee's management company or the Third-Party Manager) shall staff the Licensed Location at all times with a sufficient number of qualified and trained individuals to operate the Licensed Location in accordance with the Brand Standards and in compliance with applicable Laws. Licensor expressly permits Licensee to hire or solicit to hire any existing personnel of the Licensed Location without any restriction or fee paid to Licensor or any of Licensor's affiliates.

## 7.
## Construction, Maintenance, Repair and Capital Improvements

(a) Maintenance and Repair. Licensee shall maintain at all times the Licensed Location in good working order and condition and in compliance with the Brand Standards (subject to the provisions of Section 4.1) and Laws.

(b) Major Capital Improvements. Licensee shall not require Licensor's approval before making any alterations, improvements, replacements, renewals or additions to the Licensed Location that (a) involve a material change in the primary use of the Licensed Location, or (b) involve a material expansion or alteration of the Licensed Location (including adding or removing guest rooms or public areas, or changing the configuration of the Licensed Location) (together "Major Capital Improvements"). Licensee shall perform Major Capital Improvements in accordance with the Brand Standards (subject to the provisions of Section 4), and the Laws. Licensee shall be solely responsible for all costs and expenses of Major Capital Improvements.

## 8.
## Intellectual Property Protection

(a) Rights to Toca/Casa Intellectual Property. Licensee acknowledges and agrees: (a) as between Licensor and Licensee, Licensor is and shall remain the exclusive licensor of all right, title and interest in and to the Toca/Casa Intellectual Property and the goodwill associated therewith, (b) that Licensee shall acquire no rights in and to the Toca/Casa Intellectual Property, including any improvements, enhancements, modifications, alterations, or other developments associated therewith, or the goodwill associated therewith by virtue of this Agreement and licenses granted hereunder, and in the event Licensee does acquire any of such rights by operation of Law, Licensee shall and hereby does assign all right, title and interest therein to Licensor, (c) that Licensee shall not represent in any manner that Licensee has acquired any ownership rights whatsoever in the Toca/Casa Intellectual Property, (d) that any and all use of the Toca/Casa Intellectual Property by Licensee shall inure to the exclusive benefit of Licensor, and (e) the restrictions and limitations with respect to Licensee's use of the Toca/Casa Intellectual Property apply to all forms and formats now in existence or hereafter conceived, including print, video, electronic, and other media, and all other elements used in commerce. This Section 8.1 shall survive the termination of this Agreement.

(b) Intellectual Property Notices. Subject to the provisions of Section 4(a) of this Agreement, Licensee shall not materially deviate from the Brand Standards and usage guidelines for the Toca/Casa Intellectual Property set forth in Exhibit D. Subject to Section 4(a) and 4(b) of this Agreement, Licensor may adjust such guidelines from time to time in its reasonable discretion including, without limitation, any guidelines relating to the form and manner in which the Toca/Casa Intellectual Property is displayed or embodied, and any guidelines relating to trademark notices, copyright notices, or other proprietary legends or markings. Subject to Section 4(a) and 4(b), Licensee shall be required to adhere to new guidelines.

(c) Restrictions. Licensee shall not: (a) identify itself as the owner of the Toca/Casa Intellectual Property or any right, title or interest therein or on any registration or application for registration thereof, except as a licensee, (b) apply for or maintain the registration of any trademark or copyright relating to the Toca/Casa Intellectual Property anywhere in the world, (c) apply for or maintain the registration of any trademark which is the same as, confusingly similar to, or which incorporates the Toca/Casa Intellectual Property, anywhere in the world, and (d) take any action whatsoever to contest Licensor's proprietary interest in the Toca/Casa Intellectual Property. Licensee shall not use the Toca/Casa Intellectual Property in any manner for any purpose whatsoever in its legal name or another trade or assumed name under which Licensee does business, except in the Licensed Location name or as presently set forth in the name of Licensee or any of its affiliates. Licensee may engage in nominative use of the Toca/Casa Intellectual Property (i) to identify or describe the operations of Licensee in any prospectus, offering, circular or other form of marketing materials for Licensee's business; (ii) to identify or describe the business of Licensee in connection with a sale or financing of the Licensed Location, whether through debt, equity or other instruments; (iii) to identify or describe the business of Licensee in the marketing of the Licensed Location for sale or financing; or (iv) to identify or describe in any press release or website for Licensee's or its Affiliates' other restaurant or entertainment concepts the experience of NewCo LLC or any NewCo LLC team member and its/their historical and then-current affiliation with Toca Madera and

consent to use, or acknowledge, any right that Licensor under this Agreement, or the expiration or termination of this Agreement, shall confer on Licensee or any person claiming by or through Licensee, any right or remedy to use the Toca/Casa Intellectual Property. Licensee acknowledges and agrees that Licensor may terminate this agreement for any breach of this Section 8(c) in accordance with Section 9(c)(i).

(d) <u>Infringement</u>.   If Licensee at any time learns of any attempted and/or actual counterfeiting, infringement, imitation, unauthorized and/or illegal use of any of the Toca/Casa Intellectual Property (any or all the foregoing, "**Infringements**"), then Licensee promptly shall report the Infringements to Licensor in writing, and promptly provide Licensor with any additional information or material which Licensor may reasonably request concerning the Infringements. Licensor, in its sole and exclusive discretion shall have the right to decide whether or not to take, and to implement, any and all enforcement and/or other decisions in connection with any Infringements. Absent Licensor's express prior written approval, which may be granted or withheld in Licensor's discretion, Licensee shall not take any action with respect to any Infringements. To the extent Licensor takes or pre-approves in writing any action with respect to any Infringements, Licensee shall fully cooperate (at Licensor's sole cost and expense) in connection therewith to the extent reasonable. All compensation, proceeds and/or recoveries recovered in connection with any enforcement proceeding and/or other form of claim arising from an Infringement shall be retained solely by Licensor.

(e) <u>Trademark Notice</u>.   Licensee shall use an appropriate trademark notice approved by Licensor in writing in conjunction with all advertising and promotional materials used in connection with the Licensed Location, the Brand and the Toca/Casa Intellectual Property.

(f) <u>Other Intellectual Property</u>.   Licensor acknowledges that neither Licensor nor any affiliate of Licensor shall, by virtue of this Agreement, have any right, title, or interest in or control over any intellectual property developed or acquired by Licensee or any third party, or licensed by Licensee from a party other than Licensor or its affiliates.  Notwithstanding the foregoing, Licensor shall own any and all forms of intellectual property used by, for and/or under the authority of Licensee on or in connection with the Brand or Branded Products, or the operation of Licensed Locations (including recipes), provided that the foregoing shall not apply to any intellectual property developed independently by Licensee without using the Licensor Proprietary Information or the Toca/Casa Intellectual Property. Licensee hereby assigns to Licensor (and/or immediately upon creation shall assign to Licensor, and shall be deemed to have done so automatically) any and all such rights in and to such intellectual property. All use of any such trademark and/or trade dress rights by, for and/or under the authority of Licensee shall inure to the benefit of Licensor.

## 9.
## Term and Termination

(a) <u>Term</u>.   Subject to the termination provisions below, the term of this Agreement (the "**Initial Term**") shall commence as of the Effective Date of any Management Agreement, Pipeline Deal, or Hotel Group Deal (as described herein and in <u>Exhibit B</u>), with each continuing for ten (10) years from the particular Effective Date, unless extended or sooner terminated as hereinafter provided. Each Term may be extended at Licensee's option for two (2) additional terms of five (5) years (each an "**Extension Term**") if, and only if, Licensee provides (as Licensee may elect to do in its sole discretion) prior written notice of its election to extend the Term to Licensor at least ninety (90) days before the then-scheduled expiration of the Term. The Initial Term and any Extension Term are referred to collectively as the "**Term**". The date when this Agreement is terminated, by expiration of the Term or any other reason, is referred to as the "**Termination Date.**"

(b) Licensee's Right to Terminate.

(i) Licensee shall be entitled to terminate this Agreement without penalty upon fifteen (15) days' notice to Licensor if a material breach of this Agreement by Licensor occurs and Licensor fails to cure such material breach within thirty (30) days after receipt of written notice of the material breach, or, if such material breach cannot reasonably be cured within such thirty (30) days, Licensor does not commence to cure such material breach within thirty (30) days after notice by Licensee and thereafter diligently completes such cure within sixty (60) days after notice by Licensee.

(ii) Licensee shall be entitled to terminate this Agreement without penalty immediately upon written notice delivered to Licensor if Licensor commences or becomes the subject of any proceeding under any applicable bankruptcy law, or if a court appoints an administrator, receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for Licensor or for a substantial part of its property and any such involuntary proceeding or appointment is not discharged within sixty (60) days, or if Licensor makes a general assignment for the benefit of creditors.

(iii) Licensee shall be entitled to terminate this Agreement without penalty immediately upon written notice delivered to Licensor if Licensor fails to comply with any Laws applicable to Licensor as licensor of the Brand in a manner that may affect the validity or enforceability of this Agreement or that may expose Licensee to material liability, and if Licensor fails to cure such noncompliance within thirty (30) days after receipt of written notice of the noncompliance or, if such noncompliance cannot reasonably be cured within such thirty (30) days, Licensor does not (i) commence to cure such noncompliance within thirty (30) days after such notice by Licensee or (ii) thereafter diligently complete such cure within sixty (60) days after notice by the Licensee.

(iv) Either party may terminate this this Agreement without penalty upon fifteen (15) days' prior written notice to the other party if the other party commits a grossly negligent or willful act which materially damages the reputation of the Licensed Location or the Toca/Casa Intellectual Property.

(c) Licensor's Right To Terminate.

(i) Subject to Section 9.3(b), Licensor shall be entitled to terminate this Agreement immediately upon notice to Licensee if any material breach of this Agreement by Licensee occurs and Licensee fails to cure such material breach within thirty (30) days after receipt of written notice of the material breach, or, if such material breach cannot reasonably be cured within such thirty (30) days, Licensee does not commence to cure such material breach within thirty (30) days after such notice by Licensor and thereafter diligently complete such cure within sixty (60) days after notice by Licensor.

(ii) Licensor shall be entitled to terminate this Agreement immediately upon written notice delivered to Licensee if Licensee commences or becomes the subject of any proceeding under any applicable bankruptcy law, or if a court appoints an administrator, receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for Licensee or for a substantial part of its property and any such involuntary proceeding or appointment is not discharged within sixty (60) days, or if Licensee makes a general assignment for the benefit of creditors.

(d) Obligations on Termination.

(i) Immediately upon occurrence of the termination or expiration of this Agreement (**"Termination"**), Licensee shall cease to have any of the rights granted to it under this Agreement, but shall not be relieved from any obligations which accrued prior to the date of Termination.

(ii) Licensee shall, upon termination, take every action and execute all such documents, if any, as may be reasonably necessary or appropriate to reflect the termination of any rights acquired by Licensee under this Agreement, including, without limitation:

(1) Pay all sums, fees, Reimbursable Expenses or any other charges to which Licensor is entitled under this Agreement. The amount of all such sums, charges and fees shall be ascertained for the period ending on the Termination Date and shall be paid to Licensor to the extent ascertained on the Termination Date;

(2) Cease (and use commercially reasonable efforts to cause third parties contracted by Licensee to cease) marketing and/or operation of the Licensed Location under the Brand;

termination by Licensor) pursuant to Licensee's breach of Section 1(a) or 8(c), within fifteen (15) days, all Toca/Casa Intellectual Property (including associated trade dress), and return, destroy, or alter in a manner reasonably satisfactory to Licensor (i) all brochures, advertising and promotional materials and all other printed materials containing the Toca/Casa Intellectual Property, and (ii) all signs, operating supplies, and other items containing Toca/Casa Intellectual Property. Licensee will use commercially reasonable efforts to cover anything bearing the Toca/Casa Intellectual Property or otherwise identified as being associated with the Brand which cannot be removed on the Termination Date until it can be removed, which should be no later than thirty (30) days from the Termination Date.; and

(4) Cancel any assumed or fictitious name or equivalent registration, rename any entities using any portion of the Toca/Casa Intellectual Property as a business name, and sign a statement acknowledging the Termination or take the appropriate steps to terminate any similar agreement.

## 10.
## **Bankruptcy**

(a) The Parties acknowledge and agree that any delay in the decision of a debtor-in-possession or trustee of the bankruptcy estate to assume or reject the Agreement (the "Decision Period") materially harms Licensor by interfering with their ability to alternatively exploit the rights granted under this Agreement during a Decision Period of uncertain duration. The Parties recognize that arranging appropriate alternative exploitation of the licensed Toca/Casa Intellectual Property is a time consuming and expensive process and that it is unreasonable for Licensor to endure a Decision Period of extended uncertainty. Therefore, the Parties agree that the Decision Period shall not exceed sixty (60) days.

(b) Notwithstanding the above, if a Party commences or becomes the subject of any proceeding under any applicable bankruptcy or insolvency law, or if a court appoints an administrator, receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for the Party or for a substantial part of its property, the Party agrees to reimburse the other Party for all of its reasonable attorneys' fees and litigation expenses, including travel expenses, photocopying expenses, court and deposition transcript expenses, and other court costs and related expenses, which the other Party may incur in protecting its rights under this Agreement.

## 11.
## **Assignment and Sale of Licensed Location**

(a) <u>Assignment</u>. This Agreement or the License or any other rights granted hereunder may be assigned, sublicensed, pledged, or transferred by a Party without the written approval of the other Party only as set forth below. Any other attempted assignment, sublicense, or encumbrance shall be void and of no force or effect.

(i) <u>Permitted Assignment by Licensor</u>. Licensor may assign, novate, or otherwise transfer, in whole or in part, this Agreement or any of its rights or obligations hereunder to any person that acquires (whether by purchase of stock or assets, merger, consolidation, reorganization or other corporate-level transaction) substantially all of the business and assets related to the licensing of the Brand.

(ii) <u>Permitted Assignment by Licensee</u>. Licensee may freely assign, upon notice to Licensor, both this Agreement and Licensee's rights, duties, and obligations under this Agreement to an Affiliate; provided, however, such Transfer does not result in any change in actual or effective control of Licensee and Tosh Berman or Mikey Tanha, collectively or individually, are controlling owners of such Affiliate, which provision shall expire and be of no further force and effect upon the thirty-six (36) month anniversary of the Effective Date. In addition, Licensee may assign all of its rights and interests in this Agreement exclusively in connection with a direct or indirect sale of the Licensed Location, subject to Licensor's

renew this authorization upon the occurrence of any total assignee
Licensor's approval not to be unreasonably withheld, conditioned, or
delayed.

12.

**Licensor Programs**

(a) Sponsorships.

   (i) Licensor shall have no authority to require Licensee to participate in any sponsorship opportunities. Licensor may propose sponsorship opportunities to Licensee as part of an annual review with Licensee, but Licensee's participation in any such opportunities shall be in Licensee's sole discretion. Licensor's proposal of sponsorship opportunities shall be accompanied by full disclosure of all terms, including all written or oral agreements, financial terms, the means by which sponsorship costs and benefits are allocated among any of Licensor's properties or affiliates, and any income or benefit obtained by Licensor or any affiliate from such sponsorship. Licensee shall not be restricted from negotiating sponsorship opportunities independent of Licensor, provided that any such sponsorship opportunities do not materially deviate from past practices or the Brand Standards and are presented to Licensor for Licensor to consider any opportunity to join in such sponsorship opportunities. Licensor shall compensate Licensee for all sponsorship opportunities that Licensee participates in, with a full accounting of monies received and disbursed. If Licensor or its affiliates leverage the Licensee's business, including the Licensed Location, in any way to generate sponsorship value, whether in cash or in kind, for the Licensor or its affiliates, such sponsorship value, net of the reasonable direct costs of generating such value, including payroll and administration costs, shall be equitably shared with Licensee based on the Licensee's and/or the Licensed Location's relative contribution towards the sponsorship value received.

   (ii) So long as any sponsorships are in effect, Licensor shall provide, within thirty (30) days after the end of each calendar quarter (subject to delays in receiving relevant data from the relevant sponsors), with respect to each such sponsorship, a summary of funds received, the total value generated by those sponsorship activities, the direct costs of generating the sponsorship value, the allocation of both value and direct costs to the Licensee, and the calculation of such allocations in sufficient detail to permit Licensee to assess the fairness of such allocations. The foregoing summary shall be certified as accurate by the chief financial officer of Licensor.

   (iii) Notwithstanding the foregoing, where sponsorship agreements provide for funding of specific amounts for the benefit of Licensee or the Licensed Location, Licensor shall use commercially reasonable efforts to cooperate or shall use commercially reasonable efforts to cause its affiliates to cooperate with Licensee in amending those existing agreements to provide for direct payment to Licensee of all such amounts when and as due.

13.

**Governing Law and Dispute Resolution**

(a) <u>Governing Law</u>. This Agreement has been executed and delivered in, and shall be governed by and construed in accordance with the laws of, the State of California, United States of America, applicable to contracts made and performed in such state and without regard to conflict of law provisions.

(b) <u>Arbitration</u>. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, ANY CONTROVERSY OR DISPUTE ARISING OUT OF THIS AGREEMENT, THE INTERPRETATION OF ANY OF THE PROVISIONS HEREOF, OR THE ACTION OR INACTION OF ANY PARTY HEREUNDER SHALL BE SUBMITTED TO FINAL AND BINDING ARBITRATION IN LOS ANGELES, CALIFORNIA ADMINISTERED BY JAMS/ENDISPUTE IN ACCORDANCE WITH THE THEN-EXISTING JAMS/ENDISPUTE ARBITRATION RULES AND PROCEDURES FOR COMMERCIAL DISPUTES. CALIFORNIA CODE

OF CIVIL PROCEDURE § 1283, INCLUDING PROVISIONS PERTAIN
DISCOVERY RIGHTS, SHALL APPLY TO SUCH ARBITRATION, AND
SAID CODE SECTION IS ALSO HEREBY INCORPORATED BY
REFERENCE. IN THE EVENT OF SUCH AN ARBITRATION
PROCEEDING, THE PARTIES SHALL SELECT A MUTUALLY
ACCEPTABLE NEUTRAL ARBITRATOR FROM AMONG THE
JAMS/ENDISPUTE PANEL OF ARBITRATORS. IN THE EVENT SUCH
PARTIES SHALL BE UNABLE TO AGREE ON AN ARBITRATOR WITHIN
THIRTY (30) DAYS AFTER INITIALLY ATTEMPTING TO CHOOSE AN
ACCEPTABLE ARBITRATOR, THE ADMINISTRATOR OF
JAMS/ENDISPUTE WILL APPOINT AN ARBITRATOR. ANY AWARD OR
DECISION OBTAINED FROM ANY SUCH ARBITRATION PROCEEDING
SHALL BE FINAL AND BINDING ON THE PARTIES, AND JUDGMENT
UPON ANY AWARD THUS OBTAINED MAY BE ENTERED IN ANY
COURT HAVING JURISDICTION THEREOF. UNLESS OTHERWISE
ORDERED BY THE ARBITRATOR, THE ARBITRATOR'S EXPENSES
SHALL BE SHARED EQUALLY BY THE PARTIES. NO ACTION AT LAW
OR IN EQUITY BASED UPON ANY CLAIM ARISING OUT OF OR
RELATED TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY
COURT BY ANY PARTY HERETO EXCEPT (A) AN ACTION TO COMPEL
ARBITRATION PURSUANT TO THIS SECTION 13 OR (B) AN ACTION TO
ENFORCE AN AWARD OBTAINED IN AN ARBITRATION PROCEEDING
IN ACCORDANCE WITH THIS <u>SECTION 14</u>**Error! Reference source not found.**.

NOTICE: BY SIGNING THE AGREEMENT YOU ARE AGREEING TO HAVE ANY
DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'BINDING
ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL
ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT
POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY
TRIAL. BY YOUR EXECUTION OF THIS AGREEMENT YOU ARE GIVING
UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS
SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE ARBITRATION
OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO
ARBITRATION AFTER AGREEING TO THIS PROVISION YOU MAY BE
COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE
APPLICABLE STATE STATUTE. YOUR AGREEMENT TO THIS
ARBITRATION PROVISION IS VOLUNTARY.

Should any provision of this Agreement or any Exhibit, instrument or document
delivered pursuant to this Agreement require arbitrator or judicial interpretation, it
is agreed that the arbitrator or court interpreting or considering such provision
shall not apply the presumption that the terms hereof shall be more strictly
construed against a party by reason of the rule or conclusion that a document
should be construed more strictly against the party who itself or through its agent
prepared the same. It is agreed and stipulated that all Parties hereto have
participated equally in the preparation of this Agreement and that legal counsel
was consulted by each party before the execution of this Agreement. Titles to
Sections are inserted solely for convenience and shall not be utilized in
interpreting this Agreement. In this Agreement, whenever the context so requires,
the masculine gender includes the feminine and/or neuter, the singular number
includes the plural and vice versa. The captions preceding the text of Sections
and Paragraphs are included only for convenience of reference and shall be
disregarded in the construction and interpretation of this Agreement. The terms
**"hereby," "herein," "hereof," "hereto"** and **"hereunder"** refer to this Agreement.

14.

**Indemnification**

(a) <u>Indemnification of Licensor</u>. Licensee shall defend, indemnify, and hold Licensor and
its respective members, managers, directors, officers, employees, agents and
representatives harmless from and against any and all liabilities, fines, suits,
claims, obligations, damages, penalties, demands, actions, costs and expenses
actually incurred by Licensor and payable to a party other than Licensor or an
affiliate of Licensor (collectively, **"Licensor Claims"**) arising out of: (a)
Licensee's breach of any of its representations, warranties, covenants or
obligations under this Agreement; or (b) the marketing and operation of the
Licensed Location by Licensee.

(b) Indemnification of Licensee. Licensor shall indemnify and hold Licensee, its affiliates, and their respective members, managers, directors, officers, employees, agents and representatives, including, without limitation, Third-Party Managers, harmless from and against any and all liabilities, fines, suits, claims, obligations, damages, penalties, demands, actions, costs and expenses actually incurred by Licensee and payable to a party other than Licensee or an affiliate of Licensee (collectively, **"Licensee Claims"**) arising out of: (a) any third party claim that the use of the Toca/Casa Intellectual Property by Licensee in accordance with the terms of this Agreement and the Brand Standards infringes on such third party's intellectual property rights; (b) Licensor's breach of any of its representations, warranties, covenants or obligations under this Agreement; (d) the marketing of the Licensed Location by Licensor; (e) the violation by Licensor or its affiliates or any of their members, managers, directors, officers, employees, agents and representatives of any laws, statutes, ordinances, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of all governmental authorities and public utilities which now or hereafter may be applicable to any portion of the Licensed Location or the marketing thereof, except to the extent such Licensee Claims are caused by the gross negligence or willful misconduct of Licensee or its affiliates; or (f) any Losses from any legal action threatened or taken by the dissenting members of the Board of Directors of Owner or Owner's Affiliates, whom dissented to the approval of this Agreement in actions taken therefrom.

## 15.
## **Representations and Warranties**

(a) Representations of the Parties. Each of Licensor and Licensee represent as to itself as follows:

(i) It has been duly organized and is validly existing in good standing under the laws of the state of its organization.

(ii) It is duly qualified to do business in all jurisdictions which require such qualification to conduct the business to be conducted under this Agreement.

(iii) It has the power and authority to enter into and perform its respective obligations created by this Agreement.

(iv) This Agreement has been duly authorized by all necessary action on its part and has been duly executed and delivered by it.

(v) Neither the execution and delivery of this Agreement by it, nor compliance by it with any of the provisions hereof, will: (a) violate or conflict with any provision of its organizational documents, (b) violate, alone or with notice or the passage of time, result in the breach or Termination (defined below) of, or otherwise give any contracting party the right to terminate, or declare a default under, the terms of any contract or commitment to which it is a party or by which it may be bound that impacts such Party's duties or obligations under this Agreement, (c) violate any decree, order, injunction, judgment or award against, or binding upon, it, or (d) violate any Law applicable to such Party's performance under this Agreement.

(b)     Representations of Licensor. Licensor also represents and warrants that it is the                          sole and exclusive owner of the Brand and the Toca/Casa Intellectual Property                          and that it has not assigned any of the rights licensed herein to any third-party.

## 16.
## **General Provisions**

(a) Independent Contractor. Licensor and Licensee are each independent contractors of each other.   They do not intend to create any relationship of joint venturers, partners, agents, servants, employees, fiduciaries or representatives of each other.

Neither Party shall make any representation contained in the name of or on behalf of the other Party nor suggest that their relationship is other than that of licensor and licensee.

(b) Notices.  All notices, demands, consents, approvals and other communications (each, a "**Notice**") that are required or desired to be given by either party to the other under this Agreement shall be in writing and shall be (a) hand delivered, (b) sent by U.S. registered or certified mail, postage prepaid, return receipt requested, (c) sent by reputable overnight courier service, addressed to the appropriate party at its address set forth below, or at such other address as such party shall have last designated by Notice to the other, or (d) by e-mail.  Notices shall be deemed given when delivered.  Rejection or other refusal by the addressee to accept a Notice or the inability to deliver the Notice because of a changed address of which no Notice was given shall be deemed to be receipt of the Notice sent.

Notice addresses for the Parties are as follows:

| If to Licensor: | If to Licensee: |
|---|---|
| The Madera Group<br>8720 Sunset Boulevard<br>West Hollywood, CA 90069<br>Attention: _____<br>Email: | [NewCo]<br>_____<br>_____<br>Attention: _____<br>Email:<br><br>With a copy to:<br><br>Jeffer Mangels Butler & Mitchell LLP<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067<br>Attention:  David A. Sudeck, Esq.<br>Email: dsudeck@jmbm.com |

(c) Headings; Defined Terms.  The headings herein are for convenience of reference only, do not constitute a part of this Agreement, and shall not be deemed to limit or affect any of the terms or provisions hereof.  Exhibit C sets out definitions of capitalized terms used in this Agreement.

(d) Construction.  Whenever in this Agreement the context so requires, references to the masculine shall be deemed to include feminine and the neuter, references to the neuter shall be deemed to include the masculine and feminine, and references to the plural shall be deemed to include the singular and the singular to include the plural.  As used in this Agreement, the words "include" and "including," and all variations thereof, shall not be deemed to be terms of limitation.  The entities comprising Licensor hereunder shall be jointly and severally liable for all obligations and liabilities of Licensor under this Agreement.

(e) Entire Agreement.  This Agreement (including the schedules and exhibits hereto, which are incorporated herein and made a part of this Agreement) constitutes the entire agreement and understanding of the Parties hereto and terminates and supersedes all prior or contemporaneous agreements and understandings, both oral and written, express or implied, between the Parties concerning the subject matter of this Agreement.

(f) Waiver and Amendment.  No waiver or amendment of any provision of this Agreement shall be effective unless and until made in writing and signed by both Parties.  No waiver or forbearance by any Party of its right to enforce any provision of this Agreement shall be construed as constituting a continuing waiver or as a waiver in other instances. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any such rights.  No course of conduct or method of doing business shall modify or amend the terms hereof.

(g) Severability.  If any provision of this Agreement is determined to be unenforceable to any extent, the remainder of this Agreement shall not be affected and shall continue to be valid and enforceable to the fullest extent permitted by Law.  If any provision is held invalid as to duration, scope, activity, or subject, such provision shall be construed by limiting and reducing it so as to be enforceable to the extent compatible with applicable Law.

(h) Cooperation.  Each Party hereto shall cooperate with the other Party hereto and shall take such further action and shall execute and deliver such further documents as

may be necessary or desirable in connection with the provisions and purposes of this Agreement. Furthermore, Licensor acknowledges that Licensee may enter into a third-party management agreement subject to the terms and conditions of this Agreement, and Licensor shall cooperate fully regarding each such agreement.

(i) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(j) <u>Facsimile Signatures</u>. This Agreement shall become binding and enforceable upon a Party at such time as a counterpart has been signed and transmitted personally, electronically, or via facsimile to the other Party. In the event of transmittal by facsimile, the signed counterpart shall be deposited in the mail within twenty-four (24) hours thereafter, but the failure to do so shall have no effect on the enforceability of this Agreement.

(k) <u>Interpretation</u>. Any rule or law or any legal decision that would require the interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived by the Parties. The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intent of the Parties hereto.

(l) <u>Full Execution</u>. This document will neither be a binding agreement, nor constitute a note or memorandum of the material terms of an agreement, until each Party has received a copy executed by duly authorized officers of all the Parties.

(m) <u>Limitation on Damages</u>. Notwithstanding anything to the contrary in this Agreement, each Party unconditionally and irrevocably waives and disclaims for itself and its Representatives, to the fullest extent permitted under Laws, all rights to any consequential, punitive, exemplary or statutory damages relating to this Agreement (other than Licensee's rights and remedies relating to patents, trademarks, copyrights, trade secrets and other intellectual property). The rights and remedies in this Agreement will be adequate in all circumstances for any claims the Parties might have with respect thereto.

(n) <u>Time of the Essence</u>. Time is of the essence of each and every provision of this Agreement.

(o) <u>Confidentiality of Terms</u>. The Parties agree that the terms, conditions and provisions set forth in this Agreement are strictly confidential.

(p) <u>Public Statements</u>. The Parties shall cooperate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance of their respective obligations under this Agreement. Neither Party shall issue any press release or other public statement regarding this Agreement without the prior approval of the other Party, except where required by Laws, in which case each Party shall provide the other Party with a reasonable opportunity to review and comment upon such statement before its issuance. Notwithstanding the foregoing, Licensor shall not be required to obtain Licensee's prior approval (i) with respect to use of the approved name of the Licensed Location or identification of the Licensed Location as being associated with the Toca/Casa Intellectual Property, (ii) with respect to the identity of Licensee, (iii) with respect to publicly available information regarding Licensee, or (iv) with respect to disclosure of the terms of this Agreement, in each case for the purpose of complying with Licensor's obligations under Laws. Notwithstanding anything in this Agreement to the contrary, Licensee shall not be restricted (i) from any promotion or marketing of the Licensed Location or Licensee's affiliation with a third-party manager, or (ii) from any permitted communication/use as set forth in Section 8.3.

(q) Governmental Approvals; Compliance with Governmental Authorities.

(i) This Agreement and all other agreements contemplated herein shall be executed subject to all required approvals and authorizations, if any, by all applicable Governmental Authorities. For the purpose of this Agreement, **"Governmental Authority"** shall mean any government or political subdivision, or an agency or instrumentality thereof.

(ii) If any Governmental Authority requires, as a condition of its approval or authorization, the modification of any terms or provisions of this Agreement, the Parties shall use their commercially reasonable efforts to comply with such request; provided, however, that if such modification would have a material and adverse effect with respect to any Party's rights or obligations under this Agreement, then such Party shall have the right

to terminate this Agreement by giving notice to the other Party within thirty (30) days after receipt of such request for modification, with no liability whatsoever to either Party for such termination.

(iii) If any Governmental Authority requires Licensor to perform any action or activity, or cease to perform any action or activity, then, subject to any applicable right of Licensor to lawfully challenge, appeal, delay, or otherwise dispute or seek modification of such requirement, Licensor shall promptly comply with the Governmental Authority's requirement.

(r) <u>Compliance with Applicable Laws</u>. Licensor shall perform its obligations hereunder in compliance with Laws applicable to Licensor's obligations as licensor of the Brand. Licensee shall perform its obligations hereunder in compliance with applicable Laws.

*[Remainder of Page Intentionally Left Blank – Signature Page Immediately Follows]*

2

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

| LICENSOR | LICENSEE |
|---|---|
| **The Madera Group, LLC,**<br>a Nevada limited liability company | [NewCo],<br>a _____ |
| By: _____ | By: _____ |
| Name: MATTHEW SYKEN | Name: TOSH BERMAN |
| Title: AUTHORIZED OFFICER | Title: MANAGER |

21

## EXHIBIT A

### TOCA/CASA INTELLECTUAL PROPERTY - TRADEMARKS

The Toca/Casa Intellectual Property includes the trademarks and service marks embodied in the registrations listed below.

| Trademark | Registration No. |
|---|---|
| TOCA MADERA | USPTO Registration No. 4921793 |
| CASA MADERA | USPTO Serial No. 88228776 |

A-1

**EXHIBIT B**

**LICENSED LOCATION(S), APPLICABLE BRAND, AND EFFECTIVE DATE(S)**

[see attached]

| LICENSED LOCATION | BRAND TO BE USED FOR LICENSED LOCATION | EFFECTIVE DATE | FEE STRUCTURE (*All references to "NewCo" shall mean and refer to Licensee or its Affiliate) |
|---|---|---|---|
| Toca Madera Las Vegas – The Shops at Crystals 3720 S. Las Vegas Blvd. Las Vegas, NV 89158 | Toca Madera | | The parties intend that NewCo lease/operate/manage the premises, but TMG has guaranteed the lease. NewCo will be responsible for raising capital required for the project. In exchange for guaranteeing the lease, TMG will receive a 20% equity interest in any entity, with the same class of securities as NewCo. TMG and Breakwater will also have the option to invest up to $1,250,000.00 in the project on the same terms as those given to the lead investor in any equity round raised by NewCo. Further terms to be agreed in writing by the appropriate parties. Once the restaurant opens, NewCo will pay to TMG the greater of 2.5% of Gross Revenue or $150,000.00 per year, but only for Gross Revenue earned after the first 3 full months of operation. For the avoidance of doubt, profit distributions for owners of the project entity (including TMG and NewCo) shall be calculated after the payment of License Fees. Until Toca Madera Las Vegas opens, NewCo will not open any other full-service restaurant locations other than as set forth on this Exhibit B. The foregoing structure shall serve as non-binding precedent for future deals in which TMG guarantees the lease, unless the parties agree otherwise in writing. |
| | | | |
| Casa Madera – Mondrian | Casa Madera | | The parties intend that |

| Location | Brand | | Terms |
|---|---|---|---|
| West Hollywood 8440 Sunset Blvd. West Hollywood, CA 90069 | | | NewCo will manage the premises, but TMG will guarantee the lease. Thereafter, NewCo will pay to TMG the greater of 2% of Gross Revenue or $120,000 per year, but only for Gross Revenue earned after the first 3 full months of operation, equitably prorated for the first and last year of the Term, as needed. |
| Hotel Figueroa – Downtown Los Angeles 939 S. Figueroa St. Los Angeles, CA 90015 | N/A | | The parties intend that NewCo operate/manage the premises. NewCo will pay to TMG 35% of any and all amounts received under the contract after the first $500,000.00 received, which initial $500,000 in receipts shall belong solely to NewCo without distribution to TMG. NewCo will pay TMG promptly upon being paid under the contract with the location. |
| Toca Madera West Hollywood 8450 W. Third St. Los Angeles, CA 90045 | Toca Madera | | Refer to Management Agreement |
| Toca Madera Scottsdale 4736 N. Goldwater Blvd, Scottsdale, AZ 85251 | Toca Madera | | Refer to Management Agreement |
| Casa Madera Toronto 1 Hotel Toronto 550 Wellington St. W Toronto, ON M5V 2V5, Canada | Casa Madera | | The parties intend that NewCo operate/manage the premises. NewCo will pay to TMG 35% of any and all amounts received under the contract. |
| Madera at the Treehouse London a/k/a Casa Madera London Treehouse Hotel London 14-15 Langham Pl, Marylebone, London W1B 2QS, United Kingdom | Casa Madera | | The parties intend that NewCo operate/manage the premises. NewCo will pay to TMG 35% of any and all amounts received under the contract. |

The Parties further intend that for any Toca Madera deals not listed above that:

- Licensee/NewCo will be lessee, Licensee shall pay to TMG the greater of 2.5% of Gross Revenue or $120,000.00 per full calendar year, but only for Gross Revenue earned after the first 3 full months of operation.

• For Toca Madera deals not listed above that are management deals that NewCo procures, NewCo will pay to TMG 15% of any and all amounts earned under that contract.

• For Toca Madera deals not listed above that are licensing deals that NewCo procures, NewCo will pay to TMG 35% of any and all amounts earned under that contract.

The Parties further intend that for any Casa Madera deals not listed above that:

• Licensee/NewCo will be lessee, Licensee shall pay to TMG the greater of 2% of Gross Revenue or $120,000.00 per full calendar year, but only for Gross Revenue earned after the first 3 full months of operation.

• For Casa Madera deals not listed above that are management deals that NewCo procures, NewCo will pay to TMG 15% of any and all amounts earned under that contract.

• For Casa Madera deals not listed above that are licensing deals that NewCo procures, NewCo will pay to TMG 35% of any and all amounts earned under that contract.

For all future Toca and Casa deals, (i) TMG shall have a right of first refusal to invest on terms set by NewCo and consistent with all other investors, and (ii) TMG shall have a right of first refusal to sign future leases (where applicable) to be able to earn additional equity in those future Toca and Casa locations. The specific terms of any right of first refusal and any investment or other terms may be subsequently set forth in separate agreements signed by the Parties.

The Parties further agree as follows for any Tocaya Comps/Discounts:

• Board Members of TMG, Tosh Berman, and Mikey Tanha shall not be charged for any food, and NewCo corporate team members shall receive a 50% discount.

The Parties further agree as follows for fundraising:

• Any fundraising efforts by Licensee/NewCo, LLC for any deals listed above that began prior to this Agreement will continue under Licensee/NewCo, LLC with all rights reserved by Licensee/NewCo, LLC and/or its Affiliate(s).

B-1

**EXHIBIT C**

**DEFINITIONS**

C-1

**EXHIBIT D**

**TOCA/CASA INTELLECTUAL PROPERTY USAGE GUIDELINES**
[TO BE PROVIDED]

D-1

### <u>EXHIBIT E</u>

BRAND STANDARDS

D-1

# EXHIBIT 3

## FOOD AND BEVERAGE MANAGEMENT AGREEMENT

THIS FOOD AND BEVERAGE MANAGEMENT AGREEMENT dated as of July __ 2021, (the "**Effective Date**"), is made by and between TOCA MADERA HOLDINGS, LLC ("**Owner**"), and NewCo LLC, a California limited liability company ("**Manager**").  Owner and Manager are hereinafter collectively referred to as the "**Parties**" and individually as a "**Party**".

### RECITALS:

**WHEREAS,** Owner or Owner's Affiliate leases certain real property located at the premises listed in <u>Exhibit A</u> (the "**Premises**" or "Venues") for the operation of the restaurant(s) known as "Toca Madera" (the "**Venue(s)**");

**WHEREAS,** Owner desires that the Venue be managed and operated by Manager under the Toca/Casa Intellectual Property on the terms and conditions hereinafter set forth and in accordance with the License Agreement; and

**WHEREAS,** Manager desires to manage and operate the Venue on the terms and conditions hereinafter set forth and in accordance with the License Agreement.

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager agree as follows:

1. **<u>Definitions</u>**.  For the purposes of this Agreement, all capitalized terms shall have the meanings given to them in <u>Exhibit B</u>.

2. <u>**Premises/Venues**</u>.  The Premises as of the Effective Date are set forth in <u>Exhibit A</u>.  The Parties may update <u>Exhibit A</u> without needing to re-execute this Agreement; in other words, this Agreement shall apply to any and all other Premises as added or deleted at any time to <u>Exhibit A.</u>

Manager shall arrange to furnish, equip and decorate any Premises, in accordance with the Brand Standards (as defined in, and attached to, the License Agreement), (the "**Owner's Work**").  Owner's Work shall be at Owner's sole cost and expense.  Manager shall seek approval from Owner to the extent the cost of any of Owner's Work exceeds $20,000.00 in any given year, with such approval not to be unreasonably withheld, conditioned, or delayed.  Manager shall budget in the Approved Budget expected annual maintenance and repair amounts associated with Owner's Work, such amounts to be approved by Owner.  Owner shall, at Owner's sole cost and expense, use commercially reasonable efforts to obtain all permits, approvals, consents, licenses and certificates of occupancy required to perform the Owner's Work in accordance with applicable Law and Manager shall reasonably assist Owner in doing so, at Manager's cost and expense.  Owner and Manager acknowledge and agree that all the OS&E, Furniture and Equipment and all other personal property located in the Venue is and shall remain the exclusive property of Owner, including, without limitation, any of the foregoing purchased by Manager.

3. <u>**Engagement of Manager; Manager Duties**</u>.

(a) Owner hereby engages Manager and Manager hereby agrees to provide services in connection with the operation and management of the Venue for the account of, and on behalf of, Owner, in a manner consistent with the Operating Standard (as defined below).

(b) Manager shall have, subject to the provisions of this Agreement, sole decision-making authority in the day-to-day operation, direction, management and supervision of the Venue. Manager agrees to manage and maintain the Venue: (i) in accordance with applicable Law, the applicable Approved Budget, applicable insurance requirements, applicable union regulations, and all applicable licenses and permits required for the operation of the Venue; (ii) consistent with the service, quality and operational standards of The Madera Group, LLC, as provided to Manager from time to time by Owner; and (iii) consistent with the Brand Standards (collectively, the "**Operating Standard**").

(c) Manager's authority and obligations shall consist of the following:

(i) Managing the Staff;

(ii) creating and modifying the menus and the pricing of menu items for the Venue;

(iii) maintaining the Venue in good condition, and in furtherance of the foregoing, Manager shall notify Owner of any refurbishing or replacement of Furniture and Equipment and Operating Supplies that are, in the reasonable opinion of Manager, required to permit the Venue to be operated consistent with the Operating Standard;

(iv) causing the Venue to be maintained in a clean and tidy condition;

(g) making or causing to be made any routine repairs and
alterations that are, in the reasonable opinion of Manager, required to permit the Venue to be operated
consistent with the Operating Standard (with the cost and expense of the foregoing to be borne by the
Owner consistent with Section 2 above;

(vi) notifying Owner of any Improvements to the Venue which Manager
reasonably believes are necessary in order to permit it to continue to operate the Venue consistent with the
Operating Standard;

(vii) assisting Owner in applying for and maintaining all licenses and permits
required in connection with the management and operation of the Venue; and

(viii) taking such actions as are in Owner's or Manager's reasonable judgment
necessary or proper to address any emergency which might arise.

4. **Term**. The term of this Agreement shall commence on the Effective Date and shall continue
for ten (10) years from the Effective Date (the "**Initial Term**"); provided, however, that so long as this
Agreement has not been terminated during the Term pursuant to Section 19 of this Agreement, and
neither party provides the other party with written notice of non-renewal at least one hundred and eighty
(180) days in advance of the end of the then current Term, this Agreement will automatically renew for up
to two (2) additional terms for five (5) years each (each a "Renewal Term" and together with the Initial
Term, the "**Term**").

5. **General Operation of the Venue**.

(a) Manager shall manage the operation of the Venue in accordance with this Agreement,
in accordance with past practices of the Venue (if applicable), and in compliance with the then-applicable
Approved Budget, subject to any variations permitted under this Agreement.

(b) Manager shall be permitted to prepare and sell food and beverage items on the menu,
the forms and contents of which may be in Manager's sole discretion, in accordance with the Operating
Standard and any material deviations from the Operating Standard must be approved by Owner.

(c) Unless and until Manager and Owner agree otherwise, the Venue will be open for
business each day for no less than the hours set forth on Exhibit C attached hereto, seven (7) days per
week, subject to temporary closure for repairs, inventory, property damage or Force Majeure, but at all
times subject to the operational requirements of applicable Law.

(d) Manager agrees that Manager shall use its best efforts to give as much attention to
managing the Venues as Manager or Tosh Berman dedicates to the management of any other similar
business owned or operated by either Manager or Tosh Berman.

6. **Operating Budget**.

(a) No later than November 30th of each year in the Term, beginning on November 30,
2021, Manager shall deliver to Owner an estimated Operating Budget for the following Fiscal Year. The
Operating Budget shall contain an itemized budget, with a level of detail reasonably adequate for Owner
to understand for the given Fiscal Year including estimated receipts, disbursements, operational
expenditures, and capital expenditures. Upon request, Manager shall provide additional budget
information reasonably requested by Owner regarding the anticipated operation of the Venue during the
forthcoming Fiscal Year.

(b) Owner shall have thirty (30) days from delivery to review and approve each
Operating Budget. Within that timeframe, Owner may request a revision of the Operating Budget so long
as any such revisions are made in good faith, and agreed upon by, Manager. Owner shall not
unreasonably withhold, condition or delay its approval of the Operating Budget, and upon approval, the
Operating Budget shall be deemed an Approved Budget. To the extent Owner and Manager disagree on
budget items and such disagreements are not resolved prior to the start of the following Fiscal Year, then
Owner and Manager agree to utilize, until the next Fiscal Year or a resolution of the disagreement, the
budgeted amount for a given item from the prior year's Approved Budget, with Manager permitted to
deviate up to 10% from that amount. Owner acknowledges that the forecasts in Approved Budgets
represent Manager's good faith estimates, and agrees to discuss revisions to Approved Budgets in good
faith with Manager based on the Quarterly Statements.

(c) Manager shall be permitted, to the extent in the long-term economic interest of the
Venue, to deviate without Owner's approval from the Approved Budget by up to ten percent (10%) of the
aggregate total expenditures in the Approved Budget, except that variations in food and labor expenses
shall be deemed permitted if based on the volume of business conducted by the Venue (the foregoing, the
"**Permitted Variance**"). In the event of emergencies where expenditures are immediately necessary for
the preservation or safety of the Venue or to avoid danger to life or property, Manager shall be permitted
to reasonably expend sums without Owner's prior consent, which reasonable amounts shall be reimbursed
at cost without markup by Owner.

(d) Continuously throughout the Term, Owner shall cause amounts from Gross Revenue
to the extent available, or from working capital or other funds contributed by Owner, to be deposited into

68791665v1

an account. Manager will deposit Ticket Fees into the Operating Account in advance of Operating Expense payment to enable Manager to operate the Venue in accordance with the Approved Budget. The Operating Account shall be maintained and controlled by Manager. Withdrawals from the Operating Account may be used for the purposes of paying Operating Expenses and fees in accordance with this Agreement. Interest or other income earned during any period on the amounts in the Operating Account fund shall become part of the Operating Account. In the event that there are insufficient funds in the Operating Account to pay for any expenses incurred by the Restaurant in excess of the Approved Budget and the Permitted Variance ("Shortfall"), including to fund actual or projected food and labor expenses, Manager shall advise Owner of such Shortfall, and Owner shall fund such Shortfall. If Owner fails to do so, then if Manager funds such Shortfall, Manager shall be entitled to reimburse itself from funds in the Operating Account in the amount of the Shortfall within thirty (30) days, or as soon as the Operating Account is funded to a sufficient level that such reimbursement will not cause another Shortfall.

7. **Human Resources; Day-to-Day Management**.

(a) Manager shall have the authority to hire, train, supervise, terminate, and determine the rate of pay for all Staff necessary to fulfill its obligations hereunder, including all personnel and payroll records and manage all Staff benefits programs which may include, without limitation, health insurance, dental insurance, short and long-term disability plans, life insurance, worker's compensation, cafeteria plans, vacation plans, sick leave, and employee policy manuals. Manager shall be solely responsible and liable for ensuring that all Payroll Expenses related to the Staff are fulfilled under applicable Laws. Notwithstanding the foregoing, the Staff shall be employees of Manager (subject to Section 20 [IV] herein) with such Payroll Expenses paid from the Operating Account in accordance with (and subject to the limitations of) the Approved Budget.

(b) Manager may pledge Owner's credit in the name of, or on behalf of, Owner for Venue-level vendors for the purpose of normal course day-to-day operations of the Venue, so long as the foregoing is consistent with the Approved Budget. Except in the ordinary course of business in accordance with the Approved Budget, Manager shall not pledge its credit, nor borrow any money, or otherwise encumber any real or personal property used in connection with the Venue.

(c) Manager shall be prohibited from taking any of the following actions without Owner's prior written consent:

(i) Pledge Owner's credit in the name of or on behalf of Owner, borrow any money or issue any promissory notes or bills of exchange or other obligation for anything other than the normal course day-to-day operations of the Venue.

(ii) Execute or enter into any agreement (A) which provides for the payment of sums not authorized by Owner in an Approved Budget or the Permitted Variance thereto, (B) which would result in liability to Owner for sums other than as set forth in the Approved Budget or the Permitted Variance thereto, (C) which would sublease any part of the Premises, or (D) relating to alterations to the exterior, interior or structural design of the Premises without Owner's written approval, which approval shall not be unreasonably withheld, conditioned, or delayed. If Manager enters into any agreement or contract in violation of Sections 7(b)(ii)(A) or (B), Manager hereby agrees that Manager shall be solely responsible and liable for all amounts in excess of the Approved Budget and Permitted Variance.

(d) Manager shall promptly give Owner notice of any claims made against the Venue or Owner and any litigation or other proceeding commenced against the Venue or Owner.

8. **Key Man**. The parties acknowledge and agree that services of either Tosh Berman or Mikey Tanha are integral to the Owner's selection of Manager as manager for the Premises. In furtherance of the foregoing, if Tosh Berman and Mikey Tanha were to both leave the Manager, die, become permanently disabled, or both otherwise cease to use their best efforts to give their attention to the operation of the Manager and the Premises on at least an equal basis with any other similar business interests in which Tosh Berman or Mikey Tanha is involved, the Manager's ability to continue to operate the Premises will be materially and adversely affected. If any of the foregoing conditions were to occur to either Tosh Berman or Mikey Tanha, then the presence of the other key man will suffice. If any of the foregoing conditions occur for both Tosh Berman and Mikey Tanha, the replacement of Tosh Berman and Mikey Tanha with any other individual shall be subject to Owner's sole and exclusive discretion. This provision shall expire and be of no further force and effect upon the thirty-six (36) month anniversary of the Effective Date.

9. **No Partnership**. Nothing in this Agreement shall constitute or be construed to be or create a partnership or joint venture between Owner and Manager, or be construed to be or create a lease or sublease by Manager of the Premises.

10. **Statements; Audits; Review of Cash**.

(a) Manager shall prepare and deliver to Owner the following statements of operation:

(i) within thirty (30) days after the end of each Accounting Month, monthly unaudited operating statements for the Venue Operations including income statements reflecting the applicable monthly and year-to-date calculations of Adjusted Net Profit (collectively, the "**Monthly Statements**");

(b) within forty-five (45) days after the end of each third Fiscal Year,
quarterly unaudited operating statements for the Venue Operations in the same form and substance as
included in the Monthly Statements (the "**Quarterly Statements**"); and

(iii) within sixty (60) days after the end of each Fiscal Year, annual unaudited
operating statements for the Venue Operations in the same form and substance as included in the Monthly
Statements (the "**Annual Statements**").

Without limiting the foregoing, each such statement shall set forth the Gross Revenue,
Operating Expenses and Adjusted Net Profits of the Venue Operations, if any, for the applicable period in
such detail as is necessary to calculate the Base Fee and Incentive Fee payable to Manager pursuant to
this Agreement.

(b) Throughout the Term and for six (6) years thereafter, Owner shall have the right, at its
expense, to examine all of the books and records (including computer print-outs) for the Venue
Operations during normal business hours and to have an audit conducted on Annual Statements for up to
six (6) years after the receipt of each such Annual Statement, which audit shall be conducted by an
independent auditor selected by Owner in order to verify the amount and computation of the Gross
Revenue, Operating Expenses, Adjusted Net Profits, Base Fee, and Incentive Fee payable to Manager
pursuant to this Agreement.  If any audit reveals Gross Revenue or Adjusted Net Profits for the Fiscal
Year covered by such Annual Statement are understated or overstated, then Base Fees and Incentive Fees,
as applicable, for such period shall be recalculated and Manager shall be paid any shortfall or refund any
excess.  In the event that either party disputes any result of an audit conducted by the party that requested
the audit, then such other party shall have the right to conduct, at its expense, an independent audit to
confirm or refute the results of the other party's prior audit.  If Manager understates Gross Revenue or
Adjusted Net Profits, or overstates Operating Expenses, Base Fees or Incentive Fees by more than ten
percent (10%) as shown in any audit and fails to dispute any such claim of understatement of revenue, etc.
or overstatement of expenses, etc., or refund any excess to Owner within thirty (30) days of receipt of
written notice from Owner of the understatement, Manager shall be deemed to be in material breach of
this Agreement and shall also be responsible for all costs associated with such audit.

(c) The reasonable out-of-pocket costs incurred by Manager in performing its duties
under this Section 10 shall be an Operating Expense.

11. **Casualty**.  Except in cases where the Venue is Substantially Destroyed, in which case the
Parties shall negotiate in good faith regarding plans to reopen the Venue in its existing Premises or a new
location, proceeds received as a result of claims made in respect of any insurance shall be used for the
restoration of the property physically damaged (or as otherwise determined by the mutual agreement of
Manager and Owner), and Owner shall restore any property physically damaged as promptly as
practicable to substantially the same condition which existed prior to such damage, provided, however,
that where the proceeds of insurance would be materially deficient for any necessary restoration, Owner
may, in its reasonable discretion, upon written notice to Manager, terminate this Agreement without
liability to Manager.

12. **Insurance – Liability**.

(a) At all times during the Term of this Agreement, Owner shall carry, or cause to be
carried, liability insurance, including commercial general liability in amounts and coverages as reasonably
appropriate for the operation of the Venue, and Manager shall carry liability insurance, including
commercial general liability insurance and workers' compensation insurance in amounts and coverages
appropriate for the operation of the Venue and the employment of the Staff.  The share of the costs of
such liability insurance relating to or allocated to the Venue shall be reimbursable as an Operating
Expense.  Each Party's commercial general liability insurance shall be primary and non-contributory to
any insurance carried by the other Party.  Each Party shall notify the other Party at least thirty (30) days in
advance of changing any such required insurance coverage, and shall promptly seek new coverage if
coverage is lost for any reason.

(b) RELEASE FROM LIABILITY FOR INSURED CLAIMS.  EACH PARTY HEREBY
RELEASES THE OTHER PARTY, AND ITS AFFILIATES, AND THEIR PARTNERS, MEMBERS,
TRUSTEES, BENEFICIARIES, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS, AND THE
SUCCESSORS AND ASSIGNS OF EACH OF FOREGOING, FROM ANY AND ALL LIABILITY,
DAMAGE, LOSS, COST OR EXPENSE INCURRED BY THE RELEASING PARTY (WHETHER OR
NOT DUE TO THE NEGLIGENCE OR OTHER ACTS OR OMISSIONS OF THE PERSONS SO
RELEASED) TO THE EXTENT SUCH LIABILITY, DAMAGE, LOSS, COST OR EXPENSE IS PAID
TO THE RELEASING PARTY UNDER THE APPLICABLE INSURANCE POLICY.

13. **Covenants and Representations of Manager**.  Manager makes the following covenants and
representations to Owner, which covenants and representations shall, unless otherwise stated herein,
continue to be true during the Term of this Agreement:

(a) Manager has not taken and will not take any action which would cause Owner to have
any obligation or liability to any Person for finders' fees, brokerage fees, agents' commissions or like
payments in connection with the execution and delivery of this Agreement or the consummation of the
transactions contemplated hereby;

existing under the laws of the State of Nevada. Manager has the capacity and power to enter into this Agreement and to consummate the transaction provided for herein. This Agreement and all other documents executed and delivered by Manager constitute legal, valid, binding and enforceable obligations of Manager, and there are no claims or defenses, personal or otherwise, or offsets whatsoever to the enforceability or validity of this Agreement. The person executing this Agreement on behalf of Manager has been duly authorized to do so; and

(c) The execution, delivery and performance by Manager of its obligations under this Agreement will not conflict with or result in a breach of any Laws by which Manager is bound, or any contract to which Manager is a party or by which Manager is bound or, Manager's certification of formation or limited liability company agreement.

14. **Advertising**. Manager shall be responsible for and determine the marketing, advertising, promotional and public and media relations efforts for the Venue, provided that the foregoing does not materially deviate from the Brand Standards. All press releases regarding the Premises and/or the Venue shall be prepared by the Manager.

15. **Data Protection**. The Parties shall comply with all applicable Data Protection Laws. Any database containing Customer data, records and Customer personal data, that is created on Owner's own IT systems shall remain as between the Parties, the sole property of Owner, and Owner hereby grants to Manager a non-exclusive, transferable, worldwide, royalty-free license to use such data during the Term, subject to all applicable Laws. Any Customer data, records, and Customer personal data that is created on Manager's own IT systems shall remain as between the Parties, the sole property of Manager, is created on Owner's own IT systems shall remain as between the Parties, the sole property of Owner, and Manager hereby grants to Owner a non-exclusive, transferable, worldwide, royalty-free license to use such data during the Term, subject to all applicable Laws. The Parties shall ensure that for any data on their systems, all Customers receive all required disclosures and consent to such collection as required under applicable Laws.

16. **Liquor License**. Owner represents and warrants that, as of the Effective Date, the Liquor Licenses for the West Hollywood and Scottsdale Venues are held by Knightlife Collective, LLC and that there have been no violations relating or pursuant to the Liquor License in the five (5) year period preceding the Effective Date. Owner and Manager shall cooperate in maintaining the Liquor License, and Owner and Manager shall provide such information as the licensing authority may reasonably require or request. Manager shall not take or fail to take any action which would cause or be likely to cause a suspension, revocation or termination of the Liquor License.

17. **Toca/Casa Intellectual Property**. Owner agrees that Owner has granted a license to the Venue to for the use of the Toca/Casa Intellectual Property. Manager acknowledges and agrees that its use of the Toca/Casa Intellectual Property in the operation of the Venue shall be governed by and in accordance with that certain License Agreement dated July ___, 2021. Manager acknowledges and agrees that recipes used at the Venue are the property of Owner, and Manager shall and hereby does, and shall procure that its Staff do, assign all right, title, and interest in and to such recipes to Owner.

18. **Fees**.

(a) Manager shall be paid for services hereunder, a monthly fee (the **"Base Fee"**) equal to four and one-half percent (4.5%) of all Gross Revenue of the Venue. The Base Fee shall be calculated and paid to Manager in arrears on or before the 10th day of each month based on the Gross Revenue for the previous month, and shall be accompanied by a Monthly Statement.

(b) In addition and without offset to the Base Fee, Manager shall be paid an quarterly incentive fee (the **"Incentive Fee"**) equal to fifteen percent (15%) of the Adjusted Net Profits of the Venue for the quarter. The Incentive Fee shall be calculated by Manager and paid by Owner to Manager quarterly within fifteen (15) days of Owner receiving the relevant Quarterly Statement.

(c) During the Term, Manager shall be reimbursed by the Venues for any and all out-of-pocket expenses related to the Venues, up to an aggregate annual amount of $20,000; all reimbursements must be substantiated by an itemized receipt or invoice. If Manager seeks to exceed the $20,000 annual amount, then Manager shall obtain Owner's prior approval.

(d) The occurrence of any Force Majeure events shall not excuse Owner from paying to Manager any Base Fee or Incentive Fees earned by Manager pursuant to this Section 18.

19. **Termination Rights**

(a) If at any time during the Term any of the events set forth in this Section 19(a) attributable to either Manager as an Manager Event of Default under Section 19(a)(i) or to Owner as an Owner Event of Default under Section 19(a)(i)(A), occurs and continues beyond the applicable grace period (each an **"Event of Default"**), the non-defaulting Party may, at its option, terminate this Agreement by giving written notice to the other Party specifying a date, not earlier than thirty (30) days after the giving of such notice, when the Agreement shall terminate and the non-defaulting Party may pursue any and all remedies available to it at law or in equity.

(i) As used herein, the term "Manager Event of Default" means, unless in the case of or due to Force Majeure, casualty, condemnation or closure of the Venue by Owner or by Law, unless such casualty condemnation or closure is due to Manager's negligent or willful conduct, Manager shall fail, in any material respect, in the performance of, or compliance with, any of the material covenants, agreements, terms or conditions contained in this Agreement and such failure shall with respect to any term, covenant or condition of this Agreement continue for a period of thirty (30) days after notice thereof from Owner to Manager specifying in detail the nature of such failure; provided, however, that if such failure cannot with due diligence be cured within such thirty (30) day period, then the time within which to cure the same shall be extended for such period (such period in any event not to exceed ninety (90) days after notice of default) as may be necessary to complete the same provided that Manager has commenced such cure within the initial thirty (30) day period and with due diligence thereafter proceeds to prosecute the curing of such failure.

(A) Owner may also terminate this Agreement upon thirty (30) days prior written notice to Manager upon (I) the conviction of Manager, or Manager's managers or officers of a felony or of criminal fraud or embezzlement; (II) Manager's gross mismanagement of the Venue as determined by a mutually agreeable neutral mediator selected by the parties; (III) Manager's gross negligence, willful misconduct, bad faith, fraud, theft, deceit, or violation of applicable Law; (IV) Manager becomes the subject of a Bankruptcy which is not dismissed within the applicable grace period; or (V) Tosh Berman and Mikey Tanha cease to be controlling owners of Manager or fail to comply with Section 8(a) above.

(B) Owner may terminate this Agreement immediately upon written notice to Manager if the Venue is closed, condemned, or Substantially Destroyed due to the negligent or willful conduct of Manager or its representatives (including the Staff).

(ii) As used herein, the term "Owner Event of Default" means the occurrence of any of the following events:

(A) If Owner shall fail, in any material respect, in the performance of or compliance with any of the material covenants, agreements, terms or conditions contained in this Agreement and such failure shall (1) with respect to any term, covenant or condition of this Agreement concerning the payment of money, continues for a period of fifteen (15) days after notice thereof from Manager to Owner; and (2) with respect any other non-monetary failure under this Agreement, continues for a period of thirty (30) days after notice thereof from Manager to Owner specifying in detail the nature of such failure; provided, however, that if such failure cannot with due diligence be cured within such thirty (30) day period, then the time within which to cure the same shall be extended for such period (such period in any event not to exceed ninety (90) days after notice of default) as may be necessary to complete the same provided that Owner has commenced such cure within the initial thirty (30) day period and with due diligence thereafter proceeds to prosecute the curing of such failure;

(B) If Owner becomes the subject of a Bankruptcy which is not dismissed within the applicable grace period; or

(C) Except in the case of Force Majeure or temporary closure for renovations, if the Venue is closed to the public for more than two (2) consecutive months.

(b) In the event that Manager terminates this Agreement pursuant to the provisions of this Section 19, upon payment by Manager of all sums due to Owner for the period prior to the termination of this Agreement pursuant to this Section 19, Manager shall be released from all liability to Owner thereafter arising under this Agreement, except with respect to provisions of this Agreement which expressly survive termination.

(c) Upon termination of this Agreement, Manager shall: (i) deliver to Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Venue, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Venue; (ii) deliver and assign, transfer or otherwise convey to Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Venue, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to Owner a full set of statements set forth in Section 10 for the Venue, current to the date of termination; (iv) deliver all funds held by Manager on behalf of Owner (including in the Operating Account); and (v) render such assistance as Owner might reasonably request to facilitate an orderly transition in the management and operation of the Venue.

(d) Termination outside of these provisions shall be deemed material and Owner or Manager shall be permitted to take any action at law or equity resulting therefrom.

20. **Indemnity**.

I. Neither Owner nor Manager shall do or knowingly permit any act or thing to be done upon the Venues which would subject the other Party or its respective Affiliates or partners, members, shareholders, officers, directors, employees and/or agents (collectively with such Party, the "Indemnitees"), to any liability or responsibility for

injury, damages to persons or property or any liability by reason of any violation of any Requirement. Both Owner and Manager shall perform their obligations under this Agreement, including control over the Venues, the actions of their respective employees and agents so as to fully protect the Indemnitees against any such liability.

II. Owner shall indemnify, defend and hold harmless Manager, the entities (if any) comprising Manager, each Affiliate of Manager and their respective partners, members, shareholders, officers, directors, employees and/or agents (collectively, the "Manager Indemnitees"), from and against any and all Claims of whatever nature to the extent arising directly from, or out of (a) any gross negligence, willful misconduct, fraud, bad faith or illegal acts by Owner, its employees, contractors and agents in connection with the Venues, (b) any negligence or willful misconduct by Owner, its employees, contractors and agents, that results in a violation, suspension or revocation of the Liquor Licenses, (c) Owner's breach or default under this Agreement, (d) any Losses from any legal action threatened or taken by the dissenting members of the Board of Directors of Owner or Owner's Affiliates, whom dissented to the approval of this Agreement in actions taken therefrom, and (e) the maintnence and control Improvements of the Venue. Notwithstanding the foregoing, in no event shall Owner have any obligation to indemnify Manager Indemnitees for Claims for which Owner is entitled to indemnification pursuant to the next section. The provisions of this section shall survive the expiration or earlier termination of this Agreement.

III. Manager shall indemnify, defend and hold harmless Owner, the entities (if any) comprising Owner, each Affiliate of Owner and their respective partners, members, shareholders, officers, directors, employees and/or agents (collectively, the "Owner Indemnitees"), from and against any and all Claims of whatever nature to the extent arising directly from, or out of (a) any gross negligence, willful misconduct, fraud, bad faith or illegal acts by Manager, its employees, contractors and agents in connection with the Venues, (b) any negligence or willful misconduct by Manager, its employees, contractors and agents, that results in a violation, suspension or revocation of the Liquor Licenses, and (c) Manager's breach or default under this Agreement. Notwithstanding the foregoing, in no event shall Manager have any obligation to indemnify Owner's Indemnitees for Claims for which Manager is entitled to indemnification pursuant to the next section. The provisions of this section shall survive the expiration or earlier termination of this Agreement.

IV. Any employees of the Venue, which result in and from losses, claims, suits, whether in law or equity, of any nature, and before any court, tribunal, or alternative dispute resolution center, shall be the liability of the Venue, and any such costs, settlements, or alike shall be borne of the Venue.

(a) The provisions of this Section 20 shall survive the termination of this Agreement for the applicable statute of limitations for which a claim may be made against the Owner or Manager, as applicable, except that with respect to any claim asserted under this Section 20 within such period, the provisions of this Section 20 shall survive until such claim is finally resolved.

21. **Confidentiality**.

(a) Each party shall during the Term and thereafter keep confidential and not use for its own purposes nor (without the prior written consent of the other party to which the information belongs) disclose to any third party other than its employees, agents, lenders, co-investors, or professional advisers or as required by applicable Law any information regarding this Agreement, the Venue, or Owner and Manager's operation of the Venue (including, without limitation, the Concepts, trade secrets and other information of commercial value) which may become known to such party from another party ("**Confidential Information**"), unless such information: (i) is public knowledge or already known to such party at the time of disclosure; (ii) subsequently becomes public knowledge other than by breach of this agreement; or (iii) subsequently comes lawfully into the possession of such party from a third party.

(b) To the extent necessary to implement the provisions of this Agreement, each party may disclose Confidential Information to such of its employees, lenders, co-investors, or professional advisers as may be reasonably necessary or desirable, provided that before any such disclosure such party shall make such employees, lenders, co-investors or professional advisers aware of its obligations of confidentiality under this Agreement and shall at all times procure compliance by such employees, lenders, co-investors or professional advisers therewith.

(c) The restriction in Section 21(a) shall not prevent either party from complying with any obligation to disclose Confidential Information which is required to be disclosed by applicable Laws, provided that the disclosing party shall first notify the other party of the information to be disclosed and

the circumstances in which the disclosure is alleged to be required, as far in advance as possible before such disclosure must be made and shall, if permissible, take all reasonable action to limit such disclosure.

(d) Without prejudice to any other rights or remedies that either party may have against the other, the Parties acknowledge that they shall, without proof of special damage, be entitled to any monetary or other relief or remedies pursuant to the applicable Laws, for any threatened or actual breach of the provisions of this <u>Section 21</u>, in addition to any damages or other remedy to which they may be entitled.

(e) The obligation of confidentiality in this Agreement will survive the expiry or termination of this Agreement (whichever is earlier).

22. <u>Time of the Essence</u>.  Time is of the essence with respect to the obligations set forth herein.

23. <u>Consent</u>.  Except as otherwise expressly provided herein, whenever either party has called upon the other to execute and deliver a consent or approval in accordance with the terms of this Agreement, such consent or approval shall be in writing (which may include e-mail).

24. <u>Binding Effect; Assignment; No Third Party Beneficiaries</u>.

(a) This Agreement, and any of the rights or obligations arising hereunder, may be assigned or transferred by Manager without the prior written consent of Owner (i) to an entity formed by Manager at any point during the Term to an entity under substantially the same ownership or control as the assigning entity (e.g. to any single purpose entity for the management of the Venue, or to any wholly-owned affiliate of Manager), or (ii) to any purchaser or successor of Manager, subject to Owner's review of the creditworthiness and experience of the potential acquiror, Owner's approval not to be unreasonably conditioned, withheld, or delayed.  Owner shall have the right to assign this Agreement to any successor lessee or sublessee, or in connection with any merger, acquisition, reorganization, or the sale of all or substantially all of the assets associated with this Agreement of  Owner, and such assignment shall not require the prior written consent of Manager; provided, however, Owner shall provide Manager with at least thirty (30) days' prior written notice of such assignment. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  No assignment of this Agreement shall be effective unless and until the assignee has agreed, in writing, to be bound by all of the terms and conditions hereof.

(b) Nothing contained in this Agreement is intended to or shall:  (i) confer any benefit or rights to, or (ii) create any claim in favor of, or (iii) obligate either Owner or Manager to, any Person who is not a party to this Agreement.  Unless specifically provided for and so designated in this Agreement, there are no third-party beneficiaries with respect to the terms hereof.

25. <u>Estoppel Certificate; Attornment, Subordination</u>.

(a) Upon not less than fifteen (15) days' prior notice by Owner, Manager shall deliver, executed in recordable form, a declaration to any third party identified by Owner, (i) ratifying this Agreement; (ii) stating the commencement and termination dates; and (iii) certifying (A) that this Agreement is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated), (B) that all conditions under this Agreement to be performed by Owner have been satisfied (stating exceptions, if any), (C) that no defenses or offsets against the enforcement of this Agreement by Owner exist (or stating those claimed), (D) the date to which fees have been paid, and (E) such other reasonable information as Owner reasonably requires.  Persons receiving such statements shall be entitled to rely upon them.

(b) Manager shall, in the event of a sale of the Premises or of Owner or its Affiliate's interest in the Premises, or if the Premises is transferred pursuant to, or in lieu of, a foreclosure of a deed of trust or other mortgage, be bound to the purchaser, beneficiary or other transferee of an interest to the Premises, in accordance with all the provisions of this Agreement for the balance of the Term of this Agreement.

26. <u>Notices</u>.  All notices, demands, consents, approvals and other communications (each, a "Notice") that are required or desired to be given by either party to the other under this Agreement shall be in writing and shall be (a) hand delivered, (b) sent by U.S. registered or certified mail, postage prepaid, return receipt requested, (c) sent by reputable overnight courier service, addressed to the appropriate party at its address set forth below, or at such other address as such party shall have last designated by Notice to the other, or (d) by e-mail.  Notices shall be deemed given when delivered.  Rejection or other refusal by the addressee to accept a Notice or the inability to deliver the Notice because of a changed address of which no Notice was given shall be deemed to be receipt of the Notice sent.  Notice addresses for the Parties are as follows:

To Owner:      Toca Madera Holdings, LLC,

               _____

               _____

               Attn: _____
               Telephone: _____
               E-mail: _____

To Manager:    _____
                _____
                _____
        Attn: _____
        Telephone: _____
        E-mail:    _____

With a copy to: Jeffer, Mangels, Butler & Mitchell LLP
        1900 Avenue of the Stars, 7th Floor
        Los Angeles, CA 90067
        Attn: David A. Sudeck, Esq.
        Telephone: 310.201.3518
        E-mail:    dsudeck@jmbm.com

Notice may be given by counsel for the Parties, and such Notice shall be deemed given by Manager or Owner, as the case may be, for all purposes under this Agreement.

27. **Entire Agreement**. This Agreement, including any Exhibit(s) referred to herein, constitutes the entire agreement between the Parties hereto relating to the subject matter hereof and supersedes all prior agreements and understandings, written or oral, among the Parties relating to this subject matter. Notwithstanding the foregoing, in the event of a conflict between this Agreement and another agreement between the parties (e.g., the License Agreement), this Agreement shall only prevail in regard to matters related to the day to day operations of the Venue, and such other agreements shall prevail in regard to the primary subject matter thereof (e.g., use of the Toca/Casa Intellectual Property in the case of the License Agreement). This Agreement is to be interpreted and construed solely on the basis of those terms and provisions as are contained in the final form and format of this Agreement, as executed and delivered by the Parties hereto; it being understood that this Agreement in such final form and format also supersedes all prior drafts or earlier versions of this Agreement, and any notes or memoranda concerning or relating to this Agreement, and that no assumptions, inferences or presumptions shall be drawn or derived from or may be predicated upon any changes, omissions, deletions or additions from or to any prior drafts or earlier versions of this Agreement and no warranty, representation, promise, inducement or statement of intention relating to the transaction contemplated hereby has been made by any party or related Person that is not set forth in this Agreement and none is relied upon.

28. **Fiduciary Duties**.

(a) This Agreement shall be interpreted in accordance with general principles of contract interpretation without regard to the common law principles of agency (except as expressly provided for in this Agreement), and any liability between the Parties shall be based solely on principles of contract law and the express provisions of this Agreement. To the extent any duties, fiduciary or otherwise, that exist or may be implied for any reason whatsoever, including without limitation those resulting from the relationship between the Parties, and including without limitation all duties of loyalty, good faith, fair dealing, care, full disclosure, or any other duty deemed to exist under the common law principles of agency or otherwise (collectively, the **"Implied Fiduciary Duties"**), are inconsistent with, or would have the effect of modifying, limiting or restricting the express provisions of this Agreement, the terms of this Agreement shall prevail.

(b) For purposes of assessing Manager's duties and obligations under this Agreement, the Parties acknowledge that the terms and provisions of this Agreement and the duties and obligations set forth herein are intended to satisfy any fiduciary duties which may exist between the Parties. The Parties also hereby unconditionally and irrevocably waive and release any right, power or privilege either may have to claim or receive from the other party any punitive, exemplary, statutory, or treble damages or any incidental or consequential damages with respect to any breach of the Implied Fiduciary Duties. Furthermore, Owner specifically consents to all transactions and conduct by Manager and its Affiliates described in this Agreement, and waives any Implied Fiduciary Duties which Manager may owe to Owner now, or which may arise in the future, in connection with such transactions or conduct. Owner acknowledges and agrees that its consent to the transactions and conduct by Manager described in this Agreement, and its waiver of any Implied Fiduciary Duties otherwise owed by Manager: (i) has been obtained by Manager in good faith; (ii) is made knowingly by Owner based on its adequate informed judgment as a sophisticated party after seeking the advice of competent and informed counsel; and (iii) arises from the Owner's knowledge and understanding of the specific transactions and actions or inactions of managers that are normal, customary, and reasonably expected in the restaurant industry generally for this segment of the industry.

29. **Dispute Resolution; Construction of Agreement**. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, ANY CONTROVERSY OR DISPUTE ARISING OUT OF THIS AGREEMENT, THE INTERPRETATION OF ANY OF THE PROVISIONS HEREOF, OR THE ACTION OR INACTION OF ANY PARTY HEREUNDER SHALL BE SUBMITTED TO FINAL AND BINDING ARBITRATION IN LOS ANGELES, CALIFORNIA ADMINISTERED BY JAMS/ENDISPUTE IN ACCORDANCE WITH THE THEN-EXISTING JAMS/ENDISPUTE ARBITRATION RULES AND PROCEDURES FOR COMMERCIAL DISPUTES. CALIFORNIA

CODE OF CIVIL PROCEDURE §1283.05, WHICH PROVIDES FOR CERTAIN DISCOVERY RIGHTS, SHALL APPLY TO ANY SUCH ARBITRATION. THIS CODE SECTION IS ALSO HEREBY INCORPORATED BY REFERENCE. IN THE EVENT OF SUCH AN ARBITRATION PROCEEDING, THE PARTIES SHALL SELECT A MUTUALLY ACCEPTABLE NEUTRAL ARBITRATOR FROM AMONG THE JAMS/ENDISPUTE PANEL OF ARBITRATORS. IN THE EVENT SUCH PARTIES SHALL BE UNABLE TO AGREE ON AN ARBITRATOR WITHIN THIRTY (30) DAYS AFTER INITIALLY ATTEMPTING TO CHOOSE AN ACCEPTABLE ARBITRATOR, THE ADMINISTRATOR OF JAMS/ENDISPUTE WILL APPOINT AN ARBITRATOR. ANY AWARD OR DECISION OBTAINED FROM ANY SUCH ARBITRATION PROCEEDING SHALL BE FINAL AND BINDING ON THE PARTIES, AND JUDGMENT UPON ANY AWARD THUS OBTAINED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. UNLESS OTHERWISE ORDERED BY THE ARBITRATOR, THE ARBITRATOR'S EXPENSES SHALL BE SHARED EQUALLY BY THE PARTIES. NO ACTION AT LAW OR IN EQUITY BASED UPON ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY COURT BY ANY PARTY HERETO EXCEPT (A) AN ACTION TO COMPEL ARBITRATION PURSUANT TO THIS SECTION 27 OR (B) AN ACTION TO ENFORCE AN AWARD OBTAINED IN AN ARBITRATION PROCEEDING IN ACCORDANCE WITH THIS SECTION 27.

NOTICE: BY SIGNING THE AGREEMENT YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'BINDING ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY YOUR EXECUTION OF THIS AGREEMENT YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE APPLICABLE STATE STATUTE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

Should any provision of this Agreement or any Exhibit, instrument or document delivered pursuant to this Agreement require arbitrator or judicial interpretation, it is agreed that the arbitrator or court interpreting or considering such provision shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same. It is agreed and stipulated that all Parties hereto have participated equally in the preparation of this Agreement and that legal counsel was consulted by each party before the execution of this Agreement. Titles to Sections are inserted solely for convenience and shall not be utilized in interpreting this Agreement. In this Agreement, whenever the context so requires, the masculine gender includes the feminine and/or neuter, the singular number includes the plural and vice versa. The captions preceding the text of Sections and Paragraphs are included only for convenience of reference and shall be disregarded in the construction and interpretation of this Agreement. The terms **"hereby," "herein," "hereof," "hereto"** and **"hereunder"** refer to this Agreement.

30. **Amendment of Agreement**. This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written agreement signed by both Parties hereto and specifically referring to this Agreement and that specifically states that it amends, supersedes or cancels this Agreement or waives any of the terms hereof, executed by all Parties hereto (or, in the case of a waiver, by the party waiving compliance). Failure of any party to insist upon strict observance of or compliance with any of the terms hereof in one or more instances shall not be deemed to be a waiver of its rights to insist upon such observance or compliance in the future, or upon observance of, or compliance with other terms hereof.

31. **Invalidity of Provisions**. In case of any one or more of the provisions contained in this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and the Parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute for such invalid and unenforceable provision in light of the tenor of this Agreement, and, upon so agreeing, shall incorporate such substitute provision in this Agreement.

32. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Electronic signatures shall be deemed as valid and enforceable as original signatures.

33. **Applicable Law**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California, excluding the conflict-of-laws provisions thereof.

34. **Force Majeure**. Neither Party shall be held in breach of this Agreement if their performance hereunder is prevented by a Force Majeure event that cannot be mitigated or overcome by such Party's commercially reasonable efforts.

35. **Condemnation**. In the event of total or partial condemnation or taking of the Premises, which includes a material portion of the Venue, through use of eminent domain, in any eminent domain proceeding relating to the condemning Governmental Agency or condemning authority, either party is permitted to terminate this Agreement upon written notice within thirty (30) days of such event. Manager shall be entitled to pursue its own claim for recovery against the Governmental Agency or condemning

authority for the value of the its contract rights hereunder, provided the filing of the claim does not diminish the award which would otherwise be receivable by Owner, if any.

36. **Cumulative Rights and Remedies**. No right or remedy herein conferred upon or reserved to Owner is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute. In addition to other remedies provided in this Agreement, Owner shall be entitled to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions, or provisions of this Agreement, or to a decree compelling performance of any of the other covenants, agreements, conditions, or provisions of this Agreement, or to any other remedy allowed to Owner at law or in equity.

*[Remainder of Page Intentionally Left Blank – Signature Page Immediately Follows]*

**IN WITNESS WHEREOF**, the Parties have caused this Food and Beverage Management Agreement to be executed as of the year and date first above written.

OWNER:

TOCA MADERA HOLDINGS, LLC ,

a Delaware limited liability company

By: _____
Name: Matthew Syken
Title: AUTHORIZED OFFICER

MANAGER:

NewCo, LLC

a Nevada limited liability company

By: _____
Name: TOSH BERMAN
Title: MANAGER

LIQUOR LICENSE HOLDER [as to Section 16 only]:

KNIGHTLIFE COLLECTIVE, LLC

a NV limited liability company

By: _____
Name: MATTHEW SYKEN
Title: AUTHORIZED OFFICER

Signature Page to Food and Beverage Management Agreement

**EXHIBIT A**

**PREMISES**

Toca Madera – West Hollywood
8450 W. 3rd St.
Los Angeles, CA 90048


Toca Madera – Scottsdale
4736 N. Goldwater Blvd.
Scottsdale, AZ 85251

**EXHIBIT B**

**DEFINITIONS**

"**ABC**" shall mean the California Department of Alcoholic Beverage Control.

"**Accounting Month**" shall mean a full calendar month (or partial calendar month, if at the beginning or end of the term hereof, unless otherwise specifically provided in this Agreement).

"**Adjusted Net Profit**" shall mean, with respect to each Fiscal Year, an amount equal to Gross Revenue LESS (i) Operating Expenses, (ii) the Venue's allocable share of any and all property and/or real estate taxes, excluding the costs of any related legal settlements or judgments (if paid by Manager from the Operating Account), and (iii) insurance costs relating to the Venue incurred under this Agreement but not otherwise categorized as "Operating Expenses" pursuant to the terms hereof which may include, but not be limited to, premiums and any costs incurred for deductibles, underinsurance, and co-insurance (if paid by Manager from the Operating Account).

"**Affiliate**" shall mean: (i) any Person directly or indirectly controlling, controlled by or under common control with another Person; (ii) a Person owning or controlling twenty-five percent (25%) or more of the outstanding voting securities of such other Person; or (iii) any officer, director or partner of such Person.

"**Approved Budget**" shall mean the annual budget prepared by Manager and approved, in writing, by Owner pursuant to Section 6, which budget shall be comprised of the Operating Budget, and delivered to Owner by no later than November 30th of the prior year.

"**Bankruptcy**" shall mean the occurrence of any of the following events in respect of any Person: (i) the granting of relief against such Person in an involuntary case under the Federal Bankruptcy Code which is not removed within sixty (60) days, or in any such involuntary case, the approval of the petition by such Person as properly filed, or the admission by such Person of material allegations contained in the petition; or (ii) the execution by such Person of a general assignment for the benefit of creditors; or (iii) the commencement of a voluntary case under the Federal Bankruptcy Code by such Person; or (iv) the appointment of a trustee, conservator, liquidator, or receiver for such Person or for all or a substantial part of the assets of such Person and such receivership proceedings are not removed within sixty (60) days after the receiver's appointment; (v) in the case of a Person which is a corporation, joint venture, partnership or other business entity, the commencement by such Person of liquidation, dissolution or winding-up proceedings, or the commencement against any such Person of a proceeding to liquidate, wind-up or dissolve such Person, which proceeding is not dismissed within sixty (60) days; (vi) the Person admits in writing its inability to pay its debts as they mature; or (vii) the Person gives notice to any governmental body of insolvency or pending insolvency or suspension or pending suspension of operations.

"**Customers**" means all actual customers of the Venue;

"**Data Protection Law**" means collectively the U.S. Federal Trade Commission Act (15 U.S.C. §§41-58), the U.S. CAN-SPAM Act (15 U.S.C. §§7701-7713, 18 U.S.C. §1037), and all similar applicable Laws in the United States of America concerning the protection and treatment of personally identifiable information including, without limitation, the California Consumer Privacy Act (Cal. Civ. Code §1798.198(a) (2018)) and, if and when applicable, the General Data Protection Regulation (GDPR).

"**Fiscal Year**" shall mean (i) with respect to the first Fiscal Year, a period beginning on the Effective Date of this Agreement and ending on December 31st of such year and (ii) with respect to any subsequent period, the twelve (12) Accounting Month period beginning on January 1st and ending on December 31st (or such earlier date that this Agreement is terminated).

"**Force Majeure**" means any of the following events or circumstances that directly affect the

ability of either or both of the Parties to perform under this Agreement, including
(i) casualty or condemnation; (ii) storm, earthquake, hurricane, tornado, flood or other act of God; (iii) war, act of terrorism, insurrection, rebellion, riots or other civil unrest; (iv) epidemics, pandemics, quarantine restrictions or other public health restrictions or advisories; (v) strikes or lockouts or other labor interruptions; (vi) disruption to local, national or international transport services; (vii) embargoes, lack of materials, water, power or telephone transmissions necessary for the operation of the Venue in accordance with this Agreement; or (viii) any other event that is beyond the reasonable control of the Parties and which by the exercise of due diligence, such Party is unable wholly or in part to prevent or overcome.

**"Furniture and Equipment"** shall mean all furniture, furnishings, fixtures, decorations, and equipment (inclusive of audio, video, computer and lighting systems and equipment) necessary for the efficient operation of the Venue.

**"GAAP"** shall mean generally accepted accounting principles.

**"Governmental Agency"** shall mean any governmental agency or quasi-governmental authority, board, bureau, commission, department, instrumentality, or public body, court, or administrative tribunal.

**"Gross Revenue"** shall mean: the aggregate gross proceeds of all of Licensee's operations at the Licensed Locations, including, without limitation, all revenues associated with the sale of all food, beverages, products, merchandise, goods and services (including the sale of gift or merchandise certificates) sold in connection with the Licensed Location, excluding the following: (i) sales taxes, luxury taxes, excise taxes, license fees, or similar taxes now or hereafter imposed upon the sale of products, merchandise or goods; (ii) gratuities paid to staff to the extent the same are expressly designated as such and separately added to the total price charged, whether the same are collected by the manager as a stated percentage of any dollar amount or which are voluntarily paid by customers, and which are paid by manager to staff directly; (iii) any exchange of goods or merchandise between other projects owned or managed by manager or its Affiliates, where such exchange of goods or merchandise is made solely for the convenience of manager and not for the purpose of consummating a sale which has theretofore been made at, in or from the Licensed Location or for the purpose of depriving the owner of the benefit of a sale which otherwise would be made at, in or from the Licensed Location (and if such transfer is made between a Licensed Location with a lower royalty rate and one with a higher royalty rate, Licensor shall be entitled to the higher royalty rate); (iv) the redemption of gift or merchandise certificates; (v) proceeds from any financing; and/or (vi) any working capital provided by Owner or interest earned on funds held in any account; and (vii) rebates, discounts or credits of a similar nature and/or, any amount for any goods or services provided on a complimentary basis, in each case given consistently with Licensor's policies, procedures, and historical conduct in the three (3) years preceding the Effective Date. In the case that any Third Party Manager or any other affiliate or subcontractor is engaged by Licensee to provide any of the Services hereunder, Gross Revenue shall be calculated based on the amounts received by such Third Party Manager or subcontractor from an unaffiliated end customer where such amounts are higher than the amounts received by Licensee from such Third Party Manager or subcontractor.

**"Improvements"** shall mean all of the alterations, renovations, remodeling and improvement of the Premises other than Furniture and Equipment.

**"Law"** shall mean any statute, ordinance, promulgation, law, treaty, rule, regulation, code, judicial precedent or order, including, without limitation, United States' Foreign Corrupt Practices Act and all rules, regulations and procedures of the ABC, of any court or any Governmental Agency, or other power, department, agency, authority, or officer whether foreign, federal, state, local, or any subdivision thereof.

**"License Agreement"** shall mean that certain License Agreement, dated July __, 2021, as amended.

**"Liquor License"** shall mean that certain liquor license issued to Knightlife Collective, LLC by the ABC authorizing Owner to purchase at wholesale and sell and serve to the public beer, wine, and distilled spirits to the public for consumption on the Premises. The Liquor License is and at all times shall remain the sole property of Knightlife Collective, LLC. To the extent Manager engages in activities authorized by the Liquor License, it is doing so solely as Knightlife Collective, LLC's agent and subject to Knightlife Collective, LLC's direction. Nothing in this Agreement confers any ownership rights in the Liquor License on Manager or authorizes Manager to engage in any activities other than as expressly set forth in this Agreement.

**"Losses"** shall mean any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements of a Person not reimbursed by insurance, including, without limitation, all reasonable attorneys' fees and all other reasonable professional or consultants' expenses incurred in investigating, preparing for, serving as a witness in, or defending against any action or proceeding, whether actually commenced or threatened, but excluding consequential or incidental damages (except to the extent such damages are awarded to third Parties arising from a third party claim for which indemnification is required hereunder which such damages did not arise from the actions of the party causing the Losses), which are not covered by insurance maintained by the party causing the Losses, suffered by Owner or Manager, as the case may be. For the avoidance of doubt, payment of insurance deductibles, self-insured retention amounts or other related amounts shall constitute "Losses."

**"Operating Budget"** shall mean that portion of the Approved Budget relating to the Venue

Operations, as prepared by Manager and approved by Owner. For the avoidance of doubt, any amount incurred within the Permitted Variance shall be deemed included in the approved Operating Budget.

"**Operating Expenses**" shall mean all of the costs and expenses with respect to Venue Operations to the extent approved by Owner in advance and in writing, or otherwise as set forth in the applicable Approved Budget, except as otherwise expressly provided in this Agreement. Said Operating Expenses shall include, without limitation and without duplication, the following costs and expenses related to the Venue:

(a) Base Fee;

(b) cost of food and beverages;

(c) Payroll Expenses and union payments (if any) relating thereto;

(d) credit card fees and related bank charges;

(e) advertising, marketing and promotion expense for the Venue;

(f) necessary dues and subscriptions;

(g) cost of gas, electricity, and water;

(h) cost of insurance (including deductibles and self-insured retention amounts) related to the Venue or Staff provided by Owner, Manager or its Affiliates (including through the reasonable allocation of costs of policies insuring multiple venues), if and to the extent the same constitute Operating Expenses pursuant to Sections 11 or 12, regardless of which party initially pays for such insurance; notwithstanding anything to the contrary in this Agreement, the reimbursement or non-reimbursement of any insurance costs shall not alleviate, mitigate, modify, or otherwise supersede either party's indemnification obligations to the other party set forth in this Agreement, and in the case of conflict or ambiguity, it is the intent of the Parties, and the Parties hereby agree, that the indemnity obligations shall take precedence and otherwise supersede and control;

(i) reasonable out-of-pocket legal, accounting and professional fees and expenses incurred in the ordinary operations of the Venue;

(j) cost of licenses and permits;

(k) cost of uniforms, linen and laundry;

(l) cost of maintenance, repairs, refurbishment and replacement of the Furniture and Equipment, in accordance with the provisions of Section 3;

(m) cost of office supplies;

(n) cost of Operating Supplies;

(o) cost of independent third party payroll service, if utilized;

(p) cost of additional security services, if agreed upon by Owner;

(q) cost of service contracts for the Venue;

(r) sales taxes not otherwise included in another component of Operating Expenses and not previously deducted from Gross Net Revenue;

(s) cost of telephones, printing, stationery and postage;

(t) cost of employee relations, meals at the employee dining room and training, including the cost of housing and transportation;

(u) cash losses, including cash shortages, and theft not previously deducted from Gross Revenue;

(v) cost of outside entertainment;

(w) costs associated with or related to research and development;

(x) any and all out-of-pocket expenses incurred by Manager and related to the Venues; and

(y) costs of Manager performing its duties under Section 10.

"**Operating Supplies**" shall mean china, glassware, linens, silverware, utensils, pots, pans, and similar items of personal property, as well as paper products, inventories, and other items commonly

efficient supply of all food and beverage items for the efficient operation of the Venue.

**"OS&E"** shall mean all Operating Supplies, systems and equipment necessary for the efficient operation of the Venue.

**"Payroll Expenses"** shall mean all expenses associated with the compensation of the Staff, including, without limitation, gross salary, overtime expenses, bonuses, commissions, union dues (if applicable), social security taxes, payroll related taxes, worker's compensation and unemployment insurance and expenses associated with the maintenance of employee benefit plans, if any, and compliance with union or pension benefit plans, if any.

**"Person"** shall mean any individual, partnership, corporation, association or other entity, including, without limitation, any Governmental Agency or subdivision thereof, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

**"Staff"** shall mean all individuals working exclusively in the Venue who are employed by Manager or Manager's Affiliate at any time during this Agreement.

**"Substantially Destroyed"** shall mean damage by fire or other casualty to the Venue that results in (i) more than fifteen percent (15%) of the area of the Venue being rendered unusable and (ii) restoration which, in Owner's reasonable judgment, would take more than nine (9) months after the occurrence to complete.

**"Toca/Casa Intellectual Property"** shall mean all of Owner's right, title and interest in and to the trademarks and copyrights for the Toca Madera and Casa Madera restaurant brands, including, without limitation, those listed the License Agreement, as the same may be supplemented (but not reduced except as expressly allowed in the License Agreement) from time-to-time by Owner upon the written request of Manager, acting in Owner's reasonable discretion, upon thirty (30) days' prior notice to Manager and with Manager's written approval, which may be granted or withheld in Manager's sole discretion.

**"Venue Operations"** shall mean the business of the Manager at and from the Venue as described in Section 3.

Error! Unknown document property name.Error! Unknown document property name./Error! Unknown document property name.
Error! Unknown document property name.-Error! Unknown document property name./7-10-21/Error! Unknown document property name./Error! Unknown document property name.

**Error! Unknown document property name.**

**EXHIBIT C**

**VENUE'S HOURS OF OPERATION**

**EXHIBIT C**
-1-

# EXHIBIT 4

**CREDIT PURCHASE AGREEMENT ("Agreement")**

**Effective Date: February 13, 2023**

**Parties:** inKind Cards, Inc., located at 600 Congress Ave., Suite 1700, Austin, TX 78701 , inKind Credit Fund LP located at 600 Congress Ave., Suite 1700, Austin, TX 78701, and inKind Warehouse Facility, LLC located at 600 Congress Ave., Suite 1700, Austin, TX 78701 (collectively, "*inKind*") and Noble 33 Holdings, LLC, a Nevada limited liability company, located at 658 Silver Rock Trail, Castle Rock, CO 80104 ("*Merchant*").

---

**Credit Purchase:** inKind agrees to make, and Merchant agrees to accept a Purchase Offer of:

**Six Million Dollars ($6,000,000)** of Credit for **Three Million Dollars ($3,000,000) USD** to provide Merchant with working capital; upon completion of the Onboarding Tasks as set forth in Paragraph 2 below.

---

1. **Definitions**

   As used in this Agreement:

   a. "*Affiliate*" means any entity, individual, firm, or corporation, controlling, controlled by, or under common control with Merchant, directly or indirectly, through one or more intermediaries.

   b. "*Credit*" means electronic credit certificates for specified dollar amounts that may be used to purchase food, beverages, and other goods and services (including items for delivery).

   c. "*Customer*" means any patron of an F&B Outlet that is not a User.

   d. "*Funding Date*" means the date inKind transfers funds to Merchant to purchase Credit pursuant to a specific Purchase Offer.

   e. "*F&B Outlets*" means:

      i. Toca Madera West Hollywood (Toca Madera Weho LLC) located at 8450 W 3rd St., Los Angeles, CA 90048;

      ii. Toca Madera Scottsdale (Toca Madera Scottsdale LLC) located at 4736 N Goldwater Blvd., Scottsdale, AZ 85251;

      iii. Toca Madera Las Vegas (Toca Madera Las Vegas, LLC) located at 3720 S Las Vegas Blvd., Unit 233, Las Vegas, NV 89158;

      iv. Hotel Figueroa Food and Beverage / Sparrow Italia DTLA / Café Fig (TMG Figueroa, LLC) located at 939 S Figueroa St., Los Angeles, CA 90015;

      v. Casa Madera West Hollywood (Casa Madera Weho, LLC) located at 8440 Sunset Blvd., West Hollywood, CA 90069;

      vi. Maizon New York (Maizon New York, LLC) located at 18 9th Avenue, New York, NY 10014;

      vii. any restaurant opened or upgraded by Merchant using funding under this Agreement or added to this Agreement upon the request of the Merchant.

   f. "*Launch Date*" means the date on which:

      i. A F&B Outlet is open to the general public (if not already open by the Effective Date);

      ii. inKind starts marketing Credit; and

      iii. Users can start purchasing goods and services using Credit at a particular F&B Outlet.

   g. "*Mobile Technology*" means:

      i. the inKind user mobile app that allows Users to purchase, check, redeem, and gift their Credit, refer friends, leave feedback, and use any other features and enhancements that may be added, and

      ii. the inKind managers mobile app.

   h. "*Purchase Offer*" is a particular offer by inKind to purchase Credit from a merchant..

   i. "*Services*" means the marketing campaigns outlined in Section 3 and the Mobile Technology.

j. "*Term*" means the period of time commencing on the Effective Date and expiring on the date on which inKind ceases to hold Credit as a result of selling all Credit purchased.

k. "*User*" means a person who has downloaded the Mobile Technology and/or who purchases or is gifted Credit.

**2. Onboarding Tasks**

a. Before a Merchant may request inKind to fund a Purchase Offer, Merchant must complete various tasks so that inKind may start marketing Credit and Users may purchase Credit and redeem Credit in any and all open F&B Outlets.

    i. *Kick-Off Task.* Within ten (10) days of the Effective Date of this Agreement, Merchant shall have key executive staff participate in a kick-off call with inKind and agree on a tentative Launch Date for each F&B Outlet.

    ii. *Marketing Tasks.* Merchant shall perform various marketing onboarding tasks as indicated in Exhibit A, which is incorporated by reference..

    iii. Merchant agrees to work with inKind with its existing Customer loyalty program to find a mutually acceptable way to add inKind into Merchant's existing Customer loyalty program

b. Provided the aforementioned Onboarding Tasks are complete, Merchant may request funds when Merchant is prepared to launch. Funds will be distributed within thirty (30) days of Merchant's request. If the Launch Date has not occurred within fifteen (15) days of the Funding Date, the purchase price of Credit in the initial Purchase Offer shall be adjusted so that the amount of Credit purchased is increased by 0.625%, with an additional 0.625% increase for each week of delay thereafter.

**3. Marketing and Selling of Credit**

a. *Credit Program.* As Merchant's service provider, inKind is authorized to market and sell Credit on Merchant's behalf. inKind shall provide the Mobile Technology and shall make Credit available for purchase and redemption. Merchant is the issuer of the Credit and seller of the products for which the Credit can be used to purchase.

b. It is the intent of both Parties that inKind recoup its Funding Amount and earn a profit through the sale of Credit to Merchant's Customers and inKind Users. Thus, Merchant agrees it will help inKind facilitate the marketing of Credit. The parties agree to discuss additional marketing channels as opportunities may arise or circumstances may require. Merchant shall have the right to approve of inKind-created marketing campaigns provided such approval may not be unreasonably withheld.

c. *Priority Reservations.* Merchant will set aside two (2) tables per F&B Outlet with less than 200 seats and four (4) priority tables per F&B Outlet with 200 or more seats for Users each night which, if not reserved by Users no less than twenty-four hours in advance of the allotted time, will be released for general Customer use.

d. *Additional Purchases.* If inKind estimates it will soon sell out of Credit, inKind may make an offer to Merchant to purchase additional Credit. If Merchant declines such offer, Merchant will permit Users to purchase and redeem Credit even in excess of the Credit balance for a period of up to thirty (30) days to allow inKind to transition the Merchant out of its marketing program. Within seven (7) days of the end of such transition period, inKind will purchase from Merchant any Credit needed to make up for an overage at a rate of Two Dollars ($2) of Credit for One Dollar ($1) of cash.

e. *House Account Make-Up Funds.* To the extent that Users purchase Credit solely redeemable at the F&B Outlets ("House Accounts"), inKind will pay Merchant eight cents (8¢) per Dollar actually paid by Noble 33 Loyalty Members ("Make-Up Funds"). No Make-Up Funds will be earned or paid on bonus Credit. The Make-Up Funds will be paid within fifteen (15) days of the close of each quarter, on a quarterly basis, based on the list of Noble 33 Loyalty Members provided by Merchant at the beginning of each quarter. (By way of example, in December Merchant provides inKind with a current and updated list of Noble 33 Loyalty Members. Noble 33 Loyalty Members spend $100,000 in House Accounts during the January 1st through March 31st period. The Make-up Funds would equal $8,000 = 8 cents/dollar x $100,000.)

f. *Redemption Make-Up Funds.* inKind and Merchant expressly acknowledge that it is in their mutual interests to monitor and address, as necessary, the level of Users' redemptions of Credit in the F&B Outlets. To the extent the redemptions exceed seven percent (7%) of gross revenue in any quarter following launch (or the remainder of a calendar quarter if a particular F&B Outlet opens during a calendar quarter) ("*Redemption Threshold*"), inKind agrees to provide certain funding ("*Redemption Make-up Funds*"), separate and independent of the Credit Purchases contemplated under this Agreement, under the following circumstances: If the Credit redemptions exceed the Redemption Threshold calculated over a three (3) month calendar quarter, inKind shall provide Redemption Make-up Funds in an amount to equal to Eight Cents (8¢) for each dollar of redeemed Credit exceeding the Redemption Threshold. (By way of example, if the program Launch Date was January 1st, and revenues for the period January 1st through March 31st equals $1,000,000, and the F&B Outlets had $100,000 of Credit redeemed over the same three (3) month period, then the Redemption Make-up Funds would equal $2,400 = 8 cents/dollar x ($100,000 - ($1,000,000 x 7%)).

g. *Transparency.* Upon request, inKind will provide Merchant with reporting on Credit(s) sold.

**4. Consumer Data**

   a. Each party agrees that it will comply with its respective obligations under applicable data protection law. With regard to any personal information (or similarly protected data) of Customers provided by Merchant to inKind pursuant to this Agreement, the parties agree that Merchant is a business or controller of that personal information and inKind is a service provider or processor of that personal information (as those terms are defined by applicable data protection law). Merchant represents and warrants that (i) Merchant has provided all legally required notice and choice for the transfer and processing of personal information to and by inKind; and (ii) Merchant will not provide to inKind or cause inKind to process any sensitive category of personal information (including, social security numbers, precise location data, payment card information, nonpublic personal information, protected health information, or children's information) or personal information from individuals located outside the United States.

   b. With respect to any such personal information that is subject to the California Privacy Rights Act ("CPRA"), inKind agrees and certifies that it shall not: (a) sell or share such personal information (as defined by CPRA); (b) retain, use, or disclose such personal information for any purpose, including a commercial purpose, other than the business purpose of marketing and selling Credit, delineating Noble 33 Loyalty Members, or as otherwise permitted of a service provider under CPRA; (c) retain, use, or disclose such personal information outside of the direct business relationship between Merchant and inKind; or (d) combine such personal information with other personal information that inKind receives from or on behalf of another person, or collects from its own interaction with a consumer, provided that inKind may combine personal information to perform any business purpose as otherwise permitted of a service provider by CPRA. inKind further agrees that, with respect to any such personal information that is subject to CPRA: (1) such personal information is disclosed by Merchant only for limited and specified purposes of marketing and selling Credit or as otherwise permitted of a service provider under CPRA; (2) inKind shall comply with applicable obligations under CPRA and provide the same level of privacy protection as is required by CPRA; (3) Merchant has the right to take reasonable and appropriate steps to help ensure that inKind uses such personal information in a manner consistent with Merchant's obligations under CPRA; (4) inKind shall notify Merchant if it makes a determination that it can no longer meet its obligations under CPRA with respect to such personal information; and (5) Merchant has the right, upon notice, to take reasonable and appropriate steps to stop and remediate unauthorized use of such personal information to the extent required by CPRA.

   c. For avoidance of doubt, the foregoing service provider and processor obligations do not apply to any personal information (or similarly protected data) collected by or on behalf of inKind directly from Users who interact with inKind as inKind is the business or controller with respect to such personal information.

   d. The personally identifiable information of Customers, including the list shared by the Merchant as well as that collected via the popup modal, is owned by the Merchant.

   e. Once a Customer becomes a User, inKind owns any data (including personally identifiable information) it collects regarding that User. Through integrations with Merchant's point-of-sale and reservation systems, and those of other inKind partners, inKind may aggregate data on Users that inKind may use to produce targeted marketing. Merchant acknowledges that this would result in enhanced marketing for Merchant.

**5. Merchant Obligations**

   a. Merchant shall honor all Credit until redeemed, in accordance with the terms of this Agreement and applicable law and will use the Mobile Technology to manage and redeem Credit. Credit shall be treated the same by the F&B Outlets as any cash, credit cards, physical or electronic gift cards, or other cash equivalents that the F&B Outlets may from time to time sell. This provision will survive expiration of the Term.

   b. Merchant shall not, by itself or via a third party (e.g. GroupOn), sell discounted electronic or physical gift cards redeemable at any F&B Outlet. Merchant may sell non-discounted gift cards and may provide service and/or industry-related "comps" as necessary.

   c. Merchant may not engage in a crowdfunding campaign or publicly available shared equity campaign for any F&B Outlet where the incentive to fund offered to investors or campaign participants is free or discounted Credit. inKind acknowledges that Merchant offers economic perks and benefits to investors and existing customer loyalty program members.

   d. Merchant will ensure that operational staff, including both existing staff and new hires, are trained in the use of the Mobile Technology and how to process inKind transactions in a timely manner. inKind will provide training materials, including refreshers, upon request.

   e. Should the Merchant add or migrate to a new point of sale platform or a new reservation system, including any future applications (or apps) created or used by Merchant during the Term of this Agreement, Merchant shall notify inKind at least fourteen (14) days ahead of migration, facilitate the integration of such platform or system with inKind, add inKind as a tender type, and provide access thereto. Merchant agrees that there should not be a lapse in inKind redemption availability at any time.

   f. Merchant shall make commercially reasonable efforts to work with Merchant's partners with whom it has management contracts to allow such venues to be included within the definition of F&B Outlets.

   g. Merchant will make commercially reasonable efforts to facilitate integration between Merchant's third-party delivery partners and inKind for the purpose of allowing Credit to be used for third party deliveries.

Noble 33 - inKind Agreement – February 13, 2023

h.  To the extent Merchant is made up of more than one legal entity (each individually, a "*Sister Merchant*"), Credit will be grouped so that Users will be able to purchase Credit that allows for redemptions to any and all of the F&B Outlets owned by a Sister Merchant. Merchant will be responsible for determining how such funds will be used and allocated between the Sister Merchants. In the event that Credit is redeemed at a particular F&B Outlet in an amount beyond the amount allotted by Merchant to the Sister Merchant owner of such F&B Outlet, Merchant will work independently of inKind to ensure the party with over-redemptions is made financially whole. Each Sister Merchant will indemnify, defend, and hold harmless inKind, its agents, employees, and affiliates against any claim arising out of an accounting dispute between Sister Merchants, whether or not related to inKind purchases and redemptions. This paragraph will survive termination or expiration of this Agreement.

**6.  Credit Buyback**

a.  At any time during the first twelve (12) months from the signing of this Agreement, Merchant may elect to buy back the then-remaining Credit. The rate for such a buyback is One Dollar ($1) USD per Two Dollars ($2) of Credit. Payment shall be made in full, and inKind shall cease selling Credit upon receipt of such payment.

b.  If a period of twelve (12) months has elapsed since the last Funding Date and if, based on the sales pace, it will take more than thirty-six (36) months in total for inKind to sell out of Credit, inKind, at its sole discretion, may require the Merchant to buy back the then-remaining Credit by providing 30 days advance written notice. The rate for such a buyback is One Dollar and Twelve Cents ($1.12) USD per Two Dollars ($2) of Credit. The buyback shall be payable in twelve (12) equal monthly installments, with the first installment due thirty (30) days after receipt of the applicable written notice, and inKind will cease selling Credit upon receipt of the final installment. Any Credit sold during the buyback period will be deducted from the remaining outstanding Credit to be repurchased.  Any amounts not paid within fifteen (15) days after the date due shall bear (i) a late fee equal to five percent (5%) of the amount due and (ii) interest at the rate of one and one-half of a percent (1.5%) per month or the maximum interest rate allowed by law until all outstanding amounts are paid in full. This provision will survive expiration of the Term.

**7.  Terms of Use**

a.  inKind will provide to Merchant the agreed upon purchase price no later than the Funding Date and will make commercially reasonable efforts to ensure that the Mobile Technology will function in accordance with its specifications. Upon written request from Merchant, inKind will provide Merchant with information in inKind's possession that the Merchant and inKind reasonably deem necessary to comply with Merchant's obligations under this Agreement.

b.  Merchant is responsible for supplying all goods and services paid for with the Credit by a User. Merchant shall honor all properly redeemed Credit until redeemed in full. Merchant is solely responsible for compliance with any applicable escheat or abandoned or unclaimed property laws.

c.  inKind and Merchant agree to comply with the "Terms of Use" located at https://inKind.com/terms. inKind will notify Merchant in writing of any changes to the above Terms of Use. A current copy of the Terms of Use are attached to this Agreement as Exhibit B, and are incorporated by reference.

d.  inKind and Merchant will ensure that the Credit complies with all laws that govern vouchers, credit, coupons, and gift certificates, and any laws governing the imposition of expiration dates, service charges, or dormancy fees, including but not limited to the United States Credit CARD Act of 2009.

**8.  Representations and Warranties**

a.  inKind represents and warrants that:

i.  as of the Effective Date, inKind is not the subject of a bankruptcy or reorganization proceeding that has not been discharged or dismissed, does not have a plan to make a bankruptcy filing, and has not met with a bankruptcy attorney within the past six months;

ii.  there is no pending, threatened, or actual litigation against inKind or its Affiliates that could have an adverse material effect on this Agreement;

iii.  all information provided by inKind herein is true, correct, and accurate in all material respects;

iv.  inKind has all required permits, licenses, approval, consents, and authorizations necessary to conduct its business;

v.  inKind is in compliance with all laws, regulations, and requirements that affect it;

vi.  inKind, its agents, employees, and Affiliates are in compliance with the United States Foreign Corrupt Practices Act as well as all other applicable anti-corruption and anti-bribery laws anywhere in the world, and, as such, they have not and will not offer, promise, or make a payment to any foreign official directly or through a third party for the purpose of influencing a foreign official's decisions or actions;

vii.  inKind, its directors, officers, employees, agents, and affiliates are not, and during the term of this Agreement shall not be, Sanctioned Persons. A "*Sanctioned Person*" is (i) an entity or individual named on the Consolidated Sanctions List or the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Office

Noble 33 - inKind Agreement – February 13, 2023

of Foreign Assets Control, or any successor list, or targeted by the U.S. Department of State under economic or financial sanctions or trade embargoes of the United States of America (collectively, the "*Sanctions Laws*"); (ii) any other entity or individual with which an entity incorporated in the United States of America is prohibited from dealing pursuant to Sanctions Laws; or (iii) any entity or individual acting on behalf of anyone described in the foregoing clauses of this definition;

viii.    To the best of inKind's knowledge, it has not and it will not engage in any business with a country or territory sanctioned by the United States, including but not limited to the Balkans, Belarus, Burma, Cote D'Ivoire (Ivory Coast), Cuba, Democratic Republic of Congo, Iran, Iraq, Liberia, North Korea, Sudan, Syria, and Zimbabwe (this list is subject to change);

ix.    inKind has the legal right and ability to execute this Agreement and perform all of its obligations under this Agreement without violating any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which it is subject; and

x.    inKind is duly qualified, licensed to the extent necessary, and in good standing in each state in which it is doing business.

b.    The Merchant represents and warrants that:

i.    as of the Effective Date, Merchant is not the subject of a bankruptcy or reorganization proceeding that has not been discharged or dismissed, does not have a plan to make a bankruptcy filing, has not met with a bankruptcy attorney within the past six months, and to the best of Merchant's knowledge, has the funds to remain in business for the duration of this Agreement;

ii.    there is no pending, threatened, or actual litigation against Merchant or its Affiliates that could have an adverse material effect on this Agreement;

iii.    all information provided by Merchant herein is true, correct, and accurate in all material respects;

iv.    Merchant has all required permits, licenses, approval, consents and authorizations necessary to conduct its business, including all health codes and food safety regulations;

v.    Merchant and F&B Outlets are in compliance with all laws, regulations, and requirements that affect them;

vi.    Merchant, its agents, employees, and Affiliates are in compliance with the United States Foreign Corrupt Practices Act as well as all other applicable anti-corruption and anti-bribery laws anywhere in the world, and, as such, they have not and will not offer, promise, or make a payment to any foreign official directly or through a third party for the purpose of influencing a foreign official's decisions or actions;

vii.    Merchant, its directors, officers, employees, agents, and affiliates are not, and during the term of this Agreement shall not be, Sanctioned Persons. A "*Sanctioned Person*" is (i) an entity or individual named on the Consolidated Sanctions List or the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Office of Foreign Assets Control, or any successor list, or targeted by the U.S. Office of Foreign Assets Control, or any successor list, or targeted by the U.S. Department of State under economic or financial sanctions or trade embargoes of the United States of America (collectively, the "*Sanctions Laws*"); (ii) any other entity or individual with which an entity incorporated in the United States of America is prohibited from dealing pursuant to Sanctions Laws; or (iii) any entity or individual acting on behalf of anyone described in the foregoing clauses of this definition;

viii.    To the best of Merchant's knowledge, it has not and it will not engage in any business with a country or territory sanctioned by the United States, including but not limited to the Balkans, Belarus, Burma, Cote D'Ivoire (Ivory Coast), Cuba, Democratic Republic of Congo, Iran, Iraq, Liberia, North Korea, Sudan, Syria, and Zimbabwe (this list is subject to change);

ix.    Merchant has the legal right and ability to execute this Agreement and perform all of its obligations under this Agreement without violating any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which it is subject;

x.    Merchant is duly qualified, licensed to the extent necessary, and in good standing in each state in which it is doing business;

xi.    except for rent deferral agreements entered into or under ongoing negotiations with certain of its landlords, Merchant is current with rent payments for all F&B Outlets;

xii.    Merchant will not treat Users differently from other paying Customers in the scheduling or delivery of services, and shall price items at the same level and on the same terms as other paying Customers, and not charge any additional fees;

xiii.    Merchant has no intention to permanently close any F&B Outlet;

xiv.    where applicable, Merchant has complied with the California Consumer Privacy Act for data shared with inKind; and

xv.    Merchant has and maintains insurance policies adequate to comply with all statutory, regulatory, and other legal requirements for

1. business property insurance;

2. general liability insurance; and

3. workers' compensation insurance.

**9. Covenants**

a. Each of inKind and Merchant covenants to the other party that it will (i) preserve, renew and maintain in full force and effect its corporate or organizational existence, if any; (ii) take all reasonable action to maintain all rights, and privileges necessary or desirable for the normal conduct of Merchant's business; and (iii) remain duly qualified, licensed if applicable, and in good standing in its state of organization (if any) and every other state in which it is doing business.

b. Each of inKind and Merchant covenants to the other party that it will comply with (i) all of the terms and provisions of its organizational documents and bylaws, if any; and (ii) all applicable laws and orders, except where the failure to do so could not reasonably be expected to risk a material adverse effect on its financial condition, business or prospects or ability to perform its obligations under this Agreement.

c. Each of inKind and Merchant covenants to the other party that it will pay, discharge, or otherwise satisfy at or before maturity all of its material obligations as they are or may be due under this Agreement.

d. Each of inKind and Merchant covenants to the other party that it will promptly provide written notice to the other party upon becoming aware of any Event of Default or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default.

e. Merchant covenants to inKind that it will use, and/or cause the F&B Outlets to use, the amounts paid for Credit solely for business purposes and not for personal, family, or household purposes.

f. Merchant shall notify inKind thirty (30) days prior to any cancellation or material change to Merchant's business property insurance, liability insurance, and/or worker's compensation insurance. If Merchant does not have insurance or if Merchant loses insurance, inKind may purchase the requisite insurance on Merchant's behalf and Merchant shall be responsible for all associated costs. Failure to comply with this provision will be deemed a material breach of this Agreement.

g. Staff at every F&B Outlet shall not commit any repeated or ongoing act that could reasonably be considered immoral, abusive, illegal, or obscene; nor will staff injure, tarnish, damage, or otherwise negatively affect the reputation of the F&B Outlets. If any or all of the F&B Outlets are intrinsically tied to a "celebrity chef," as that term is commonly understood in the hospitality and restaurant industries, Merchant shall ensure that such celebrity chef conducts him or herself in accordance with the highest standards of appropriate business behavior and ethics. Failure to comply with this provision may be deemed an Event of Default.

**10. Confidentiality**

a. Each party acknowledges that it will have access to certain Confidential Information of the other party. Each party agrees that it will: (a) protect and safeguard the Confidential Information in strict confidence and against unauthorized use, dissemination, publication, or disclosure, (b) use the other party's Confidential Information exclusively for the purpose of carrying out the receiving party's obligations under this Agreement and for no other purpose, nor for its own account or the account of any third party, unless expressly permitted in writing by the disclosing party, and (c) employ security measures with regard to the Confidential Information that meet or exceed the security measure best practices employed in the restaurant and hospitality industries.

b. For purposes of this Agreement, "*Confidential Information*" means any information, whether oral or written, disclosed by either party to the other party, which is designated as "Confidential," "Proprietary," or some similar designation, or which, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered confidential. Confidential Information includes, without limitation, (i) design layouts, standards, material/finishes/equipment specifications and all documentation related thereto, (ii) business and financial records, statements, and projections, (iii) business strategy, market share information, customer, client, and/or partner lists and data, and (iv) nonpublic information relating to the disclosing party's customers, clients, employees, owners, partners, contracts, licenses, intellectual property, promotional and marketing activities, and other business affairs. Notwithstanding the foregoing, Confidential Information shall not include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (v) is required by law or supervisory authority, the provisions of a law or ordinance, stock exchange regulation, a legal proceeding or a court judgment to be disclosed by the receiving party.

**11. Merchant Intellectual Property**

a. Merchant may be asked to provide logos, trade names, trademarks, service marks, images, photographs, video content, or other marketing materials (collectively, "*Merchant IP*") to be used to market the Credit. While inKind holds

Credit only, Merchant hereby grants inKind a non-exclusive, non-transferable, non-sublicensable, royalty-free and worldwide license to use the Merchant IP solely for the purpose of developing, distributing, and otherwise promoting the Credit and the Merchant's inclusion in the inKind network. Merchant will not provide any Merchant IP for which it cannot grant the licenses described in this paragraph. inKind shall not use, sell, rent, lease, sublicense, distribute, broadcast, transmit, stream, place shift, transfer, copy, reproduce, download, time shift, display, perform, modify or timeshare the Merchant IP or any portion thereof, or use any Merchant IP as a component of or a base for products or services prepared for commercial use, sale, sublicense, lease, access or distribution, other than solely in connection with the promotion and sale of the Credit as contemplated hereunder. If Merchant should reasonably determine that any use, marketing, or promotion of Merchant's IP by inKind is objectionable or detrimental, Merchant shall notify inKind, and inKind shall immediately discontinue such use, marketing, or promotion.

b.   inKind shall not take any action to challenge or object to the validity of Merchant's rights in the Merchant IP or Merchant's ownership or registration thereof. Except as specifically provided in this Agreement, inKind and any third party assisting inKind with its obligations in this Agreement, are not authorized to use any Merchant IP in any medium without prior written approval from an authorized representative of Merchant. inKind shall not include any trade name, trademark, service mark, logo, domain name, or social media identifier of Merchant, or any of their respective Affiliates, or any variant or misspelling thereof, in any trademark, domain name, email address, social network identifier, metadata or search engine keyword. All rights to the Merchant IP not expressly granted in this Agreement are reserved by Merchant. None of inKind or its Affiliates has or shall claim any right, title, or interest in or to any of the Merchant IP. The parties acknowledge that Merchant may not have an adequate remedy at law for any violations of the foregoing restrictions and shall have the right to seek injunctive relief in the event of any continued use of the Merchant IP or any part thereof prohibited hereunder. This section shall survive the termination of this Agreement.

12.  **inKind Intellectual Property**

a.   Merchant acknowledges and agrees that, as between the parties, inKind owns all interest in and to the Mobile Technology, inKind trade names, logos, trademarks, service marks, domain names, social media identifiers, all data collected through or from the Mobile Technology, all audiovisual content, video recordings, audio recordings, photographs, graphics, artwork, text or any other content created by inKind or at inKind's direction, or assigned to inKind, and any materials, software, technology or tools used or provided by inKind to promote, resell or distribute the goods and services and conduct its business in connection therewith (collectively "*inKind IP*"). Merchant shall not use, sell, rent, lease, sublicense, distribute, broadcast, transmit, stream, place shift, transfer, copy, reproduce, download, time shift, display, perform, modify or timeshare the inKind IP or any portion thereof, or use such inKind IP as a component of or a base for products or services prepared for commercial use, sale, sublicense, lease, access or distribution, except that inKind grants Merchant a limited, non-exclusive, revocable, non-transferable, non-sublicensable license to use inKind's mobile merchant software application, solely for the purposes permitted by that software until all Credit has been redeemed. Merchant shall keep the inKind IP confidential, and shall not prepare any derivative work based on the inKind IP or translate, reverse engineer, decompile or disassemble the inKind IP. If inKind should reasonably determine that any use, marketing, or promotion of inKind's IP by Merchant is objectionable or detrimental, inKind shall notify Merchant, and Merchant shall immediately discontinue such use, marketing, or promotion

b.   Merchant shall not take any action to challenge or object to the validity of inKind's rights in the inKind IP or inKind's ownership or registration thereof. Except as specifically provided in this Agreement, Merchant and any third party assisting Merchant with their obligations in this Agreement, are not authorized to use inKind IP in any medium without prior written approval from an authorized representative of inKind. Merchant shall not include any trade name, trademark, service mark, domain name, social media identifier, of inKind or its Affiliates, or any variant or misspelling thereof, in any trademark, domain name, email address, social network identifier, metadata or search engine keyword. Merchant shall not use or display any inKind IP in a manner that could reasonably imply an endorsement, relationship, affiliation with, or sponsorship between Merchant or a third party and inKind. All rights to the inKind IP not expressly granted in this Agreement are reserved by inKind. The parties acknowledge that inKind may not have an adequate remedy at law for any violations of the foregoing restrictions and shall have the right to seek injunctive relief in the event of any continued use of the inKind IP or any part thereof prohibited hereunder. This section shall survive the termination of this Agreement.

13.  **Taxes**

Merchant will be solely responsible for calculating, collecting, and remitting any value added, use, occupancy, restaurant, privilege, gross receipts, sales or other applicable taxes (each a "*Tax*" and collectively, "*Taxes*") owed to federal, state, or local taxing authorities in connection with Users' redemption of Credit.

14.  **Third Party Beneficiaries**

This Agreement does not create any third-party beneficiary rights in any individual or entity that is not a party to this Agreement.

15.  **Notifications**

a.   All notices, requests, demands, required disclosures and other communications from inKind to the Merchant will be transmitted to the Merchant by email to the address provided under the Merchant's signature in the Credit Purchase

Agreement. The Merchant shall send all notices or other communications required to be given hereunder to the Company via email at notices@inKind.com with a hard copy sent to: inKind, 600 Congress Ave., Suite 1700, Austin, TX 78701 , Attention: Merchant Support.

b. A notice that is sent by certified or registered mail will be deemed received three (3) business days after it is mailed. A notice that is sent by Federal Express or other recognized and reputable national overnight courier will be deemed received on the business day following the date such notice is accepted by such overnight courier for delivery to the intended recipient. Any email notice given shall be deemed to have been delivered and received on the first business day following that on which the electronic mail has been sent (assuming that there is no error in delivery). Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

c. inKind may, but is not required to, email Merchant regarding opportunities for pricing discounts and special programs offered by inKind's affiliate partners.

## 16. Events of Default

a. Subject to applicable law, a party may declare the other party to be in default under this Agreement if any one or more of the following events occurs and is continuing (each an "*Event of Default*"):

   i. Merchant permanently ceases operations of so many F&B Outlets that the total number of F&B Outlets under this Agreement is less than four (4);

   ii. A party breaches any clause in this Agreement and fails to cure the same within fifteen (15) days following written notice of such default;

   iii. A party breaches any clause in this Agreement that cannot be cured;

   iv. Any representation or warranty made in writing by a party or any of a party's employees or agents in connection with the transactions contemplated hereby or thereby proves to have been knowingly false or incorrect in any material respect on the date as of which made; or

   v. Merchant refuses to honor Credit to be redeemed.

b. Upon any Event of Default, a party may commence an action against the other party to collect all amounts owed in connection with this Agreement and/or charge and recover from the other party all of such party's out-of-pocket costs and expenses, including reasonable outside attorneys' fees, arbitration costs, and/or court costs, incurred by such party in connection with the defense, protection or enforcement of such party's rights under this Agreement (including, without limitation, in connection with any bankruptcy proceeding) and any other fees that may be due and owing. Upon an Event of Default by Merchant, a sum of money calculated by multiplying the dollar amount of purchased Credit not yet sold by inKind (in the case of (a)(i), (ii), (iii) or (iv)) or not yet redeemed (in the case of (a)(v)) by $0.70 shall become immediately due and payable by Merchant to inKind ("*Merchant Default Payment*"). Merchant acknowledges that the actual damages to be suffered by inKind in an Event of Default by Merchant would be extremely difficult if not impossible to ascertain and that the amount of the Merchant Default Payment is a reasonable estimate of the actual damages to be suffered by inKind and that such sum represents liquidated damages and not a penalty. The Merchant Default Payment is due within fifteen (15) days of the emailing of the Notice of Default for an incurable default, or fifteen (15) days after failure to cure within the cure period, as applicable ("Default Due Date"). Any amounts not paid by the Default Due Date will accrue interest at the rate of ten percent (10%) per year or the maximum interest rate allowed by law until all outstanding amounts are paid in full. All rights available to either party are cumulative and not exclusive of any other right or remedy available to us in law or equity. This provision will survive expiration of the Term.

## 17. Security Interest

a. Upon an Event of Default by Merchant, and after notice has been provided by inKind and the applicable cure period, if any, has ended, Merchant grants to inKind a continuing security interest in and to all the present and future accounts, receivables, chattel paper, deposit accounts, personal property, goods, assets and fixtures, general intangibles, instruments, equipment and inventory (as those terms are defined in Article 9 of the Uniform Commercial Code ("*UCC*")) of the F&B Outlets, wherever located, and with respect to these items, all proceeds now or hereafter owned or acquired (collectively, the "*Collateral*"). inKind may exercise any and all rights or remedies available to a secured creditor under Article 9 of the UCC or analogous state laws, including filing one or more UCC-1 financing statements to perfect its security interest in the Collateral and exercise any and all remedies available to secured parties under the UCC or any other applicable law. In the event inKind takes action to perfect its security interest in the Collateral, inKind shall immediately notify Merchant in writing of the same (including providing Merchant a copy of any such recorded UCC-1 financing statements). Further upon an Event of Default, Merchant agrees that it will, from time to time, promptly execute and deliver all instruments and documents (including any account control agreements) and take all further action, that may be reasonably necessary or appropriate, or that inKind may reasonably request, to perfect inKind's security interest in the Collateral against Merchant or to enable inKind to exercise and enforce its rights and remedies hereunder.

b. If an unexpected event should occur that affects the standard operation of an F&B Outlet, such as a fire or flood on property, and it becomes imperative for the Merchant to take out a loan to restore the property and cure any associated

Noble 33 - inKind Agreement – February 13, 2023

breaches based on the temporary closure of an F&B Outlet, inKind will make reasonable, commercial efforts to subordinate its security interest to such emergency loan.

**18. Assignment**

The Merchant will not assign this Agreement, or delegate or sublicense any of the Merchant's rights under this Agreement, without inKind's prior written consent. Any assignment or transfer without inKind's prior written consent is void. Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of, the parties and their respective successors and assigns.

**19. Waiver**

The failure by a party to enforce any provision of this Agreement will not constitute a present or future waiver of such provision or any other provision of this Agreement nor limit that party's right to enforce such provision at a later time. All waivers by a party must be in writing to be effective.

**20. Severability**

If any portion of this Agreement is held to be invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect. Any invalid or unenforceable portions will be interpreted to affect the intent of the original portion. If such construction is not possible, the invalid or unenforceable portion will be severed from this Agreement but the rest of the Agreement will remain in full force and effect.

**21. Survival of Terms**

The following Sections of this Agreement shall survive the termination or expiration of this Agreement for any reason: Sections 4, 5.a, 5.h, 6, 7.b, 9.c, 10-13; 16-18, 20-21, 24-30, and any other terms herein which expressly state that such terms will survive or which by their nature are required to survive to give effect to the surviving terms stated to survive, shall survive the termination or expiration of this Agreement for any reason and will continue in full force and effect subsequent to and notwithstanding such termination until such provisions are satisfied or by their nature expire.

**22. Authority**

Each party hereto represents and warrants to the other that it has full power and authority to enter into and perform its obligations under this Agreement, and that the person signing this Agreement on behalf of such party has been properly authorized and empowered to enter into this Agreement on its behalf.

**23. Disclaimers**

a.   INKIND AND ITS AFFILIATES MAKE NO WARRANTIES, EXPRESS OR IMPLIED, GUARANTEES OR CONDITIONS WITH RESPECT TO THE SERVICES. THE MERCHANT UNDERSTANDS THAT USE OF THE SERVICES IS AT ITS OWN RISK AND THAT INKIND PROVIDES THE SERVICES ON AN "AS IS" BASIS "WITH ALL FAULTS" AND "AS AVAILABLE." INKIND DOES NOT GUARANTEE THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. TO THE EXTENT PERMITTED UNDER THE LAW, INKIND EXCLUDES ANY IMPLIED WARRANTIES, INCLUDING FOR MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, WORKMANLIKE EFFORT, AND NON-INFRINGEMENT.

b.   The Merchant acknowledges and agrees that it will rely on its own judgment in using inKind's services. inKind (i) makes no representations with respect to the quality of any opportunity; (ii) does not guarantee the performance of any User; (iii) is not an investment adviser, does not provide investment advice and does not recommend securities transactions.

**24. Limitations of Liability**

NEITHER PARTY NOR ITS AFFILIATES WILL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, OR DATA) OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, NEITHER INKIND NOR ANY OF ITS AFFILIATES WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) THE MERCHANT'S INABILITY TO USE THE SERVICES, INCLUDING AS A RESULT OF ANY (I) TERMINATION OR SUSPENSION OF THIS AGREEMENT OR THE MERCHANT'S USE OF OR ACCESS TO THE SERVICES, (II) INKIND'S DISCONTINUATION OF THE SERVICES, OR (III) ANY UNANTICIPATED OR UNSCHEDULED DOWNTIME OF ALL OR A PORTION OF THE SERVICES FOR ANY REASON, INCLUDING AS A RESULT OF POWER OUTAGES, SYSTEM FAILURES, OR OTHER INTERRUPTIONS; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY THE MERCHANT IN CONNECTION WITH THIS AGREEMENT OR THE MERCHANT'S USE OF OR ACCESS TO THE SERVICES; OR (D) ANY UNAUTHORISED ACCESS TO, ALTERATION OF, OR THE DELETION, DESTRUCTION, DAMAGE, LOSS, OR FAILURE TO STORE ANY DATA, OTHER THAN IN THE CASE OF GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT. IN ANY CASE, INKIND AND ITS AFFILIATES' AGGREGATE LIABILITY UNDER THIS AGREEMENT WILL BE LIMITED TO THE AMOUNT INKIND HAS FUNDED THE MERCHANT THROUGH ACCEPTED PURCHASE OFFERS.

Noble 33 - inKind Agreement – February 13, 2023

**25.  Indemnity**

a.  The Merchant shall defend and indemnify against, and hold inKind, its Affiliates and their representatives and agents harmless from any and all actual or direct losses, liabilities, judgments, arbitration awards, settlements, damages, and costs resulting from or arising out of any third party suits, actions, claims, demands, or similar proceedings (collectively, "*Proceeding*") caused by the grossly negligent acts or omissions or willful misconduct of, or breach of this Agreement by, the Merchant or the Merchant's directors, officers, managers, employees, or other agents.

b.  inKind shall indemnify against, and hold Merchant, its Affiliates and their representatives and agents harmless from any and all actual or direct losses, liabilities, judgments, arbitration awards, settlements, damages, and costs resulting from or arising out of any Proceeding caused by the grossly negligent acts or omissions or willful misconduct of, or breach of this Agreement by, inKind, or inKind's directors, officers, managers, employees, or other agents.

c.  In the event of a Proceeding, the indemnifying party will consult with the indemnified party before accepting any proposed settlement terms. An indemnified party may also retain and use its own counsel at its own expense.

**26.  Corporate Guarantor**

a.  By signing this Agreement, each Guarantor assumes, jointly and severally, the full, complete and timely performance of all of Merchant's obligations under the Agreement or if a breach of any of Merchant's representations, warranties or covenants occurs. If such a breach occurs, then Guarantor(s) shall perform all obligations under this Agreement including paying, or causing to be paid, any amounts due that inKind would otherwise be entitled to collect from Merchant. This guarantee is a guarantee of performance and not a guarantee of collection. inKind may proceed to enforce its rights against each Guarantor prior to, contemporaneously with or after, any enforcement against Merchant or without any enforcement against Merchant. The Guarantor's obligations are unconditional and absolute and shall remain in full force and effect and without regard to and shall not be released, discharged or in any way affected by (a) any amendment to this Agreement; (b) any exercise or non-exercise of or delay on exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against Merchant or any of its officers, directors or principals; (d) defects in the formation or authority of Merchant; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety. If payment of any sum by Merchant is recovered as a preference or fraudulent conveyance under any bankruptcy or insolvency law, the liability of Guarantor(s) under this guaranty shall continue and remain in full force and effect notwithstanding such recovery. By this provision, the Guarantor(s) is notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the provisions of this Section are triggered by a breach of this Agreement by Merchant. Each Guarantor acknowledges receiving a copy of this Agreement and having read the terms of this Agreement, including, without limitation, the guarantee set forth in this paragraph, and the Guarantor's signature will serve as confirmation that the Guarantor understands all terms and conditions of this Agreement. Each Guarantor agrees that this guarantee is continuing and absolute and that inKind may modify or extend the terms of this Agreement, or compromise, settle or release any other obligor under this Agreement without notice or consent by Guarantor and without affecting Guarantor's liability. For the avoidance of doubt, Guarantor is obligated to pay the amount due and any assessed fees only upon the occurrence of an Event of Default.

b.  Provisions of Standard Terms of Business Applicable to Each Guarantor: Sections 4-29, and any other relevant Section apply fully to each Guarantor individually, and each reference to "Merchant," in such Sections of this Agreement shall be deemed to apply not just to Merchant but also to each Guarantor individually.

**27.  Governing Law; Venue**

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to its choice of law provisions.  Venue and jurisdiction of any arbitration, suit, or cause of action shall lie exclusively in Austin in Travis County, Texas.

**28.  Arbitration**

a.  Except for the interpretation and enforcement of injunctive relief (which shall be subject to litigation in any court having proper jurisdiction), in the event of any dispute, claim, or disagreement arising from or relating to this Agreement or the breach thereof, the parties agree to submit any and all disputes, claims, or differences to a single arbitrator for claims of $1,000,000 or less, or three arbitrators for claims greater than $1,000,000, in an arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules and Mediation Procedures (the "Commercial Rules"), including the Procedures for Large, Complex Commercial Disputes, if and as appropriate.  Such arbitration shall take place in Austin, Texas. THE PARTIES AGREE THAT BY ENTERING INTO THIS AGREEMENT, MERCHANT AND INKIND ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.  In the event of any arbitration arising from breach of this Agreement, or the services provided under this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs incurred including court costs, reasonable outside attorneys' fees, and all other directly related expenses incurred in such arbitration.  The award rendered by the arbitration panel shall be final and binding on the parties and may be entered

and enforced in any court having jurisdiction and any court where a party or its assets is located. Each party hereby consents to the jurisdiction of any such court for purposes of enforcing the award.

b.    The parties acknowledge and agree that a breach of Merchant's obligations under Paragraphs 5(a), 7(b), and 16(a)(v) could cause irreparable harm to inKind for which inKind would have no adequate remedy at law, and further agree that, notwithstanding the agreement of the parties to arbitrate controversies or claims as set forth above, inKind may apply to a court of competent jurisdiction to seek to enjoin preliminarily or permanently any breach or threatened breach of the Merchant's obligations under Paragraphs 5(a), 7(b), and 16(a)(v).

**29.  Litigation**

Either party may seek any pre-judgment remedy in a court of competent jurisdiction.  In connection with any action or proceeding for temporary or permanent injunctive relief, each party hereto hereby waives the claim or defense that a remedy at law alone is adequate and agrees, to the maximum extent permitted by law, to have each provision of this Agreement specifically enforced against it, without the necessity of posting bond or other security against him or it.  In the event of any litigation arising from breach of this Agreement, or the services provided under this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs incurred including court costs, reasonable outside attorneys' fees, and all other directly related expenses incurred in such litigation.

**30.  Entire Agreement; Singular and Plural**

This Agreement is the entire agreement between the Merchant and inKind regarding the subject matter of this Agreement. This Agreement supersedes all prior or contemporaneous representations, understandings, agreements, or communications between the Merchant and inKind, whether written or verbal, regarding the subject matter of this Agreement. Unless clearly inappropriate, a reference to the singular includes a reference to the plural and vice versa.

**31.  Counterparts; Electronic delivery**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Noble 33 - inKind Agreement – February 13, 2023

IN WITNESS WHEREOF, the undersigned have executed this Credit Purchase Agreement as of the date first written above.

inKind Cards, Inc.

By:

Name: Johann Moonesinghe

Title: CEO

inKind Credit Fund LP

By its manager inKind Credit Fund GP, LLC

By:

Name: Andrew Harris

Title: Manager

inKind Warehouse Facility, LLC

By its manager inKind Cards, Inc.

By:

Name: Johann Moonesinghe

Title: Authorized Signatory

Merchant: Noble 33 Holdings, LLC

By:

Name: Michael Tanha

Title: CEO

Email: Mikey@Noble33.com

Corporate Guarantor: Noble 33 Holdings, LLC

By:

Name: Michael Tanha

Email: Mahdiar@Noble33.com

Address: 3750 Las Vegas Blvd S #3303

Las Vegas NV 89158

Noble 33 - inKind Agreement – February 13, 2023

EXHIBIT A

Marketing Tasks

**Create an email & SMS capture popup for your website(s):**

- inKind will work with Merchant to create a modal with Merchant's logos, fonts, colors, etc., that will be added to Merchant's website(s) simply to gather email addresses. inKind's Account Managers create the modal, then immediately engage with any email gathered through its backend systems.
  - Merchant will have approval rights over all aspects of the popups and any communication sent to the captured email addresses and phone numbers.
  - Merchant will have access to these newly gathered emails for in-house marketing.
  - The modal is custom designed. inKind can incorporate any existing messaging (i.e. Now Hiring, Specific Events, etc.).

**Email Marketing:**

- inKind will gather Noble 33 emails and an email marketing campaign will be created and sent from inKind and take the form of a monthly series with different focuses - a launch campaign educating guests about House Accounts, campaigns giving guests the opportunity to buy House Accounts, campaigns gifting small amounts of credit to drive consumers to the restaurant and then bolster retention by converting them to high-spend House Account holders, and event-based campaigns highlighting things such as events or new menu items.
- Merchant agrees that the above-mentioned email campaigns can also be sent to Merchant's Customer Loyalty Program members on a quarterly basis.
- Merchant will have approval rights over any and all marketing communication.

**inKind Consumer Network Engagement:**

- Post-launch, inKind will engage with its user network via cross-sell and gifting campaigns encouraging them to explore Merchant's restaurants.

**Corporate Sales:**

- inKind's Corporate Sales team will engage with national and regional corporates to sell large amounts of credit. Corporate sales can range from gifting an amount of the credit inKind purchases from you to a corporate's employees (oriented at driving new high-spending customers to your restaurants) to large corporate purchases.

**Reservation Confirmations:**

- inKind may also engage in reservation-based marketing communications (such as adding "pro tips" to reservation confirmations) to encourage potential Customers to purchase Credit, which will increase the probability a potential Customer keeps their reservation and/or spends more at an F&B Outlet. The content of such communications shall be developed in conjunction with and approved by Merchant's marketing department. Merchant will help determine the frequency of such communications, provided that if the sales pacing of Credit falls below 1/36th of the Initial Purchase Offer ($166,667 in Credit Sales per month) inKind may increase the frequency to help improve sales. Merchant agrees to facilitate such marketing.

*Exclusive Experiences.*

- Merchant may create exclusive custom dining packages offered only to inKind users.

Noble 33 - inKind Agreement – February 13, 2023

EXHIBIT B

InKind's Terms of Use

November 10, 2022

These Terms of Use incorporate the inKind privacy policy, which is available to view here: privacy policy.

Amendments to Terms of Use

We reserve the right to modify these Terms of Use at any time in our sole discretion. Any changes to these Terms of Use will become effective immediately upon the posting thereof. Please regularly review these Terms of Use to keep yourself apprised of any changes. Your continued use of inkindcapital.com following the posting of changes will constitute your acceptance of the revised Terms of Use.

Sale of House Accounts

**(a) Purchasing**

inKind may, in its sole discretion, verify a user's identity prior to processing a purchase. inKind may also refuse to process a purchase, may cancel a purchase, as reasonably deemed necessary, to comply with applicable law or to respond to a case of misrepresentation, fraud or known or potential violations of the law or these Terms of Sale. Refunds for cancelled orders may be issued where appropriate.

inKind does not guarantee that it offers best available rates or prices and does not guarantee against pricing errors. inKind reserves the right, in its sole discretion, to not process or to cancel any orders placed, including, without limitation, if the price was incorrectly posted on the Site. If this occurs, inKind will attempt to notify you by email. In addition, inKind reserves the right, in its sole discretion, to correct any error in the stated retail price of the Gift Cards or House Accounts.

inKind has a process for evaluating merchants but does not fully investigate or vet merchants. inKind is not responsible for any claims associated with any issues with Gift Card or House Account credit redemptions. You should make whatever investigation you deem necessary or appropriate before purchasing any Gift Card or House Account to determine whether merchant is qualified to provide the advertised good. Merchant is solely responsible for the care and quality of the goods and services being provided.

**(b) Gift Cards and House Accounts**

Gift Cards and House Accounts are electronic credit certificates for specified dollar amounts that may be used to purchase items or services sold by a particular merchant (the "Merchant"), and shall be treated the same by the Merchant as any physical gift cards or other electronic gift cards that the Merchant may from time to time sell.

The Merchant is the sole issuer of the Gift Cards and House Accounts. Gift Cards and House Accounts are not redeemable for cash, unless required by law. In the event a Merchant ceases operations, you agree that your only course of action is to seek a refund from the Merchant, not from inKind.

Gift Cards and House Accounts combine two separate portions: (i) a paid portion equal to the amount you paid for the Gift Card or House Account (the "Paid Portion"); and (ii) at no additional charge to you, a time-sensitive promotional portion for the balance of the value of the Gift Card or House Account if used by the promotional expiration date detailed upon purchase

Noble 33 - inKind Agreement – February 13, 2023

(the "Promotional Portion"). The Paid Portion will never expire. The paid portion is redeemed first, then the promotional portion.

- Gift Cards and House Accounts are not redeemable for cash.
- Use of a Gift Card or House Account for alcoholic beverages is at the sole discretion of the Merchant in accordance with applicable law.
- Gift Cards and House Accounts cannot be combined with any other coupons or promotions, unless expressly permitted by the Merchant.
- Gift Cards and House Accounts cannot be used for taxes, tips, prior balances and/or shipping or handling, as applicable.
- Duplicate use of Gift Cards and House Accounts is prohibited.
- Unless otherwise stated therein, the Gift Card and House Account price does not include sales, value-added or use taxes, which may be charged to you separately by the Merchant at the time you redeem the Gift Card or House Account.

The Merchant is the issuer of the Gift Card or House Account and is solely responsible for redeeming the Gift Card or House Account for items or services sold by the Merchant and for compensating you should the Merchant cease accepting Gift Cards and/or House Accounts. The Merchant is also solely responsible for all goods and services it provides to you and for any and all injuries, illnesses, damages, claims, liabilities and costs it may cause you to suffer, directly or indirectly, in full or in part, whether related to the use or redemption of a Gift Card or House Account or not, as well as for any unclaimed property liability arising from unredeemed or partially redeemed Gift Cards or House Accounts.

inKind is solely the marketer of the Merchant's goods or services, and may from time to time engage third parties or affiliates to administer Gift Card and House Account management on behalf of Merchants. You hereby irrevocably waive all rights related to, and release inKind and its subsidiaries, affiliates, partners, officers, directors, employees and agents from, any liabilities arising from or related to any act or omission of a Merchant in connection with your use of a Gift Card or House Account or the products and/or services it provides in connection with it.

By purchasing, viewing a mobile version, using or attempting to use any Gift Card or House Account, you agree to any additional deal-specific terms advertised in connection with the Gift Card or House Account at the time of purchase (the "fine print" regardless of how labeled), and these Terms of Use. These rules apply to all Gift Cards and House Accounts that we make available, except as otherwise required by law. Any attempt to redeem a Gift Card or House Account in violation of the Terms of Use will render the Gift Card or House Account void.

Unauthorized or unlawful reproduction, resale, modification or trade of Gift Cards and House Accounts is prohibited. Pricing relating to certain Gift Cards and House Accounts on inkind.com may change at any time in inKind's discretion, without notice.

**(c) Refunds**

In the event the restaurant ceases operations, you will be entitled to claim the remaining amount of the paid portion of your House Account from the restaurant. The paid portion is redeemed first, then the promotional portion (for example, if you paid $500 for $600 in credit and have $200 remaining on your account, you would be entitled to a refund of $100 - being $500 less the $400 of credit you have used).

Registration and Account Security

In consideration of your use of inkind.com, you agree (a) that when required to provide information about yourself, you will provide accurate, current and complete information, (b) to keep your password secure, (c) to update any information

Noble 33 - inKind Agreement – February 13, 2023

provided by you to us in order to keep it accurate, current and complete, and (d) to be fully responsible for all use of your account and for any actions that take place using your account.

Intellectual Property Rights

All software, design, text, information, data, databases, images, photographs, illustrations, audio clips, video clips, artwork, graphic material, or other copyrightable elements (collectively, "Content"), other than User Content (as defined below), are the property of inKind and/or its subsidiaries, affiliates, assigns, licensors, vendors, partners or other respective owners and are protected, without limitation, pursuant to U.S. and foreign copyright laws. No Content (other than your own User Content) may be reproduced, modified, used to create derivative works, displayed, performed, published, distributed, disseminated, broadcast or circulated to any third party without our express prior written consent.

Use License

You are hereby granted a limited license to access and use the inkind.com website for personal, non-commercial transitory viewing only. Under this license, you may not:

- modify or copy the Content except as expressly permitted hereby;
- use the Content for any commercial purpose or any public display;
- attempt to decompile or reverse engineer any software contained on inkind.com;
- remove any copyright or other proprietary notations from the Content; or
- transfer the Content to another person or "mirror" the Content on any other server.

This license shall automatically terminate if you violate any of the above restrictions. We may terminate this license for any reason at our sole discretion.

Trademarks

"inKind" and its logo (collectively, "inKind Trademarks") constitute our trademarks or service marks. Other company, product, and service names and logos used and displayed on inkind.com may be trademarks or service marks owned by us or others. You may not use, copy, display, distribute, modify or reproduce any of the trademarks or service marks found on inkind.com unless in accordance with written authorization by us. The use of any of the inKind Trademarks as part of a link to or from any site is prohibited unless we provide advance written approval. Any questions concerning any inKind Trademarks, or whether any mark or logo is an inKind Trademark, should be referred to us.

User Content Agreement

You represent, warrant and agree that no materials of any kind submitted through your account or otherwise posted or shared by you on inKind.com will violate or infringe upon the rights of any third party, including copyright, trademark, privacy, publicity or other personal or proprietary rights, or contain libelous, defamatory or otherwise unlawful material. You further agree not to use electronic or other means to collect email addresses or other contact information of Users for the purposes of sending unsolicited communications. Additionally, you agree not to create any automated user-generated content, use

automated scripts to collect information from inkind.com or for any other purpose. You further agree that you may not use inKind in any unlawful manner or in any other manner that could damage, disable, overburden or impair inkind.com.

In addition, you agree not to use inkindcapital.com to:

- upload, post, transmit, share, store or otherwise make available any content that we deem to be harmful, threatening, unlawful, defamatory, infringing, abusive, inflammatory, harassing, vulgar, obscene, fraudulent, invasive of privacy or publicity rights, hateful, or racially, ethnically or otherwise objectionable;
- register for more than one User account or register for a User account on behalf of an individual other than yourself;
- impersonate any person or entity, or falsely state or otherwise misrepresent your identity, your age or your affiliation with any person or entity;
- upload, post, transmit, share or otherwise make available any unsolicited or unauthorized advertising, solicitations, promotional materials, "junk mail," "spam," "chain letters" or any other form of solicitation;
- except as may be permitted under separate terms and conditions of use, upload, post, transmit, share, store or otherwise make publicly available on inKind.com any private information of any third party, including, without limitation, addresses, phone numbers, email addresses, Social Security numbers or bank account details;
- upload, post, transmit, share or otherwise make available any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment;
- intimidate or harass another User;
- upload, post, transmit, share, store or otherwise make available content that would constitute, encourage or provide instructions for a criminal offense, violate the rights of any party, or that would otherwise create liability or violate any local, state, national or international law;
- use or attempt to use another's account, service or system without our authorization; or
- upload, post, transmit, share, store or otherwise make available content that, in our judgment, is objectionable or restricts or inhibits any other person from using or enjoying the Site, or which may expose us or any User to any harm or liability of any type.

<u>User Content Posted on inkind.com</u>
You are solely responsible for the content that you post on inkind.com or transmit to or share with other Users ("User Content"). You understand and agree that we may, but are not obligated to, review and delete or remove (without notice) any User Content at our sole discretion, including without limitation, User Content that in our judgment violates these Terms of Use, might be offensive or illegal, or might violate the rights of, harm, or threaten the safety of, Users or others.

By posting User Content to any part of inkind.com, you are deemed to grant to us, and you represent and warrant that you have the right to grant, an irrevocable, perpetual, non-exclusive, transferable, worldwide license (with the right to sublicense) to use, copy, publicly perform, publicly display, reformat, translate, excerpt (in whole or in part) and distribute such User Content for any purpose on or in connection with inkind.com or the promotion thereof, to prepare derivative works of, or incorporate into other works, such User Content, and to grant and authorize sublicenses of the foregoing. You may remove your User Content from inkind.com at any time. However, if you choose to remove your User Content, the license granted above will not expire.

<u>Links to Third Party Websites</u>
From time to time inkind.com may contain links to websites that are controlled, owned or operated by third parties ("third-party sites"). We take no responsibility for any information, or its availability provided on third-party sites. You acknowledge and agree that your use of any third-party sites is governed by the terms of use for those websites, and not by these Terms

Noble 33 - inKind Agreement – February 13, 2023

of Use. We do not endorse any third-party sites that have links on inkindcapital.com or any products or services offered by such sites. We provide the links for your convenience and you access them at your own risk. Any third-party sites may have substantially different privacy policies and be less secure than our own, we are not responsible for the content of any third-party sites, nor do we make any representation or warranty, express or implied, regarding the content on any third- party site, and we shall have no liability of any nature whatsoever for any failure of products or services offered or advertised on such sites or otherwise.

Copyright Complaints
If you are the owner or controller of any copyright that you believe is being infringed by material on inkind.com, you may send a written notification under the Digital Millennium Copyright Act (via mail or email) of such infringement to inKind's Designated Agent to the following address:

Attn: Compliance Officer
inKind
600 Congress Ave
Ste 1700
Austin TX 78704

Or email: compliance@inkind.com

The notice must meet the notice requirements under the Digital Millennium Copyright Act. In accordance with the Digital Millennium Copyright Act and other applicable law, inKind Capital has a policy of terminating, at its sole discretion, the registrations of Users who are deemed to be repeat infringers. We may also, at our sole discretion, limit the access to inkindcapital.com afforded to any Users who infringe intellectual property rights of others.

Service Use Technical Requirements
In order to use inKind's services and redeem food and beverage credit, You must own or have access to a smartphone with active wireless internet connectivity. Functionality of the inKind mobile application is dependent on You keeping your smartphone current with the latest updates and security patches to your operating system as well as to the latest version of the inKind app. We do not support older mobile operating systems and, if You use an older operating system, You may not be able to access the app and/or redeem credit.

Mobile Marketing
By joining the inKind Cards, Inc. dba inKind mobile alerts program, you have consented to receive recurring marketing text messages. For help call 202-556-0745 or email support@inkind.com. To stop receiving messages at any time, text STOP to the number we text you on. For HELP, text HELP to the number we text you on. Your consent to receive text messages is not a condition of purchase. Msg&Data rates may apply. Carriers are not liable for delayed or undelivered messages. The inKind mobile alerts program is available in the US only. For how we treat your data, please visit our Privacy Policy.

Standard messaging rates apply to your entry or submission message to any inKind text message service, our confirmation and all subsequent text message correspondence. Please contact your wireless carrier for information about your messaging and data plan(s). Your carrier may impose message or charge limitations on your account that are outside our control. All associated charges are billed by and payable to your mobile service provider.

Data obtained from you in connection with our text message service may include your cell phone number, your carrier's name, and the date, time and content of your messages to us and other information that you may provide. We may use this

Noble 33 - inKind Agreement – February 13, 2023

information to contact you and to provide the services you request from us, and to otherwise operate, develop and improve the service. We and third-party partners collect information using cookies, pixel tags, plugins, or similar technologies. For example, we may use pixel tags to recognize and alert you, if you leave items in your shopping cart. Our third-party partners, such as analytics and advertising partners, may use these technologies to collect information about your online activities over time and across different services. Your wireless carrier and other service providers may also collect data about your text usage, and their practices are governed by their own policies. We will only use information you provide to the service to transmit your text message. We reserve the right at all times to disclose any information as necessary to satisfy any law, regulation or governmental request, to avoid liability, or to protect our rights or property.

Use of Personally Identifiable Information
Please see our Privacy Policy.

Disclaimer of Warranties
WE DO NOT GUARANTEE THE ACCURACY, ADEQUACY, TIMELINESS, RELIABILITY, COMPLETENESS, OR USEFULNESS OF ANY OF THE CONTENT, AND WE DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE CONTENT.

INKIND.COM AND ALL OF THE CONTENT IS PROVIDED "AS IS" AND "AS AVAILABLE," WITHOUT ANY WARRANTY, EITHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT OR TITLE. ADDITIONALLY, THERE ARE NO WARRANTIES AS TO THE OUTCOME OF YOUR USE OF THE CONTENT. WE DO NOT WARRANT THAT INKIND.COM IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THIS DOES NOT AFFECT THOSE WARRANTIES THAT ARE INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER THE LAWS APPLICABLE TO THIS AGREEMENT.

WE MAY DISCONTINUE OR MAKE CHANGES IN THE CONTENT AND INKIND.COM AT ANY TIME WITHOUT PRIOR NOTICE TO YOU AND WITHOUT ANY LIABILITY TO YOU. ANY DATED INFORMATION IS PUBLISHED AS OF ITS DATE ONLY, AND WE DO NOT UNDERTAKE ANY OBLIGATION OR RESPONSIBILITY TO UPDATE OR AMEND ANY SUCH INFORMATION. WE RESERVE THE RIGHT TO TERMINATE ANY OR ALL INKINDCAPITAL.COM OFFERINGS OR RELATED TRANSACTIONS WITHOUT PRIOR NOTICE TO YOU. INKIND.COM COULD CONTAIN TECHNICAL INACCURACIES OR TYPOGRAPHICAL ERRORS. USE OF INKIND.COM IS AT YOUR OWN RISK.

Limitations of Liability
TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER WE NOR OUR AFFILIATES NOR OUR OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, LICENSORS, REPRESENTATIVES, NOR ANY THIRD-PARTY PROVIDERS TO THE SITE, ARE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR OTHER INJURY ARISING OUT OF OR IN ANY WAY CONNECTED WITH USE OF INKIND.COM, OR WITH A USER'S DELAY OR INABILITY TO USE THE SITE, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS AND SERVICES OBTAINED THROUGH INKIND.COM, WHETHER RESULTING IN WHOLE OR IN PART, FROM BREACH OF CONTRACT, TORTIOUS BEHAVIOR, FEDERAL OR STATE SECURITIES LAWS, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.

Indemnification
You agree to indemnify and hold inKind Cards, inc., its subsidiaries and affiliates, and each of their directors, officers, agents, contractors, partners and employees, harmless from and against any loss, liability, claim, demand, damages, costs and expenses, including reasonable attorney's fees, arising out of or in connection with any User Content you post or share on

Noble 33 - inKind Agreement – February 13, 2023

or through inkind.com, your use of inkind.com, your conduct in connection with inkind.com or with other Users of inkind.com, or any violation of these Terms of Use or of any law or the rights of any third party.

Consent to Electronic Disclosures

inKind can only give you the benefits of our service by conducting most of our business through the Internet. By agreeing to these Terms of Use you hereby consent to do business and receive all disclosures, notices, documents and information, including Schedule K-1s, ("Communications") from us in relation to all of your interactions and transactions on inkindcapital.com electronically by e-mail or at inkind.com and acknowledge that this agreement satisfies Revenue Procedure 2012-17 which requires affirmative consent to electronic delivery of Schedule K-1s.

To access and retain the Communications electronically, you will need to use a computer with Internet Explorer 7.0 or above, Firefox 3.0 or above, Google Chrome or similar software, Adobe Acrobat and hardware capable of running this software. By agreeing to these Terms of Use you hereby acknowledge that you can access the electronic Communications in these formats.

You may withdraw your consent to receive Communications electronically by contacting us via email at support@inkind.com with the subject heading "Electronic Disclosures". The withdrawal of your consent will not affect the legal validity and enforceability of any pending purchase you may have on inKind.com, or any electronic Communications provided or business transacted between us prior to the time you withdraw your consent.

You may also elect to receive paper copies of any Communications by contacting us at the email address stated above.

Please keep us informed of any changes in your email or mailing address so that you continue to receive all Communications without interruption.

Governing Law; Venue

These Terms of Use and all matters or issues collateral thereto will be governed by, construed and enforced in accordance with the laws of the State of Delaware without regard to conflict-of-laws principles.

Any dispute or claim relating in any way to your use of inkindcapital.com, or to products or services sold or distributed by us or through us, will be resolved by binding arbitration rather than in court, with the following exceptions:

- You may assert claims in small claims court if your claims apply; and
- In the event that the arbitration agreement in these Terms of Use is for any reason held to be unenforceable, any litigation against us (except for small-claims court actions) may be commenced only in a federal or state court located within the District of Columbia, and we both consent to the jurisdiction of those courts for such purposes.

The arbitration agreement in these Terms of Use is governed by the Federal Arbitration Act (FAA), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver discussed below. State arbitration laws do not govern in any respect.

This arbitration agreement is intended to be broadly interpreted, and will survive termination of these Terms of Use. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this agreement, including, but not limited to any claim that all or any part of this agreement is void or voidable. There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual

Noble 33 - inKind Agreement – February 13, 2023

basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow these Terms of Use as a court would.

To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to: inKind, 610 W Live Oak St, Austin TX 78704, Attn: Legal. You may download the forms located at http://www.jamsadr.com. The arbitration will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures or, if applicable, its Comprehensive Arbitration Rules and Procedures, and any applicable supplemental rules including its Consumer Arbitration Standards of Minimum Fairness. The JAMS Rules are available online at http://www.jamsadr.com or by calling (800)-352-5267. Payment of all filing, administration and arbitrator fees will be governed by JAMS's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous, but in no event will we pay for attorneys' fees. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

We each agree that the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. **You agree to waive any right to a jury trial or to participate in a class action.** If this specific provision is found to be unenforceable, then the entirety of this arbitration section will be null and void and neither of us will be entitled to arbitrate our dispute.

Availability
inkind.com is not intended for use by, or distribution to, any person or entity in any jurisdiction or country where such use or distribution would be contrary to applicable law or regulation. By offering inkindcapital.com and Content, we make no distribution or solicitation to any person to use inkind.com or Content in jurisdictions where the provision of inkind.com and/or Content is prohibited by law.

Other Agreements
These Terms of Use shall be subject to any other agreements you have entered into with us.

Additional Terms
Certain sections or pages on inkind.com may contain separate terms and conditions of use, which are in addition to the terms and conditions of these Terms of Use. In the event of a conflict, those additional terms and conditions will govern for those sections or pages of inkind.com.

General Provisions
If any provision of these Terms of Use is found to be invalid or unenforceable, the provisions shall be enforced to the fullest extent possible, and the remaining provisions of these Terms of Use shall remain in full force and effect. These Terms of Use supersede any previous Terms of Use to which you and we may have been bound. These Terms of Use will be binding on, inure to the benefit of, and be enforceable against the parties and their respective successors and assigns. Neither the course of conduct between parties nor trade practice shall be deemed to modify any provision of these Terms of Use. All rights not expressly granted herein are hereby reserved. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section.